# Exhibit C

Exhibit C

Electronically Filed by Superior Court of California, County of Orange, 10/04/2019 05:15:00 PM.
DAVID H. YAMASAKI, Clerk of the Court By Sarah Loose, Deputy Clerk. 30-2019-01101802-CU-BT-CXC ROA # 9

1  **Robins Kaplan LLP**
   Roman M. Silberfeld, Bar No. (62783)
2  RSilberfeld@RobinsKaplan.com
   Bernice Conn, Bar No. (161594)
3  BConn@RobinsKaplan.com
   Michael A. Geibelson, Bar No. (179970)
4  MGeibelson@RobinsKaplan.com
   Lucas A. Messenger, Bar No. (217645)
5  LMessenger@RobinsKaplan.com
   2049 Century Park East, Suite 3400
6  Los Angeles, CA  90067
   Telephone: 310-552-0130
7  Facsimile: 310-229-5800

8  Attorneys for Plaintiffs County of Alameda, City of
   Costa Mesa, City of Anaheim, City of Santa Ana,
9  City of San Clemente, City of Encinitas, City of La
   Habra, City of La Mesa, City of Oxnard, City of
10 Placentia, and The People of the State of California

11 [Additional Counsel Listed on Signature Page]

12 (NO FEE – Cal. Gov. Code § 6103)

13

14            SUPERIOR COURT OF THE STATE OF CALIFORNIA

15                        COUNTY OF ORANGE

16

17 COUNTY OF ALAMEDA; CITY OF COSTA          Case No.
   MESA; CITY OF ANAHEIM; CITY OF SANTA
18 ANA; CITY OF SAN CLEMENTE; CITY OF         **PLAINTIFFS' FIRST AMENDED**
   ENCINITAS; CITY OF LA HABRA; CITY OF       **COMPLAINT FOR:**
19 LA MESA; CITY OF OXNARD; CITY OF
   PLACENTIA; and THE PEOPLE OF THE           **1. PUBLIC NUISANCE;**
20 STATE OF CALIFORNIA, by and through        **2. FRAUD;**
   Alameda County Counsel Donna Ziegler, Costa **3. NEGLIGENCE;**
21 Mesa City Attorney Kimberly Hall Barlow, and **4. UNJUST ENRICHMENT;**
   Anaheim City Attorney Robert Fabela, Santa Ana **5. CIVIL CONSPIRACY;**
22 City Attorney Sonia R. Carvalho, San Clemente **6. FALSE ADVERTISING; and**
   City Attorney Scott C. Smith, Encinitas City **7. NEGLIGENT FAILURE TO**
23 Attorney Leslie Devaney, La Habra City Attorney **WARN**
   Richard D. Jones, La Mesa City Attorney Glenn
24 Sabine, Oxnard City Attorney Stephen Fischer,
   Placentia City Attorney Christian Bettenhausen,
25
   Plaintiffs,
26
   v.
27
   RICHARD S. SACKLER, an individual and as
28 trustee for TRUST FOR THE BENEFIT OF
   MEMBERS OF THE RAYMOND SACKLER

---

61577634.1



1 FAMILY; JONATHAN D. SACKLER, an
individual and as trustee for TRUST FOR THE
2 BENEFIT OF MEMBERS OF THE RAYMOND
SACKLER FAMILY; MORTIMER D.A.
3 SACKLER, an individual; KATHE A.
SACKLER, an individual; ILENE SACKLER
4 LEFCOURT, an individual; BEVERLY
SACKLER, an individual and as trustee for
5 TRUST FOR THE BENEFIT OF MEMBERS OF
THE RAYMOND SACKLER FAMILY;
6 THERESA SACKLER, an individual; DAVID A.
SACKLER, an individual; CEPHALON, INC.;
7 TEVA PHARMACEUTICAL INDUSTRIES,
LTD.; TEVA PHARMACEUTICALS USA,
8 INC.; JANSSEN PHARMACEUTICALS, INC.;
JOHNSON & JOHNSON; ORTHO-MCNEIL-
9 JANSSEN PHARMACEUTICALS, INC.;
JANSSEN PHARMACEUTICA, INC.; ENDO
10 INTERNATIONAL PLC; ENDO HEALTH
SOLUTIONS INC.; ENDO
11 PHARMACEUTICALS INC.; PAR
PHARMACEUTICAL, INC.; PAR
12 PHARMACEUTICAL COMPANIES, INC.;
ALLERGAN FINANCE LLC; WATSON
13 LABORATORIES, INC.; ACTAVIS PHARMA,
INC.; ACTAVIS LLC; ALLERGAN PLC;
14 ALLERGAN, INC.; ALLERGAN USA, INC.;
MALLINCKRODT, PLC; MALLINCKRODT,
15 LLC; SPECGX LLC; MYLAN INC.; MYLAN
PHARMACEUTICALS, INC.; MYLAN
16 INSTITUTIONAL INC.; MYLAN
TECHNOLOGIES, INC.; CARDINAL HEALTH,
17 INC.; CARDINAL HEALTH 110, LLC;
AMERISOURCEBERGEN CORPORATION;
18 MCKESSON CORPORATION; CVS HEALTH
CORPORATION; CVS PHARMACY, INC.;
19 WALGREEN CO.; KAISER FOUNDATION
HOSPITALS; THRIFTY PAYLESS INC.; H.D.
20 SMITH WHOLESALE DRUG CO.; and
DOES 1-100, inclusive,
21
22                    Defendants.
23
24
25
26
27
28

61577634.1

FIRST AMENDED COMPLAINT

**14**                                                    **Exhibit C**

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

| | | |
|---|---|---|
| I. | INTRODUCTION | 1 |
| II. | THE PARTIES | 3 |
| | A.   The Plaintiffs | 3 |
| | B.   The Manufacturer Defendants | 5 |
| | The Purdue Non-Parties and Sackler Defendants | 6 |
| | Teva | 14 |
| | Janssen | 16 |
| | Endo | 17 |
| | Allergan | 18 |
| | Mallinckrodt | 20 |
| | Mylan | 21 |
| | C.   The Distributor Defendants | 22 |
| | D.   The Doe Defendants | 24 |
| | E.   Defendants' Agents, Successors, and Parent-Subsidiary Relationships | 24 |
| III. | JURISDICTION AND VENUE | 25 |
| IV. | GENERAL FACTUAL ALLEGATIONS | 25 |
| | A.   An Overview of the Opioid Epidemic | 25 |
| | B.   The Manufacturer Defendants Spread False or Misleading Information About the Safety of Opioids | 29 |
| | 1.   The Manufacturer Defendants Engaged in False and Misleading Direct Marketing of Opioids | 32 |
| | 2.   The Manufacturer Defendants Used Detailing and Speaker Programs to Spread False and Misleading Information About Opioids | 32 |
| | 3.   The Manufacturer Defendants Deceptively Marketed Opioids through Seemingly Independent Third Parties that Disseminated Unbranded Advertising Created by the Manufacturer Defendants | 35 |
| | C.   The Manufacturer Defendants' Statements about the Safety of Opioids Were Patently False | 44 |
| | 1.   Deceptive Claims of Pseudoaddiction | 51 |
| | 2.   Deceptive Minimization of Opioid Withdrawal | 54 |
| | 3.   Deceptive Claims that Opioid Dosages Could Be Increased without Added Risk | 54 |
| | D.   Deceptive Advertising of Abuse Deterrent Opioids | 57 |
| | E.   The Manufacturer Defendants Misrepresented the Benefits of Chronic Opioid Therapy | 62 |
| | F.   All Defendants Created an Illicit Market for Opioids | 73 |
| | 1.   The Distributor Defendants Negligently Failed to Control the Flow of Opioids to Plaintiffs Through Illicit Channels | 76 |

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

61577634.1

- i -

FIRST AMENDED COMPLAINT

**15**                    **Exhibit C**

   2.   The Manufacturer Defendants Negligently Failed to Control the Flow of Opioids to Plaintiffs Through Illicit Channels ............... 83

G.   The Defendants Knowingly Profited from an Interstate Opioid Crisis ................................................................................... 84

H.   Defendants' Unlawful Conduct and Breaches of Legal Duties Caused the Harm Alleged Herein and Substantial Damages...... 89

I.   The Impact of Opioid Abuse on Plaintiffs and their Residents .. 92

J.   The Statutes of Limitations Are Tolled and Defendants Are Estopped from Asserting Statutes of Limitations As Defenses .. 98

V.   FACTS PERTAINING TO DEFENDANTS' CONSPIRACY       100

A.   The Marketing Scheme ........................................................... 100

B.   The Distribution Scheme ........................................................ 104

VI.   THE SACKLER DEFENDANTS       106

A.   The Sackler Family Integrated Advertising and Medicine....... 106

B.   Purdue and the Development of OxyContin.............................. 108

C.   The Sackler Family and the Purdue Board ............................... 109

VII.   MISCELLANEOUS FACTUAL ALLEGATIONS       114

VIII.   CAUSES OF ACTION       114

FIRST CAUSE OF ACTION .............................................................. 114

SECOND CAUSE OF ACTION........................................................... 118

THIRD CAUSE OF ACTION ............................................................. 120

FOURTH CAUSE OF ACTION........................................................... 125

FIFTH CAUSE OF ACTION .............................................................. 126

SIXTH CAUSE OF ACTION .............................................................. 129

SEVENTH CAUSE OF ACTION ......................................................... 131

PRAYER FOR RELIEF ..................................................................... 132

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

61577634.1

FIRST AMENDED COMPLAINT

## I.   INTRODUCTION

1.   An epidemic of prescription opioid abuse is devastating the United States. Plaintiffs County of Alameda, City of Costa Mesa, City of Anaheim, City of Santa Ana, City of San Clemente, City of Encinitas, City of La Habra, City of La Mesa, City of Oxnard, and City of Placentia have all been particularly hard hit, causing them to suffer substantial loss of resources, economic damages, and damages to the health and welfare of their citizens.

2.   Alameda County and the cities of Costa Mesa, Anaheim, Santa Ana, San Clemente, Encinitas, La Habra, La Mesa, Oxnard, and Placentia, by and through their attorneys hereto and their respective County Counsel and City Attorneys, hereby bring this action on their own behalf for injuries suffered and on behalf of the People of the State of California (the "People," and together with the above-referenced California county and cities, the "Plaintiffs") to protect the public from false and misleading advertising, fraudulent acts, negligent acts, and a public nuisance.

3.   Opioid analgesics are widely diverted and improperly used, and the widespread abuse of opioids has resulted in a national epidemic of opioid addiction and overdose deaths.[1] The opioid epidemic is "directly related to the increasingly widespread misuse of powerful opioid pain medications."[2]

4.   This epidemic has been building for years. The conditions for its creation and acceleration were intentionally brought about by Defendants, who have made billions of dollars off the epidemic.

5.   The effects of the opioid epidemic and resulting health care crisis have been exacerbated by Defendants' efforts to conceal or minimize the risks of opioid abuse, while at the same time circumventing or ignoring any safeguards against opioid abuse.

6.   Plaintiffs have seen increased costs of, among other things: (a) medical and therapeutic care, and other treatment costs for patients suffering from opioid addiction, overdose,

---

[1] See Nora D. Volkow & A. Thomas McLellan, *Opioid Abuse in Chronic Pain—Misconceptions and Mitigation Strategies*, 374 N. Eng. J. Med. 1253 (2016).
[2] See Robert M. Califf et al., *A Proactive Response to Prescription Opioid Abuse*, 374 N. Eng. J. Med. 1480 (2016).

FIRST AMENDED COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

**Exhibit C**

1    or death; (b) counseling, treatment and rehabilitation services; (c) treatment of infants born with

2    opioid-related medical conditions; (d) welfare and foster care for children whose parents suffer

3    from opioid-related disability or incapacitation, including costs of related legal proceedings; (e)

4    public safety connected to the opioid epidemic within Plaintiffs' boundaries, including police,

5    emergency response services, and detention centers; (f) increased burden on Plaintiffs' code

6    enforcement programs; (g) re-education of doctors and patients about the appropriate use of

7    opioids; and (h) extensive clean-up of public parks, spaces, and facilities. At the same time,

8    Plaintiffs have seen a reduction to tax revenues caused by the epidemic created by the

9    Defendants. Almost every resident in Plaintiffs' communities has been affected. The resulting

10   damage to Plaintiffs and their residents was directly and foreseeably caused by Defendants'

11   actions.

12          7.      These increased costs could have been—and should have been—prevented by the

13   opioid industry. Defendants controlled the manufacture, marketing, and distribution of

14   prescription opioids. As such Defendants, and not Plaintiffs, were in the best position to protect

15   Plaintiffs and their residents from the risk of harm stemming from misuse of these products.

16   Defendants owed Plaintiffs a duty of care to act reasonably in light of that potential harm. In

17   addition to these common law duties, the opioid industry is required by California law to develop

18   and maintain a system to track suspicious orders of prescription opioids and report them under

19   16 CCR § 1782 and California Business & Professions Code §§ 4164 and 4169.1.

20          8.      Instead of acting with reasonable care and in compliance with their legal duties,

21   Defendants intentionally flooded the market with opioids and pocketed billions of dollars in the

22   process.

23          9.      At the same time, Defendants flooded the market with false statements designed

24   to persuade both doctors and patients that prescription opioids posed a low risk of addiction.

25   Those claims were false.[3]

26          10.     Defendants' actions have not only resulted in significant costs to Plaintiffs, but

27

28   [3] *See* Vivek H. Murthy, *Letter from the Surgeon General* (August 2016), available at
     http://turnthetiderx.org/ (last accessed December 18, 2017).

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

61577634.1                                    - 2 -

1   also have created a palpable climate of fear, distress, dysfunction, and chaos among their

2   residents where opioid diversion, abuse, and addiction are prevalent and where diverted opioids

3   tend to be used frequently.

4        11.    Plaintiffs therefore seek the means to abate the epidemic created by Defendants'

5   wrongful and/or unlawful conduct.

6   **II.**    **THE PARTIES**

7        **A.**    **The Plaintiffs**

8        12.    The County of Alameda, California and the People of the State of California, by

9   and through their attorneys hereto and Alameda's County Counsel, hereby bring this action on

10   Alameda County's behalf for injuries suffered and on behalf of the People of the State of

11   California to protect the public from false and misleading advertising, fraudulent acts, negligent

12   acts, and a public nuisance. Alameda County has standing to recover damages incurred because

13   of Defendants' actions and omissions. Alameda County also has standing to bring actions,

14   including, *inter alia*, public nuisance claims asserted under California law.

15        13.    The City of Costa Mesa, California and the People of the State of California, by

16   and through their attorneys hereto and Costa Mesa's City Attorney, hereby bring this action on

17   Costa Mesa's behalf for injuries suffered and on behalf of the People of the State of California to

18   protect the public from false and misleading advertising, fraudulent acts, negligent acts, and a

19   public nuisance. Costa Mesa has standing to recover damages incurred because of Defendants'

20   actions and omissions. Costa Mesa also has standing to bring actions, including, *inter alia*,

21   public nuisance claims asserted under California law.

22        14.    The City of Anaheim, California and the People of the State of California, by and

23   through their attorneys hereto and Anaheim's City Attorney, hereby bring this action on

24   Anaheim' behalf for injuries suffered and on behalf of the People of the State of California to

25   protect the public from false and misleading advertising, fraudulent acts, negligent acts, and a

26   public nuisance. Anaheim has standing to recover damages incurred because of Defendants'

27   actions and omissions. Anaheim also has standing to bring actions, including, *inter alia*, public

28   nuisance claims asserted under California law.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

FIRST AMENDED COMPLAINT

15.     The City of Santa Ana, California and the People of the State of California, by and through their attorneys hereto and Santa Ana's City Attorney, hereby bring this action on Santa Ana's behalf for injuries suffered and on behalf of the People of the State of California to protect the public from false and misleading advertising, fraudulent acts, negligent acts, and a public nuisance. Santa Ana has standing to recover damages incurred because of Defendants' actions and omissions. Santa Ana also has standing to bring actions, including, *inter alia*, public nuisance claims asserted under California law.

16.     The City of San Clemente, California and the People of the State of California, by and through their attorneys hereto and San Clemente's City Attorney, hereby bring this action on San Clemente's behalf for injuries suffered and on behalf of the People of the State of California to protect the public from false and misleading advertising, fraudulent acts, negligent acts, and a public nuisance. San Clemente has standing to recover damages incurred because of Defendants' actions and omissions. San Clemente also has standing to bring actions, including, *inter alia*, public nuisance claims asserted under California law.

17.     The City of Encinitas, California and the People of the State of California, by and through their attorneys hereto and Encinitas' City Attorney, hereby bring this action on Encinitas' behalf for injuries suffered and on behalf of the People of the State of California to protect the public from false and misleading advertising, fraudulent acts, negligent acts, and a public nuisance. Encinitas has standing to recover damages incurred because of Defendants' actions and omissions. Encinitas also has standing to bring actions, including, *inter alia*, public nuisance claims asserted under California law.

18.     The City of La Habra, California and the People of the State of California, by and through their attorneys hereto and La Habra's City Attorney, hereby bring this action on La Habra's behalf for injuries suffered and on behalf of the People of the State of California to protect the public from false and misleading advertising, fraudulent acts, negligent acts, and a public nuisance. La Habra has standing to recover damages incurred because of Defendants' actions and omissions. La Habra also has standing to bring actions, including, *inter alia*, public nuisance claims asserted under California law.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

61577634.1

- 4 -

FIRST AMENDED COMPLAINT

Exhibit C

1    19.    The City of La Mesa, California and the People of the State of California, by and

2    through their attorneys hereto and La Mesa's City Attorney, hereby bring this action on La

3    Mesa's behalf for injuries suffered and on behalf of the People of the State of California to

4    protect the public from false and misleading advertising, fraudulent acts, negligent acts, and a

5    public nuisance. La Mesa has standing to recover damages incurred because of Defendants'

6    actions and omissions. La Mesa also has standing to bring actions, including, *inter alia*, public

7    nuisance claims asserted under California law.

8    20.    The City of Oxnard, California and the People of the State of California, by and

9    through their attorneys hereto and Oxnard's City Attorney, hereby bring this action on Oxnard's

10   behalf for injuries suffered and on behalf of the People of the State of California to protect the

11   public from false and misleading advertising, fraudulent acts, negligent acts, and a public

12   nuisance. Oxnard has standing to recover damages incurred because of Defendants' actions and

13   omissions. Oxnard also has standing to bring actions, including, *inter alia*, public nuisance

14   claims asserted under California law.

15   21.    The City of Placentia, California and the People of the State of California, by and

16   through their attorneys hereto and Placentia's City Attorney, hereby bring this action on

17   Placentia's behalf for injuries suffered and on behalf of the People of the State of California to

18   protect the public from false and misleading advertising, fraudulent acts, negligent acts, and a

19   public nuisance. Placentia has standing to recover damages incurred because of Defendants'

20   actions and omissions. Placentia also has standing to bring actions, including, *inter alia*, public

21   nuisance claims asserted under California law.

22   **B.     The Manufacturer Defendants**

23   22.    The Manufacturer Defendants are defined below. At all relevant times, the

24   Manufacturer Defendants have packaged, distributed, supplied, sold, placed into the stream of

25   commerce, labeled, described, marketed, advertised, promoted, and purported to warn or

26   purported to inform prescribers and users regarding the benefits and risks associated with the use

27   of prescription opioid drugs. Also at all relevant times, the Manufacturer Defendants have

28   manufactured and sold prescription opioids without fulfilling their legal duty to prevent

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

61577634.1                        - 5 -

1   diversion and report suspicious orders.

2   **The Purdue Non-Parties and Sackler Defendants**

3   23.   Non-party Purdue Pharma L.P. is a limited partnership organized under the laws

4   of Delaware, and on September 15, 2019, Purdue Pharma L.P. filed a voluntary petition under

5   Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the

6   Southern District of New York—*In re Purdue Pharma, L.P.*, Case No. 19-23649.

7   24.   Non-party Purdue Pharma Inc. is a New York corporation with its principal place

8   of business in Stamford, Connecticut, and is the general partner of Purdue Pharma L.P. Along

9   with Purdue Pharma L.P., Purdue Pharma Inc. filed a voluntary petition on September 15, 2019,

10   under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court

11   for the Southern District of New York—*In re Purdue Pharma Inc.*, Case No. 19-23648.

12   25.   Non-party The Purdue Frederick Company, Inc. is a Delaware corporation with

13   its principal place of business in Stamford, Connecticut.

14   26.   Non-party Purdue Holdings L.P. is a Delaware limited partnership and wholly

15   owns the limited partnership interest in Purdue Pharma L.P.

16   27.   Non-party P.F. Laboratories, Inc. ("PF Labs") is a New Jersey corporation with

17   its principal place of business in Stamford, Connecticut (Purdue Pharma L.P., Purdue Pharma

18   Inc., Purdue Holdings L.P., The Purdue Frederick Company, Inc., and PF Labs are referred to

19   collectively herein as "Purdue").

20   28.   Purdue manufactures, promotes, sells, and distributes opioids such as OxyContin,

21   MS Contin, Dilaudid/Dilaudid HP, Butrans, Hysingla ER,[4] and Targiniq ER in the United States,

22   including California. OxyContin is Purdue's best-selling opioid. Since 2009, Purdue's annual

23   sales of OxyContin have fluctuated between $2.47 billion and $2.99 billion, up four-fold from its

24   2006 sales of $800 million. OxyContin constitutes roughly 30% of the entire market for

25   analgesic drugs (painkillers).

26

27   [4] Long-acting or extended release ("ER" or "ER/LA") opioids are designed to be taken once or
twice daily. Short-acting opioids, also known as immediate release ("IR") opioids, last for
28   approximately 4-6 hours.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

61577634.1                          - 6 -

FIRST AMENDED COMPLAINT

29.     In May 2007, Purdue entered into a stipulated final judgment with the State of California, acting by and through the California Attorney General, based principally on Purdue's direct promotion of OxyContin through May 8, 2007, which is the effective date of the stipulated final judgment (the "2007 Purdue Judgment"). The 2007 Purdue Judgment ordered that Purdue "shall not make any written or oral claim that is false, misleading, or deceptive" in the promotion or marketing of OxyContin. The 2007 Purdue Judgment further required that Purdue provide fair balance regarding risks and benefits in all promotion of OxyContin, including about the risks of taking higher doses for longer periods and the risks of addiction, overdose, and death.

30.     The 2007 Purdue Judgment further required that Purdue establish and follow an abuse and diversion detection program to identify high-prescribing doctors who show signs of inappropriate prescribing, stop promoting drugs to them, and report them to the authorities:

31.     Upon identification of potential abuse or diversion," Purdue was required by the 2007 Purdue Final Judgment to conduct an inquiry and take appropriate action, "which may include ceasing to promote Purdue products to the particular Health Care Professional, providing further education to the Health Care Professional about appropriate use of opioids, or providing notice of such potential abuse or diversion to appropriate medical, regulatory or law enforcement authorities.

32.     Through this Complaint, the People do not seek to enforce any provision of the 2007 Purdue Judgment. The People also are not seeking any relief against Purdue entities under any state consumer protection law (as that term is defined by section (I)(1)(M) and footnote 1 of 2007 Purdue Judgment) or based on any conduct by Purdue relating to its promotional and marketing practices regarding OxyContin at any time up to and including May 8, 2007. The People, however, do assert claims arising under California law independent of the 2007 Purdue Judgment, and seek civil penalties and injunctive relief as afforded by those laws.

33.     At all relevant times, Purdue has been controlled by members of the Sackler family who have been and continue to be the ultimate intended beneficiaries of virtually all of Purdue's profit distributions. Together, members of the Sackler family always held the controlling majority of the board of Purdue Pharma, Inc. (the "Purdue Board"), which functioned

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

as the nexus of decision-making for all Purdue entities and gave them full power over both Purdue Pharma Inc. and Purdue Pharma L.P. They directed deceptive sales and marketing practices at California from deep within Purdue, sending hundreds of orders to executives and line employees. From the money that Purdue collected selling opioids, they paid themselves and their family billions of dollars. The individual Defendants named in this action are the remaining living Sackler family members who served on the Purdue Board.

34.     Defendant Richard S. Sackler is a natural person residing in Travis County, Texas. He is the son of Purdue founder Raymond Sackler, and from 1990 through 2018, served as a member of the board of directors of the Purdue Board. Richard S. Sackler was also Purdue's head of research and development from at least 1990 through 1999, and its president from 1999 through 2003. Richard S. Sackler is also a trustee of The Trust for the Benefit of Members of the Raymond Sackler Family (the "Raymond Sackler Trust"), which is the 50% direct or indirect beneficial owner of Purdue and Purdue related entities and the recipient of 50% of the profits from the sale of opioids by Purdue and Purdue-related entities.

35.     Defendant Jonathan D. Sackler is a natural person residing in Fairfield County, Connecticut. He is the son of Purdue founder Raymond Sackler, and was a member of the board of directors of Purdue and Purdue-related entities from 1990 through 2018. Jonathan D. Sackler is also a trustee of the Raymond Sackler Trust.

36.     Defendant Mortimer D.A. Sackler is a natural person residing in New York County, New York. He is the son of Purdue founder Mortimer Sackler. Mortimer D.A. Sackler and was a member of the board of directors of Purdue and Purdue-related entities from 1993 through 2018.

37.     Defendant Kathe A. Sackler is a natural person residing in Fairfield County, Connecticut. She is the daughter of Purdue founder Mortimer Sackler, and was a member of the board of directors of Purdue and Purdue-related entities from 1990 through 2018.

38.     Defendant Ilene Sackler Lefcourt is a natural person residing in New York County, New York. She is the daughter of Purdue founder Mortimer Sackler and was a member of the board of directors of Purdue and Purdue-related entities from 1990 through 2018.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

FIRST AMENDED COMPLAINT

39.     Defendant Beverly Sackler is a natural person residing in Fairfield County, Connecticut. She is the widow of Purdue founder Raymond Sackler, and has served as a member of the board of directors of Purdue and Purdue-related entities from approximately 1995 through 2017. Beverly Sackler is also a trustee of the Raymond Sackler Trust.

40.     Defendant Theresa Sackler is a natural person residing in New York County, New York. She is the widow of Purdue founder Mortimer Sackler, and was a member of the board of directors of Purdue and Purdue-related entities from 1993 through 2018.

41.     Defendant David A. Sackler is a natural person residing in New York County, New York. He is the son of Richard Sackler (and the grandson of Raymond Sackler), and served as a member of the board of directors of Purdue and Purdue-related entities from 2012 through 2018. Together, Defendants Richard S. Sackler, Jonathan D. Sackler, Mortimer D.A. Sackler, Kathe A. Sackler, Ilene Sackler Lefcourt, Beverly Sackler, Theresa Sackler, David A. Sackler and the Trust for the Benefit of the Members of the Raymond Sackler Family will hereinafter be collectively referred to as the "Sacklers" or the "Sackler Defendants."

42.     Non-party Rhodes Pharmaceuticals L.P. ("Rhodes") is a Delaware limited partnership with its principal place of business in Coventry, Rhode Island. Along with Purdue Pharma L.P. and Purdue Pharma Inc., Rhodes Pharmaceuticals L.P. filed a voluntary petition on September 16, 2019, under Chapter 11 of the United States Bankruptcy Code in the United States Bankruptcy Court for the Southern District of New York—*In re Rhodes Pharmaceuticals L.P..*, Case No. 19-23667. In or around November 2007, in the immediate aftermath of the 2007 Purdue Judgment, the Sackler Defendants established Rhodes, which markets a generic version of OxyContin. According to a former senior manager at Purdue, "Rhodes was set up as a 'landing pad' for the Sackler family in 2007 to prepare for the possibility that they would need to start afresh following the crisis engulfing OxyContin."[5] The Sackler Defendants' involvement in Rhodes and Rhodes' relationship to Purdue was not publicly known until the September 9, 2018, publication of an article in the Financial Times. According to the article, "Rhodes has not been

---

[5] David Crow, *How Purdue's 'one-two' punch fuelled the market for opioids*, Financial Times (Sept. 9, 2018), https://www.ft.com/content/8e64ec9c-b133-11e8-8d14-6f049d06439c.

61577634.1                                  - 9 -

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

FIRST AMENDED COMPLAINT

25                                          **Exhibit C**

1  publicly connected to the Sackler family before, and their ownership of the company may

2  weaken one of their longstanding defences: that they cannot be held responsible for the opioid

3  crisis because Purdue accounts for a small fraction of the overall prescriptions."[6] Staff from

4  Rhodes and Purdue use the same employee handbook and "little distinction is made internally

5  between the two companies." Rhodes is included in the defined term "Purdue," which is defined

6  in paragraph 27 above.

7      43.    On information and belief, the Sackler Defendants also used a number of known

8  and unknown entities as vehicles to transfer funds from Purdue directly or indirectly to

9  themselves, including PLP Associates Holdings L.P., Rosebay Medical Company L.P., and

10  Beacon Company.

11      44.    On information and belief, at all relevant times, and at least through the end of

12  2018, the Sackler Defendants:

13      a.    Oversaw and controlled Purdue's sales representatives and monitored their

14  emails while receiving extensive, detailed reports, including regarding the number of

15  sales representatives and the total number of prescribers visited each quarter. Richard S.

16  Sackler testified Purdue primarily promoted its opioids through its sales representatives

17  and regular visits from representatives were the key to get doctors to continue to

18  prescribe the drugs. The Purdue Board knew which drugs the sales representatives were

19  to promote, the number of visits representatives made to doctors, how much each visit

20  cost the company, and the quarterly plans for sales visits. The Purdue Board approved

21  specific hiring plans for their sales representatives, hiring directors, and regional

22  managers, and created sales territories for representatives to target doctors.

23      b.    Oversaw and controlled Purdue's deceptive sales campaign and directed

24  Purdue to hire hundreds more sales representatives to visit doctors thousands more times.

25  They insisted that sales representatives repeatedly visit the most prolific prescribers.

26  They directed representatives to encourage doctors to prescribe more of the highest doses

27

28  [6] Id.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

61577634.1  - 10 -

FIRST AMENDED COMPLAINT

of opioids. They studied unlawful tactics to keep patients on opioids longer and then ordered staff to use them. They asked for detailed reports about doctors suspected of misconduct, how much money Purdue made from them, and how few of them Purdue had reported to the authorities.

c.    Oversaw and controlled the specific tactics used by Purdue sales representatives to sell opioids.

d.    Oversaw and controlled the promotional claims that Purdue representatives used during sales visits. The directors and CEO reviewed reports that Purdue sales representatives were deceptively promoting opioids as an appropriate treatment for minor pain and engaging in other unlawful marketing techniques.

e.    Oversaw and controlled Purdue's strategy of making false claims that its opioids had less risk of abuse.

f.    Oversaw and controlled Purdue's strategy to have sales representatives tell doctors and pharmacists that they could prescribe opioids to "trusted" patients without risk of addiction.

g.    Oversaw and controlled Purdue's training of sales representatives to target vulnerable populations and encourage doctors to put them on opioids, without disclosing the risks. Purdue deceptively promoted opioids for elderly patients, veterans, patients who had never taken opioids, and patients with osteoarthritis.

h.    Oversaw and controlled Purdue's research, and received detailed and specific reports concerning Purdue opioids being used for "opioid-naïve" patients and patients with osteoarthritis.

i.    Oversaw and controlled Purdue's strategy of making deceptive claims about research by its own employees, designed to "highlight" the risks of non-opioid drugs like Tylenol and ibuprofen. In connection with this strategy, Purdue paid for deceptive propaganda by groups designed to appear independent from Purdue, promoting the message that NSAIDs and Tylenol have "life-threatening" side effects, but opioids are "the gold standard of pain medications."

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

61577634.1                                    - 11 -

j. Oversaw and controlled Purdue's strategy of paying high-prescribing doctors to promote its opioids. The Purdue Board was aware of the amount paid to specific high prescribers and the return on investment it received from these payments. The Purdue Board knew Purdue allowed a gift spending limit of $750 per doctor per year and was told paying doctors was a high-risk activity that could result in improper off-label use or other promotional activity for opioids.

k. Were directly informed of "Reports of Concern" filed by Purdue sales representatives regarding high-prescribing doctors, as well as "field inquiries" in response to the reports.

l. Oversaw and controlled Purdue's focus on encouraging patients to use higher and higher doses of opioids. The Purdue Board oversaw measures to counteract public health initiatives encouraging doctors to consult with pain specialists before prescribing high opioid doses.

m. Oversaw and controlled Purdue's plan to keep patients hooked on opioids for longer periods of time through higher doses. The Purdue Board received thorough reports of how many patients remained on Purdue opioids for extended lengths of time. Internal documents indicated patients on higher doses used the product for longer amounts of time, creating greater chances of addiction and abuse. The Purdue Board was presented with a plan to create workshops and give specific direction to representatives about this link and knew increasing opioid use was a focus point of the company.

n. Oversaw and controlled Purdue's use of "savings cards" to get patients on Purdue opioids for longer periods of time. The Purdue Board knew exactly how many thousands of cards were used each quarter and the Return on Investment. The goal of the program was for patients "to remain on therapy longer."

o. Oversaw and controlled Purdue's strategy to target prescribers without special knowledge of opioids. Purdue proceeded with this strategy despite the DEA expressing concern Purdue was marketing its opioids to doctors who were not appropriately trained in pain management. Purdue's leadership also oversaw a strategy of

FIRST AMENDED COMPLAINT

**28**                                                        **Exhibit C**

targeting elderly patients and used images of older patients to target healthcare professionals who practiced in long-term care. The directors and CEO knew or should have known this strategy was deceptive and increased the risk of addiction and overdose.

p.      Oversaw and controlled Purdue's strategy to steer patients away from safer alternatives with the false claim that its opioids improve patients' "quality of life."

q.      Were aware of a plan to steer patients away from safer pain-management medicines, which involved efforts to emphasize the danger of acetaminophen-based pain medication to the liver. These efforts included deceptive websites the New York Attorney General specifically held to be misleading.

r.      Oversaw and controlled Purdue's efforts to generate deceptive marketing materials designed to obscure the risk of addiction and even the fact that Purdue was behind the campaign.

s.      Oversaw and controlled Purdue's strategy to convince doctors that their patients suffered from "pseudoaddiction" when their patients showed signs of addiction to Purdue's opioids, and urging doctors to respond to pseudoaddiction by increasing the opioid dose.

t.      Oversaw and controlled Purdue's response to thousands of harm reports from patients.

u.      Oversaw and controlled distributions of billions of dollars of Purdue's profits to themselves and other members of the Sackler family.

45.     Each of the Sackler Defendants knew and intended that the sales representatives would not tell doctors and patients the truth about Purdue's opioids. Indeed, they knew and intended these unfair and deceptive tactics achieved their purpose by concealing the truth.

46.     Each of the Sackler Defendants knew and intended that prescribers, pharmacists, and patients in California would rely on Purdue's deceptive sales campaign to prescribe, dispense, and take Purdue opioids. Securing that reliance was the purpose of the sales campaign.

47.     Each of the Sackler Defendants knew and intended that Purdue staff reporting to them would pay top prescribers tens of thousands of dollars to encourage other doctors to write

FIRST AMENDED COMPLAINT

**29**                                                                 **Exhibit C**

1    dangerous prescriptions in California.

2        48.    Each of the Sackler Defendants knew and intended that Purdue staff reporting to

3    them would reinforce these misleading acts through thousands of additional acts in California,

4    including by sending deceptive publications to California doctors and deceptively promoting

5    Purdue opioids at medical schools and physicians' offices across California.

6        49.    Each of the Sackler Defendants knowingly and intentionally took money from

7    Purdue's deceptive business in California.

8        50.    Each of the Sackler Defendants knowingly and intentionally sought to conceal his

9    or her misconduct.

10       51.    The Sackler Defendants are included in the defined term "Purdue," which is

11    defined in paragraph 27 above.

12                                    **Teva**

13       52.    Defendant Teva Pharmaceutical Industries, Ltd. ("Teva Ltd.") is an Israeli

14    corporation with its principal place of business in Petah Tikva, Israel. Shares of Teva Ltd. are

15    traded on the New York Stock Exchange (symbol: TEVA). In its most recent Form 10-K filed

16    with the SEC, Teva Ltd. stated that it does business in the United States through its North

17    America Segment, which accounted for approximately 50% of the company's $18.9 billion in

18    net revenue during the year ended December 31, 2018. Teva Ltd. regularly conducts business in

19    California.

20       53.    Defendant Teva Pharmaceuticals USA, Inc. ("Teva USA") is a wholly owned

21    subsidiary of Teva Ltd. and is a Delaware corporation with its principal place of business in

22    Pennsylvania.

23       54.    Defendant Cephalon, Inc. ("Cephalon") is a Delaware corporation with its

24    principal place of business in Frazer, Pennsylvania, and it was acquired by Teva Ltd. in October

25    2011. Cephalon manufactures, promotes, sells and distributes opioids such as Actiq and Fentora

26    in the United States, including California. Significantly, the FDA only approved Actiq and

27    Fentora for the management of breakthrough cancer pain in patients who are tolerant to around-

28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

61577634.1                           - 14 -

1    the-clock opioid therapy for their underlying persistent cancer pain. In 2008, Cephalon pleaded

2    guilty to a criminal violation of the Federal Food, Drug and Cosmetic Act for its misleading

3    promotion of Actiq and two other drugs and agreed to pay $425 million.

4         55.    Teva Ltd., Teva USA, and Cephalon work together closely to market and sell

5    Cephalon products in the United States. Teva Ltd. conducts all sales and marketing activities for

6    Cephalon in the United States through Teva USA and has done so since its October 2011

7    acquisition of Cephalon. Teva Ltd. and Teva USA hold out Actiq and Fentora as Teva products

8    to the public. Teva USA sells all former Cephalon-branded products through its "specialty

9    medicines" division. The FDA approved prescribing information and medication guide, which is

10   distributed with Cephalon opioids marketed and sold in California, discloses that the guide was

11   submitted by Teva USA, and directs physicians to contact Teva USA to report adverse events.

12   Teva Ltd. has directed Cephalon to disclose that it is a wholly-owned subsidiary of Teva Ltd. on

13   prescription savings cards distributed in California, indicating Teva Ltd. would be responsible

14   for covering certain co-pay costs.

15        56.    All of Cephalon's promotional websites, including those for Actiq and Fentora,

16   prominently display Teva Ltd.'s logo. Teva Ltd.'s financial reports list Cephalon's and Teva

17   USA's sales as its own, and its year-end report for 2012—the year immediately following the

18   Cephalon acquisition—attributed a 22% increase in its specialty medicine sales to "the inclusion

19   of a full year of Cephalon's specialty sales." Through interrelated operations like these, Teva

20   Ltd. operates in California and the rest of the United States through its subsidiaries Cephalon and

21   Teva USA. The United States is the largest of Teva Ltd.'s global markets, representing 53% of

22   its global revenue in 2015, and, were it not for the existence of Teva USA and Cephalon, Teva

23   Ltd. would conduct those companies' business in the United States itself. Upon information and

24   belief, Teva Ltd. directs the business practices of Cephalon and Teva USA, and their profits

25   inure to the benefit of Teva Ltd. as controlling shareholder. Teva Branded Pharmaceutical

26   Products R&D, Teva Neuroscience, Teva Parenteral Medicines, Teva Pharmaceuticals USA, and

27   Teva Sales and Marketing are registered to do business in California with the California

28   Secretary of State.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

1    57.    Defendant Actavis Pharma, Inc. (f/k/a Watson Pharma, Inc.) is a Delaware

2    corporation with its principal place of business in New Jersey. Actavis manufactures, promotes,

3    sells, and distributes opioids, including the branded drug Kadian, a generic version of Kadian,

4    and generic versions of Duragesic and Opana, in the United States, including California. Actavis

5    acquired the rights to Kadian from King Pharmaceuticals, Inc., on December 30, 2008 and began

6    marketing Kadian in 2009.

7    58.    Defendant Actavis LLC (f/k/a Actavis, Inc.) is a Delaware limited liability

8    company with its principal placed of business in New Jersey.

9    59.    Defendant Watson Laboratories, Inc. is a Nevada corporation with its principal

10   place of business in Corona, California. Watson Laboratories, Inc. and Actavis Pharma, Inc. are

11   registered to do business in California with the California Secretary of State. Between 2000 and

12   2015, Watson Laboratories, Inc. held the ANDAs for Norco and was the manufacturer of the

13   drug. Watson Laboratories, Inc. also was the ANDA holder of various generic opioids.

14   60.    In August 2016, Teva Ltd. purchased Allergan plc's worldwide generic opioid

15   business, and in the process, acquired Actavis Pharma, Inc., Actavis LLC, and Watson

16   Laboratories, Inc. from Allergan plc. Thus, since August 2016, Teva Ltd. has owned the generic

17   opioids business that was formerly owned and operated by the Allergan/Actavis entities. Teva

18   Ltd. uses each of these Defendants—Actavis LLC, Actavis Pharma, Inc., and Watson

19   Laboratories, Inc.—to market and sell its drugs in the United States (together, Teva Ltd., Teva

20   USA, Cephalon, Watson Laboratories, Inc., Actavis Pharma, Inc., and Actavis LLC are referred

21   to as "Teva," except that references to Teva do not encompass Actavis Pharma, Inc., Actavis

22   LLC, and Watson Laboratories, Inc. prior to their purchase by Teva Ltd. in August 2016).

23                                    **Janssen**

24   61.    Defendant Johnson & Johnson ("J&J"), a New Jersey corporation with its

25   principal place of business in New Brunswick, New Jersey.

26   62.    Defendant Janssen Pharmaceuticals, Inc. ("Janssen Pharmaceuticals") is a

27   Pennsylvania corporation with its principal place of business in Titusville, New Jersey, and it is a

28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

FIRST AMENDED COMPLAINT

wholly owned subsidiary of J&J. Jansen Pharmaceuticals was formerly known as Ortho-McNeil-Janssen Pharmaceuticals, Inc., which in turn was formerly known as Janssen Pharmaceutica, Inc. Upon information and belief, J&J is the only company that owns more than 10% of Janssen Pharmaceuticals' stock, and corresponds with the FDA regarding Janssen's products. Upon information and belief, J&J controls the sale and development of Janssen Pharmaceutical's products and Janssen's profits inure to J&J's benefit.

63.     Defendant Ortho-McNeil-Janssen Pharmaceuticals, Inc. ("Ortho-McNeil"), now known as Janssen Pharmaceuticals, is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey.

64.     Defendant Janssen Pharmaceutica, Inc. ("Janssen Pharmaceutica"), now known as Janssen Pharmaceuticals, is a Pennsylvania corporation with its principal place of business in Titusville, New Jersey (together, Janssen Pharmaceuticals, Inc., Ortho-McNeil-Janssen Pharmaceuticals, Inc., Janssen Pharmaceutica, Inc., and J&J are referred to as "Janssen").

65.     Janssen manufactures, promotes, sells, and distributes drugs in the United States, including California, including the opioid Duragesic (fentanyl). Before 2009, Duragesic accounted for at least $1 billion in annual sales. Until January 2015, Janssen developed, marketed, and sold the opioids Nucynta and Nucynta ER. Together, Nucynta and Nucynta ER accounted for $172 million in sales in 2014.

### Endo

66.     Defendant Endo International plc ("Endo International") is an Irish public limited company, with global headquarters in Dublin, Ireland and U.S. headquarters in Malvern, Pennsylvania. Endo International operates in the United States as Endo Pharmaceuticals.

67.     Defendant Endo Health Solution Inc. ("EHS") is a Delaware corporation with its principal place of business in Malvern, Pennsylvania.

68.     Defendant Endo Pharmaceuticals, Inc. ("EPI") is a wholly owned subsidiary of EHS and is a Delaware corporation with its principal place of business in Malvern, Pennsylvania.

FIRST AMENDED COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

69.     Defendant Par Pharmaceutical, Inc. is a Delaware corporation with its principal place of business located in Chestnut Ridge, New York. Par Pharmaceutical, Inc. is a wholly owned subsidiary of Par Pharmaceutical Companies, Inc.

70.     Defendant Par Pharmaceutical Companies, Inc., formerly known as Par Pharmaceutical Holdings, Inc., is a Delaware corporation with its principal place of business located in Chestnut Ridge, New York. Par Pharmaceutical, Inc. and Par Pharmaceutical Companies, Inc. are referred to collectively "Par Pharmaceutical." Par Pharmaceutical was acquired by Endo International plc in September 2015 and is an operating company of Endo International (together, Endo International, EHS, EPI, and Par Pharmaceutical are referred to collectively as "Endo").

71.     Endo develops, markets, and sells prescription drugs, including the opioids Opana/Opana ER, Percodan, Percocet, and Zydone, in the United States, including California. In 2012, opioids made up roughly $403 million of Endo's overall revenues of $3 billion. Opana ER yielded $1.15 billion in revenue from 2010 and 2013, and accounted for 10% of Endo's total revenue in 2012. Endo also manufactures and sells generic opioids such as oxycodone, oxymorphone, hydromorphone, and hydrocodone products in the United States, including California, by itself and through its subsidiary, Qualitest Pharmaceuticals, Inc. Endo Medical (SA) International Trade Co., is registered to do business in California with the California Secretary of State.

**Allergan**

72.     Defendant Allergan plc, formerly known as Actavis plc, is a public limited company incorporated in Ireland with its principal place of business in Dublin, Ireland. In November 2012, Actavis, Inc. and Watson Pharmaceuticals, Inc. merged, and the combined company changed its name first to Actavis, Inc. as of January 2013, and then later Actavis plc in October 2013. Actavis plc acquired Allergan, Inc. in March 2015, and the combined company changed its name to Allergan plc in June 2015. Actavis plc had the same corporate headquarters both before and after the merger; Actavis plc had the same website as Actavis, Inc.; and Actavis

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

FIRST AMENDED COMPLAINT

34                                                     **Exhibit C**

1    plc maintained all of Actavis Inc.'s officers in the same positions. *See City of Chicago v. Purdue*

2    *Pharma L.P.*, et al., No. 14-4361, 2015 WL 2208423, at *7, 2015 U.S. Dist. LEXIS 60587, at

3    *23-24 (N.D. Ill. May 8, 2015). Shares of Allergan plc are traded on the New York Stock

4    Exchange (symbol: AGN). In its most recent Form 10-K filed with the SEC, Allergan plc stated

5    that it does business in the U.S. through its US Specialized Therapeutics and US General

6    Medicine segments, which generated nearly 80 percent of the company's $15.8 billion in net

7    revenue during the year ended December 31, 2018. Allergan plc regularly conducts business in

8    California.

9         73.    Defendant Allergan, Inc. is a Delaware corporation with its principal place of

10   business in Irvine, California and is a wholly owned subsidiary of Allergan plc. Allergan, Inc.

11   currently holds the ANDAs for Norco and is currently listed as the labeler for Norco by the U.S.

12   Food & Drug Administration.

13        74.    Defendant Allergan USA, Inc. is a Delaware corporation with its principal place

14   of business in Madison, New Jersey and is a wholly owned subsidiary of Allergan plc. Allergan

15   USA, Inc. and Allergan, Inc. are registered to do business in California with the California

16   Secretary of State.

17        75.    Defendant Allergan Finance, LLC (f/k/a Actavis, Inc. f/k/a Watson

18   Pharmaceuticals, Inc.) is a Nevada limited liability company that exists for the purpose of

19   holding shares of other companies that manufacture and distribute prescription pharmaceuticals.

20   Its sole member is Allergan W.C. Holding Inc. f/k/a Actavis W.C. Holding Inc., a Delaware

21   corporation with its principal place of business in Madison, New Jersey. In 2008, Actavis, Inc.

22   (n/k/a Allergan Finance, LLC), acquired the opioid Kadian through its subsidiary, Actavis

23   Elizabeth LLC, which had been the contract manufacturer of Kadian since 2005. Since 2008,

24   Kadian's label has identified the following entities as the manufacturer or distributor of Kadian:

25   Actavis Elizabeth LLC, Actavis Kadian LLC, Actavis Pharma, Inc., and Allergan USA, Inc.

26   Currently, Allergan USA, Inc. is contracted with UPS SCS, Inc. to distribute Kadian on its

27   behalf.

28        76.    Prior to their sale to Teva Ltd. in August 2016 described in paragraphs 57-60

61577634.1                                    - 19 -

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

1  above, Defendants Actavis Pharma, Inc., Actavis LLC, and Watson Laboratories, Inc. were

2  owned by Allergan plc (together, and in the period prior to the merger with Allergan, Inc. in

3  March 2015, Actavis plc, Actavis, Inc., Actavis LLC, Actavis Pharma, Inc., Watson

4  Pharmaceuticals, Inc., Watson Pharma, Inc., and Watson Laboratories, Inc. are referred to herein

5  as "Actavis").

6      77.    During the period prior to their sale to Teva Ltd., Defendants Actavis Pharma,

7  Inc., Actavis LLC, and Watson Laboratories, Inc. were part of the same corporate family as

8  Allergan Finance LLC, and sold and marketed opioids as part of a coordinated strategy to sell

9  and market the branded and generic opioids of Allergen Finance, LLC, Actavis Pharma, Inc.,

10  and Actavis LLC (together, Allergan plc, Allergan, Inc., Allergan USA, Inc., Allergan Finance,

11  LLC, Actavis Pharma, Inc., Actavis LLC, and Watson Laboratories, Inc. are referred to

12  collectively as "Allergan," except that references to Allergan do not encompass Actavis Pharma,

13  Inc., Actavis LLC, and Watson Laboratories, Inc. after their sale to Teva Ltd. in August 2016).

14      78.    Allergan manufactures, promotes, sells, and distributes opioids, including the

15  branded drug Norco in the United States, including California.

16                                    **Mallinckrodt**

17      79.    Defendant Mallinckrodt, plc is an Irish public limited company headquartered in

18  Staines-upon-Thames, United Kingdom, with its U.S. headquarters in St. Louis, Missouri.

19  Mallinckrodt, plc operates within the United States as Mallinckrodt Pharmaceuticals. Shares of

20  Mallinckrodt plc are traded on the New York Stock Exchange (symbol: MNK). In its most recent

21  Form 10-K filed with the United States Securities and Exchange Commission ("SEC"),

22  Mallinckrodt plc stated that its products compete primarily in the U.S. market, which accounted

23  for almost 90% of the company's $3.2 billion in net sales during the fiscal year ended December

24  28, 2018.

25      80.    Defendant Mallinckrodt, LLC is a limited liability company organized and

26  existing under the laws of the State of Delaware. Mallinckrodt, LLC is a wholly owned

27  subsidiary of Mallinckrodt, plc.

28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

61577634.1                          - 20 -

81.     Defendant SpecGx LLC is a Delaware limited liability company with its headquarters in Clayton, Missouri, and it is a wholly-owned subsidiary of Mallinckrodt plc. (together, Mallinckrodt, plc, Mallinckrodt, LLC, and SpecGx LLC are referred to as "Mallinckrodt").

82.     Mallinckrodt manufactures, markets, and sells drugs in the United States including generic oxycodone, of which it is one of the largest manufacturers. In July 2017, Mallinckrodt agreed to pay $35 million to settle allegations brought by the Department of Justice that it failed to detect and notify the DEA of suspicious orders of controlled substances. Mallinckrodt U.S. Holdings, Mallinckrodt ARD Inc., Mallinckrodt Enterprise Holdings, and Mallinckrodt Hospital Products are registered to do business in California with the California Secretary of State.

### Mylan

83.     Defendant Mylan Inc. (f/k/a Mylan Laboratories Inc.) is a Pennsylvania corporation with its principal place of business in Canonsburg, Pennsylvania and is indirectly, wholly owned by Mylan N.V., a publicly-held company.

84.     Defendant Mylan Pharmaceuticals, Inc. is a West Virginia corporation with its principal place of business in Canonsburg, Pennsylvania. Mylan Pharmaceuticals, Inc. is a wholly-owned subsidiary of Mylan Inc.

85.     Defendant Mylan Institutional Inc. is an Illinois corporation with its principal place of business in Canonsburg, Pennsylvania, and it is a wholly-owned subsidiary of Mylan Inc.

86.     Defendant Mylan Technologies, Inc. (f/k/a Bertek, Inc.) is a West Virginia corporation headquartered in St. Albans, Vermont and is a wholly-owned subsidiary of Mylan Inc. (together, Mylan Inc., Mylan Pharmaceuticals, Inc., Mylan Institutional Inc., and Mylan Technologies, Inc. are referred to as "Mylan"). At all times relevant to this Complaint, Mylan manufactured, promoted, sold, and distributed generic opioid pharmaceutical products to the United States and California.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

FIRST AMENDED COMPLAINT

87. Collectively, the Sackler Defendants, Teva, Janssen, Endo, Allergan, Mallinckrodt, and Mylan are the "Manufacturer Defendants."

**C. The Distributor Defendants**

88. Defendant Cardinal Health, Inc. is a publicly traded company incorporated under the laws of Ohio and with a principal place of business in Ohio. Cardinal distributes prescription opioids to providers and retailers, including in California. Cardinal has engaged in consensual commercial dealings with Plaintiffs and their residents, and has purposefully availed itself of the advantages of conducting business with and within Plaintiffs' borders. Cardinal is in the chain of distribution of prescription opioids.

89. Defendant Cardinal Health 110, LLC is a Delaware limited liability company with its principal place of business in Dublin, Ohio (together, Cardinal Health, Inc. and Cardinal Health 110, LLC are referred to herein as "Cardinal"). Along with Cardinal Health 100, Cardinal Health 127, and Cardinal Health 201, Cardinal Health 110, LLC is registered to do business in California with the California Secretary of State

90. Defendant AmerisourceBergen Corporation ("AmerisourceBergen") is a publicly traded company incorporated under the laws of Delaware and with a principal place of business in Pennsylvania. AmerisourceBergen distributes prescription opioids to providers and retailers, including in California. AmerisourceBergen has engaged in consensual commercial dealings with Plaintiffs and their residents, and has purposefully availed itself of the advantages of conducting business with and within Plaintiffs' borders. AmerisourceBergen is in the chain of distribution of prescription opioids. AmerisourceBergen Associate Assistance Fund, AmerisourceBergen Corporation, AmerisourceBergen Drug Corporation, and AmerisourceBergen Services Corporation are registered to do business in California with the California Secretary of State.

91. Defendant McKesson Corporation ("McKesson") is a publicly traded company incorporated under the laws of Delaware and with a principal place of business in San Francisco, California. McKesson distributes prescription opioids to providers and retailers, including in California. McKesson has engaged in consensual commercial dealings with Plaintiffs and their

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

1   residents, and has purposefully availed itself of the advantages of conducting business with and

2   within Plaintiffs' borders. McKesson is in the chain of distribution of prescription opioids.

3   McKesson Corporation is registered to do business in California with the California Secretary of

4   State.

5   92.   Collectively, AmerisourceBergen, Cardinal, and McKesson dominate 85% of the

6   market share for the distribution of prescription opioids. The "Big 3" are Fortune 500

7   corporations listed on the New York Stock Exchange and their principal business consists of the

8   nationwide wholesale distribution of prescription drugs. *See Fed. Trade Comm'n v. Cardinal*

9   *Health, Inc.*, 12 F. Supp. 2d 34, 37 (D.D.C. 1998) (describing Cardinal, McKesson, and

10  AmerisourceBergen predecessors). Each has been investigated and/or fined by the DEA for the

11  failure to report suspicious orders. Plaintiffs have no reason to believe each has engaged in

12  unlawful conduct which resulted in the distribution, dispensing, and diversion of prescription

13  opioids into their communities. Plaintiffs name each of the "Big 3" herein as defendants and

14  places the industry on notice that Plaintiffs are acting to abate the public nuisance plaguing their

15  communities. Distributor Defendants have had substantial contacts and business relationships

16  with the People. Distributor Defendants have purposefully availed themselves of business

17  opportunities within Plaintiffs' communities.

18  93.   Defendant CVS Health Corporation (f/k/a CVS Caremark Corporation) is a

19  Delaware corporation, and has its principal place of business located in Woonsocket, Rhode

20  Island.

21  94.   Defendant CVS Pharmacy, Inc. is a Rhode Island corporation, and has its

22  principal place of business located in Woonsocket, Rhode Island. CVS Health Corporation is the

23  direct parent corporation of CVS Pharmacy, Inc. (together, CVS Pharmacy, Inc. and CVS

24  Pharmacy, Inc. are referred to herein as "CVS").

25  95.   Defendant Walgreen Co. is an Illinois corporation, and its principal place of

26  business is located in Deerfield, Illinois.

27  96.   Defendant H.D. Smith Wholesale Drug Co. ("H.D. Smith") is a Delaware

28  corporation, and its principal place of business is located in Springfield, Illinois. In 2018, H.D.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

1   Smith Holding Company was purchased by AmerisourceBergen.

2        97.    Defendant Thrifty Payless Inc. dba Rite Aid ("Thrifty") is a California

3   corporation, and its principal place of business is located in Camp Hill, Pennsylvania. Thrifty is a

4   subsidiary of Rite Aid Corporation.

5        98.    Defendant Kaiser Foundation Hospitals is a California nonprofit, public-benefit

6   corporation with a principal place of business in Oakland, California.

7        99.    Collectively, AmerisourceBergen, Cardinal, McKesson, CVS, Walgreen Co.,

8   H.D. Smith, Thrifty, and Kaiser Foundation Hospitals are the "Distributor Defendants."

9   **D.**    **The Doe Defendants**

10       100.   Plaintiffs are ignorant of the true names or capacities, whether individual,

11   corporate or otherwise, of the Defendants sued herein under the fictitious names DOES 1

12   through 100 inclusive, and they are therefore sued herein pursuant to Code of Civil Procedure §

13   474. Plaintiffs will amend this Complaint to show their true names and capacities if and when

14   they are ascertained. Plaintiffs are informed and believe, and on such information and belief

15   allege, that each of the Defendants named as a DOE is responsible in some manner for the events

16   and occurrences alleged in this Complaint and is liable for the relief sought herein.

17   **E.**    **Defendants' Agents, Successors, and Parent-Subsidiary Relationships**

18       101.   Each action described herein is part of, and in furtherance of, the unlawful

19   conduct alleged herein, and was authorized, ordered, and agreed to by each Defendant's officers,

20   agents, employees, or other representatives who were actively engaged in the management of

21   said Defendant's affairs within the course and scope of their duties and employment and with

22   said Defendant's actual, apparent, and ostensible authority.

23       102.   With respect to each parent company Defendant identified above, each parent-

24   owner:

25          •   Knew of and/or participated in the fraudulent and/or otherwise illegal conduct

26             of its subsidiaries;

27          •   Exercised complete domination over the acquired-subsidiary company, and

28             such domination and control over finances, policy, and business practices was

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

61577634.1

- 24 -

1    used to commit the unlawful acts complained of herein, which resulted in

2    Plaintiffs' injury;

3    • Expressly or impliedly assumed the predecessor's liabilities for the unlawful

4    acts complained of herein, which resulted in Plaintiffs' injury;

5    • Essentially merged itself in substance, if not in form, with the acquired

6    subsidiary company; and/or is a mere continuation of the acquired-subsidiary

7    company.

8    **III.   JURISDICTION AND VENUE**

9    103.   This Court has jurisdiction over this action. Defendants are engaging in false and

10   misleading advertising, fraudulent acts, negligent acts, and creating or assisting in the creation of

11   a public nuisance within Plaintiffs' communities, and the People through their attorneys have the

12   right and authority to prosecute this case on behalf of the People.

13   104.   Venue is proper in this Court because Defendants transact business in California,

14   and Defendant Allergan, Inc.'s principal place of business is in Irvine, California, which is

15   located within Orange County.

16   **IV.   GENERAL FACTUAL ALLEGATIONS**

17   **A.   An Overview of the Opioid Epidemic**

18   105.   The term "opioid" includes all drugs derived from the opium poppy. The United

19   States Food and Drug Administration describes opioids as follows: "Prescription opioids are

20   powerful pain-reducing medications that include prescription oxycodone, hydrocodone, and

21   morphine, among others, and have both benefits as well as potentially serious risks. These

22   medications can help manage pain when prescribed for the right condition and when used

23   properly. But when misused or abused, opioids can cause serious harm, including addiction,

24   overdose, and death."[7]

25   106.   Prescription opioids with the highest potential for addiction are listed under

26

27   [7] *See* U.S. FDA, Opioid Medications, available at
     https://www.fda.gov/Drugs/DrugSafety/InformationbyDrugClass/ucm337066.htm (last accessed
28   December 19, 2017).

FIRST AMENDED COMPLAINT

Schedule II of the Controlled Substances Act. This includes non-synthetic opium derivatives (such as codeine and morphine, also known generally as "opiates"), partially synthetic derivatives (such as hydrocodone and oxycodone), and fully synthetic derivatives (such as fentanyl and methadone).

107.    Historically, opioids were considered too addictive and debilitating for the treatment of chronic pain such as back pain, migraines, and arthritis. According to Dr. Caleb Alexander, director of Johns Hopkins University's Center for Drug Safety and Effectiveness, "[opioids] have very, very high inherent risks ... and there's no such thing as a fully safe opioid."[8]

108.    Opioids also tend to induce tolerance, whereby a person who uses opioids repeatedly over time no longer responds to the drug as strongly as before, thus requiring a higher dose to achieve the same effect. This tolerance contributes to the high risk of overdose during a relapse.

109.    Before the 1990s, generally accepted standards of medical practice dictated that opioids should only be used short-term for acute pain, pain relating to recovery from surgery, or for cancer or palliative (end-of-life) care. Due to the lack of evidence that opioids improved patients' ability to overcome pain and function, as well as evidence of *greater* pain complaints as patients developed tolerance to opioids over time, and the serious risk of addiction and other side effects, the use of opioids for chronic pain was discouraged or prohibited. As a result, doctors generally did not prescribe opioids for chronic pain.

110.    The market for chronic pain patients, however, was much larger, and to take advantage of it, Defendants had to change doctors' general reluctance to prescribe opioids for chronic pain.[9]

111.    As described herein, Defendants engaged in conduct that directly caused doctors

---

[8] Matthew Perrone et al., *Drugmakers push profitable, but unproven, opioid solution*, Center for Public Integrity, available at https://www.publicintegrity.org/2016/12/15/20544/drugmakers-push-profitable-unproven-opioid-solution (last accessed December 20, 2017).
[9] *See* Harriet Ryan et al., *'You want a description of hell?' OxyContin's 12-hour problem*, L.A. Times (May 5, 2016), available at http://www.latimes.com/projects/oxycontin-part1/ (last accessed December 20, 2017).

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

61577634.1                                    - 26 -

FIRST AMENDED COMPLAINT

42                                            Exhibit C

1 to prescribe skyrocketing amounts of opioids to patients. Defendants also intentionally neglected
2 their obligations to prevent diversion of the highly addictive substance.

3     112.    As a result of Defendants' wrongful conduct, the number of opioid prescriptions
4 increased sharply, reaching nearly 250,000,000 prescriptions in 2013, which was almost enough
5 for every person in the United States to have a bottle of pills. This represents an increase of
6 300% since 1999. In California, opioid prescribing rates peaked in 2013 when 54.9 opioid
7 prescriptions were dispensed per 100 persons.

8     113.    Many Americans, including Californians and Plaintiffs' residents, are now
9 addicted to prescription opioids. In 2016, drug overdoses killed over 60,000 people in the United
10 States, an increase of more than 22 percent over the previous year. The New York Times
11 reported in September 2017, that the opioid epidemic is now killing babies and toddlers because
12 deadly opioids are "everywhere" and are easily mistaken as candy.[10] The opioid epidemic has
13 been declared a public health emergency by the President of the United States. The wave of
14 opioid addiction was created by the increase in prescriptions.

15     114.    One in four Americans receiving long-term opioid therapy struggles with opioid
16 addiction. Nearly 2 million Americans have a prescription opioid use disorder. According to the
17 NIH's National Institute on Drug Abuse, approximately 21 to 29 percent of patients prescribed
18 opioids for chronic pain misuse them. Between 8 and 10 percent develop an opioid use disorder.
19 Four to 6 percent of people who misuse prescription opioids transition to heroin abuse, and about
20 80 percent of people who use heroin first misused prescription opioids.

21     115.    Drug overdose deaths among all Americans increased more than 200 percent
22 between 1999 and 2015.

23     116.    Deaths from prescription opioids have quadrupled in the past 20 years. In
24 California, there were 4,654 total opioid overdose deaths in 2016.[11]

25

---

[10] Julie Turkewitz, *"The Pills are Everywhere:" How the Opioid Crisis Claims Its Youngest Victims*, N.Y. Times (Sept. 20, 2017), available at https://www.nytimes.com/2017/09/20/us/opioid-deaths-children.html (last accessed January 4, 2018).
[11] *See* Center for Disease Control (CDC)/NCHS, National Vital Statistics System, Mortality, available at https://www.cdc.gov/drugoverdose/data/statedeaths.html (last accessed August 13,

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

61577634.1         - 27 -

FIRST AMENDED COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

117.    At the same time, treatment admissions for abuse of opioids and emergency room visits for non-medical opioid use have dramatically increased. The increases in opioid deaths and treatments are directly tied to the prescribing practices created by Defendants. According to the CDC[12], opioid deaths and treatment admissions are tied to opioid sales:



Rates of Opioid Sales, OD Deaths, and Treatment, 1999–2010

— Opioid Sales KG/10,000    — Opioid Deaths/100,000    — Opioid Treatment Admissions/10,000

CDC. *MMWR* 2011

118.    People who are addicted to prescription opioid painkillers are forty times more likely to be addicted to heroin, which is pharmacologically similar to prescription opioids. Available data indicates that the nonmedical use of prescription opioids is a strong risk factor for heroin use. According to the CDC, heroin drug overdose deaths have more than tripled in the

2018).
[12] U.S. Dep't of Health & Human Servs., *Addressing Prescription Drug Abuse in the United States*, available at https://www.cdc.gov/drugoverdose/pdf/hhs_prescription_drug_abuse_report_09.2013.pdf (last accessed December 29, 2017).

FIRST AMENDED COMPLAINT

1  past four years. In California, 355 overdose deaths in 2016 involved heroin.[13]

2  119.  Prescription opioid abuse "is a serious national crisis that affects public health as

3  well as social and economic welfare." The economic burden of prescription opioid misuse alone

4  on the public is $78.5 billion a year, including the costs of healthcare, lost productivity, addiction

5  treatment, and criminal justice expenditures.[14]

6  **B.  The Manufacturer Defendants Spread False or Misleading Information About**
   **the Safety of Opioids**

7

8  120.  Each Manufacturer Defendant developed a well-funded marketing scheme based

9  on deception to persuade doctors and patients that opioids can and should be used to treat

10  chronic pain without risk of abuse or addiction, resulting in opioid prescriptions to a far larger

11  group of patients who are much more likely to become addicted. In connection with this scheme,

12  each Manufacturer Defendant spent, and continues to spend, millions of dollars on promotional

13  activities and materials that falsely deny or minimize the risks of opioids.

14  121.  The Manufacturer Defendants employed the same marketing plans and strategies,

15  and deployed the same messages in and around California, including in Plaintiffs' communities,

16  as they did nationwide. Across the pharmaceutical industry, corporate headquarters are

17  responsible for funding and overseeing "core message" development on a national basis. This

18  comprehensive approach ensures that the Manufacturer Defendants' messages are accurately and

19  consistently delivered across marketing channels—including detailing visits, speaker events, and

20  advertising—and in each sales territory. The Manufacturer Defendants consider this high level of

21  coordination and uniformity crucial to successfully marketing their prescription drugs.

22  122.  To increase the impact of their deceptive marketing schemes, on information and

23  belief, the Manufacturer Defendants coordinated and created unified marketing plans to ensure

24  that their messages were consistent with one another and effective across all their marketing

25

26  [13] *See* National Institute of Drug Abuse, California Opioid Summary, available at
27  https://www.drugabuse.gov/drugs-abuse/opioids/opioid-summaries-by-state/california-opioid-summary, (last accessed August 13, 2018).
   [14] Opioid Crisis, NIH, National Institute on Drug Abuse, available at
28  https://www.drugabuse.gov/drugs-abuse/opioids/opioid-crisis (last accessed December 19, 2017).

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

61577634.1                          - 29 -

FIRST AMENDED COMPLAINT

1   efforts.

2      123.   The deceptive marketing schemes included, among others: (a) false or misleading

3   direct, branded advertisements; (b) false or misleading direct-to-physician marketing, also

4   known as "detailing;" (c) false or misleading materials, speaker programs, webinars, and

5   brochures; and (d) false or misleading unbranded advertisements or statements by purportedly

6   neutral third parties that were really designed and distributed by the Manufacturer Defendants.

7   All of these schemes were geared towards convincing both doctors and patients that opioid use

8   to treat chronic pain carried a low, or no, risk of addiction.

9      124.   Contrary to the language on their drugs' labels regarding the serious risks

10   associated with their use, the Manufacturer Defendants made false and misleading claims that:

11   (a) downplayed the serious risk of addiction; (b) created and promoted the concept of

12   "pseudoaddiction" when signs of actual addiction began appearing, and advocated that the signs

13   of addiction should be treated with more opioids; (c) exaggerated the effectiveness of screening

14   tools to prevent addiction; (d) claimed that opioid dependence and withdrawal are easily

15   managed; (e) denied the risks of higher dosages; and (f) exaggerated the effectiveness of "abuse-

16   deterrent" opioid formulations to prevent abuse and addiction. The Manufacturer Defendants

17   also falsely touted the benefits of long-term opioid use, including the supposed ability of opioids

18   to improve function and quality of life, even though there was no scientifically reliable evidence

19   to support the Manufacturer Defendants' claims.

20      125.   These statements were not only unsupported by or contrary to the scientific

21   evidence, but they also were contrary to pronouncements by and guidance from the FDA and

22   CDC based on that exact same evidence. Indeed, as discussed herein, the 2016 CDC Guideline

23   makes it patently clear that the Manufacturer Defendants' schemes were and continue to be

24   deceptive.

25      126.   The Manufacturer Defendants began their marketing schemes decades ago and

26   continue them today.

27      127.   The Manufacturer Defendants' efforts have been wildly successful. Opioids are

28   now the most prescribed class of drugs. Globally, opioid sales generated $1.1 billion in revenue

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

1    for drug companies in 2010 alone, and sales in the United States have exceeded $8 billion in

2    revenue annually since 2009.[15] In an open letter to the nation's physicians in August 2016, the

3    U.S. Surgeon General expressly connected this "urgent health crisis" to "heavy marketing of

4    opioids to doctors. . . [m]any of [whom] were even taught – incorrectly – that opioids are not

5    addictive when prescribed for legitimate pain."[16]

6            128.    On information and belief, as a part of their deceptive marketing schemes, the

7    Manufacturer Defendants identified and targeted susceptible prescribers and vulnerable patient

8    populations in the United States, including California.

9            129.    For example, on information and belief, the Manufacturer Defendants focused

10   their deceptive marketing schemes on primary care doctors, who were more likely to treat

11   chronic pain patients and prescribe them drugs, but who were less likely to be well-schooled in

12   treating pain and the risks and benefits of opioids, including abuse and addiction, and therefore

13   more likely to accept the Manufacturer Defendants' misrepresentations.

14           130.    On information and belief, the Manufacturer Defendants also targeted vulnerable

15   patient populations like the elderly and veterans, who tend to suffer from chronic pain.

16           131.    The Manufacturer Defendants targeted these vulnerable patients even though the

17   risks of long-term opioid use were significantly greater for them. For example, the 2016 CDC

18   Guideline observed that existing evidence showed that elderly patients taking opioids suffer from

19   elevated fall and fracture risks, greater risk of hospitalization, and increased vulnerability to

20   adverse drug effects and interactions. The Guideline therefore concluded that there are special

21   risks of long-term opioid use for elderly patients and recommended that doctors use "additional

22   caution and increased monitoring" to minimize the risks of opioid use in elderly patients. The

23   same is true for veterans, who are more likely to use anti-anxiety drugs (benzodiazepines) for

24   post-traumatic stress disorder, which interact dangerously with opioids.

25

26

27   [15] *See* Katherine Eban, *Oxycontin: Purdue Pharma's Painful Medicine*, Fortune, (Nov. 9, 2011);
     David Crow, *Drugmakers Hooked on 10bn Opioid Habit*, Fin. Times (August 10, 2016).
28   [16] Murthy, supra note 3.

61577634.1                                          - 31 -

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

**1.   The Manufacturer Defendants Engaged in False and Misleading Direct Marketing of Opioids**

132.   Each Manufacturer Defendant conducted, and continues to conduct, direct marketing consisting of advertising campaigns touting the purported benefits of their branded drugs. For example, upon information and belief, the Manufacturer Defendants spent more than $14 million on medical journal advertising of opioids in 2011, nearly triple what they spent in 2001.

133.   A number of the Manufacturer Defendants' branded ads deceptively portrayed the benefits of opioids for chronic pain. For example:

a.   Endo, on information and belief, has distributed and made available on its website opana.com a pamphlet promoting Opana ER with photographs depicting patients with physically demanding jobs like construction worker and chef, misleadingly implying that the drug would provide long-term pain-relief and functional improvement.

b.   On information and belief, Purdue also ran a series of ads, called "Pain vignettes," for OxyContin in 2012 in medical journals. These ads featured chronic pain patients and recommended OxyContin for each. One ad described a "54-year-old writer with osteoarthritis of the hands" and implied that OxyContin would help the writer work more effectively.

134.   Although Endo and Purdue agreed in late 2015 and 2016 to cease making these misleading representations in New York, they continued to disseminate them elsewhere throughout the United States, including California.

135.   The direct advertising disseminated by the Manufacturer Defendants failed to disclose studies that were not favorable to their products, or that they lacked clinical evidence to support many of their claims.

**2.   The Manufacturer Defendants Used Detailing and Speaker Programs to Spread False and Misleading Information About Opioids**

136.   Each Manufacturer promoted the use of opioids for chronic pain through "detailers"—sophisticated and specially trained sales representatives who visited individual

FIRST AMENDED COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

1   doctors and medical staff in their offices—and small group speaker programs.

2       137.   The Manufacturer Defendants invested heavily in promoting the use of opioids

3   for chronic pain through detailers and small group speaker programs.

4       138.   The Manufacturer Defendants devoted massive resources to direct sales contacts

5   with doctors via detailers. Upon information and belief, the Manufacturer Defendants spend in

6   excess of $168 million in 2014 alone on detailing branded opioids to doctors, more than twice

7   what they spent on detailing in 2000. From mid-2013 through 2015, Purdue, Janssen, and Endo

8   detailed at least 6,238, 584, and 195 prescribers in California respectively. By itself, Purdue was

9   responsible for more than 1 out of every 3 reported opioid-related detailing visits in California

10   by Defendants.

11       139.   On information and belief, these detailers have spread and continue to spread

12   misinformation regarding the risks and benefits of opioids to hundreds of thousands of doctors,

13   including thousands of doctors in California, in the following manner:

14         a.   Describe the risk of addiction as low or fail to disclose the risk of

15   addiction;

16         b.   Describe their opioid products as "steady state" – falsely implying that

17   these products are less likely to produce the high and lows that fuel addiction – or as less

18   likely to be abused or result in addiction;

19         c.   Tout the effectiveness of screening or monitoring patients as a strategy for

20   managing opioid abuse and addiction;

21         d.   State that there is no maximum dose and that doctors can safely increase

22   doses without disclosing the significant risks to patients at higher doses;

23         e.   Discuss "pseudoaddiction;"

24         f.   State that patients would not experience withdrawal if they stopped using

25   their opioid products; and

26         g.   State that abuse-deterrent formulations are tamper- or crush-resistant and

27   harder to abuse or misuse.

28       140.   Because these detailers must adhere to scripts and talking points drafted by the

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

61577634.1

- 33 -

1    Manufacturer Defendants, it can be reasonably inferred that most, if not all, of the Manufacturer

2    Defendants' detailers made and continue to make these misrepresentations to the thousands of

3    California doctors they have visited and continue to visit. The Manufacturer Defendants have not

4    corrected this misinformation.

5         141.    The Manufacturer Defendants' detailing to doctors was highly effective in

6    generating the national proliferation of prescription opioids. On information and belief, the

7    Manufacturer Defendants used sophisticated data mining and intelligence to track and

8    understand the rates of initial prescribing and renewal by individual doctors, allowing specific

9    and individual targeting, customizing, and monitoring of their marketing efforts.

10        142.    The Manufacturer Defendants also identified doctors to serve on their speakers'

11   bureaus in exchange for payment and other remuneration, as well as attend programs with

12   speakers and meals paid for by the Manufacturer Defendants. These speakers gave the false

13   impression that they were providing unbiased and medically accurate presentations when they

14   were in fact presenting a script prepared by the Manufacturer Defendants. On information and

15   belief, these presentations conveyed misleading information, omitted material information, and

16   failed to correct the Manufacturer Defendants' prior misrepresentations about the risks and

17   benefits of opioids, including addiction risks.

18        143.    Each Manufacturer Defendant devoted and continues to devote massive resources

19   to direct sales contacts with doctors. In 2014 alone, Defendants spent $168 million on detailing

20   branded opioids to doctors. This amount is twice as much as Defendants spent on detailing in

21   2000. The amount includes $108 million spent by Purdue, $34 million by Janssen, $10 million

22   by Endo, and $2 million by Actavis.

23        144.    Marketing impacts prescribing habits, with face-to-face detailing having the

24   greatest influence. On information and belief, more frequent prescribers are generally more

25   likely to have received a detailing visit, and in some instances, more infrequent prescribers of

26   opioids received a detailing visit from a Manufacturer Defendant's detailer and then prescribed

27   only that Manufacturer Defendant's opioid products.

28        145.    The FDA has cited at least one Manufacturer Defendant for deceptive promotions

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

61577634.1                          - 34 -

FIRST AMENDED COMPLAINT

1  used by its detailers and in its direct-to-physician marketing. In 2010, the FDA notified Actavis

2  that certain brochures distributed by Actavis were "false or misleading because they omit and

3  minimize the serious risks associated with [Kadian], broaden and fail to present the limitations to

4  the approved indication of the drug, and present unsubstantiated superiority and effectiveness

5  claims." The FDA also found that "[t]hese violations are a concern from a public health

6  perspective because they suggest that the product is safer and more effective than has been

7  demonstrated."[17]

8            **3.  The Manufacturer Defendants Deceptively Marketed Opioids**
9                **through Seemingly Independent Third Parties that Disseminated**
              **Unbranded Advertising Created by the Manufacturer Defendants**

10      146.  The Manufacturer Defendants also deceptively marketed opioids in California

11  through unbranded advertising—i.e., advertising that promotes opioid use generally but does not

12  name a specific opioid. This type of advertising was ostensibly created and disseminated by

13  independent third parties. But by funding, directing, reviewing, editing, and distributing

14  unbranded advertising, the Manufacturer Defendants coordinated and controlled the deceptive

15  messages disseminated by these third parties and acted in concert with them to falsely and

16  misleadingly promote opioids for the treatment of chronic pain as non-addictive.

17      147.  The extent of the financial ties between the opioid industry and third-party

18  advocacy groups is stunning. A recent report released by the United State Senate Homeland

19  Security and Governmental Affairs Committee reveals nearly $9 million in payments from

20  companies, including Purdue and Janssen, to 14 outside groups between 2012 and 2017.[18]

21  According to the report, "[t]he fact that ... manufacturers provided millions of dollars to the

22  groups described below suggests, at the very least, a direct link between corporate donations and

23  the advancement of opioids-friendly messaging." The report concluded that "many of the groups

24

25  [17] Letter from Thomas Abrams, Dir., Div. of Drug Mktg., Advert., & Commc'ns, U.S. Food & Drug Admin., to Doug Boothe, CEO, Actavis Elizabeth LLC (Feb. 18, 2010), available at

26  http://www.fdanews.com/ext/resources/files/archives/a/ActavisElizabethLLC.pdf (last accessed December 29, 2017).

27  [18] *See* Scott Neuman & Alison Kodjak, *Drugmakers Spend Millions Promoting Opioids To Patient Groups, Senate Report Says*, NPR.org (Feb. 13, 2018), available at

28  https://www.npr.org/sections/thetwo-way/2018/02/13/585290752/drugmakers-spent-millions-promoting-opioids-to-patient-groups-senate-report-says (last accessed February 23, 2018).

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

61577634.1                                          - 35 -

1   described in this report may have played a significant role in creating the necessary conditions

2   for the U.S. opioids epidemic."

3       148.    The Manufacturer Defendants utilized third-party, unbranded advertising to

4   market opioids to avoid regulatory scrutiny because such advertising is not submitted to and

5   typically is not reviewed by the FDA. The Manufacturer Defendants also used third-party,

6   unbranded advertising to give the false appearance that the deceptive messages came from an

7   independent and therefor objective source. Like tobacco companies did before them, the

8   Manufacturer Defendants used third parties that they funded, directed, and controlled to carry

9   out and conceal their scheme to deceive doctors and patients about the risks and benefits of long-

10  term opioid use for chronic pain.

11      149.    The Manufacturer Defendants' deceptive, third-party, unbranded advertising

12  often contradicted what they said in their branded materials reviewed by the FDA. For example,

13  Endo's unbranded advertising stated that "People who take opioids as prescribed usually do not

14  become addicted." This directly contradicted its concurrent, branded advertising for Opana ER,

15  which warned that "use of opioid analgesic products carries the risk of addiction even under

16  appropriate medical use."

17      150.    In addition to using third parties to disguise the source of their misinformation

18  campaign, the Manufacturer Defendants also retained the services of a small group of

19  physicians—known as "key opinion leaders" or "KOLs"—to convince both doctors and patients

20  that opioid use to treat chronic pain carried a low, or no, risk of addiction. On information and

21  belief, the Manufacturer Defendants' KOLS were selected, funded, and elevated by the

22  Manufacturer Defendants because their public positions supported the use of opioids to treat

23  chronic pain.

24      151.    Manufacturer Defendants paid these KOLs to serve as consultants or on their

25  advisory boards and to give talks or present continuing medical education programs (CMEs), and

26  their support helped these KOLs become respected industry experts. As they rose to prominence,

27  these KOLs touted the benefits of opioids to treat chronic pain without significant risk of

28  addiction, repaying Defendants by advancing their marketing goals. These KOLs' professional

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

61577634.1                                  - 36 -

1    reputations became dependent on continuing to promote a pro-opioid message.

2         152.    Pro-opioid doctors like the KOLs are one of the most important avenues that the

3    Manufacturer Defendants use to spread their false and misleading statements about the risks and

4    benefits of long-term opioid use. The Manufacturer Defendants know that doctors rely heavily

5    and more uncritically on their peers for guidance, and KOLs provide the false appearance of

6    unbiased and reliable support for treatment of chronic pain through chronic opioid therapy

7    without significant risk of addiction.

8         153.    For example, the New York Attorney General ("NY AG") found in its settlement

9    with Purdue that through March 2015, the Purdue website *In the Face of Pain* failed to disclose

10   that doctors who provided testimonials on the site were paid by Purdue,[19] and concluded that

11   Purdue's failure to disclose these financial connections potentially misled consumers regarding

12   the objectivity of the testimonials.

13        154.    The Manufacturer Defendants' KOLs have written, consulted on, edited, and lent

14   their names to books and articles, and given speeches and CMEs supportive of chronic opioid

15   therapy while minimizing risks of addiction. Manufacturer Defendants also created opportunities

16   for their KOLs to participate in research studies Manufacturer Defendants suggested or chose

17   and then cited and promoted favorable studies or articles by their KOLs. By contrast, Defendants

18   did not support, acknowledge, or disseminate publications of doctors unsupportive or critical of

19   chronic opioid therapy that acknowledged risks of addiction.

20        155.    The Manufacturer Defendants' KOLs also served on committees that developed

21   treatment guidelines that strongly encourage the use of opioids to treat chronic pain and on the

22   boards of pro-opioid advocacy groups and professional societies that develop, select, and present

23   CMEs. These guidelines and CMEs were not supported by the scientific evidence at the time

24   they were created, and they are not supported by the scientific evidence today. Defendants were

25

---

26   [19] *See* New York State Office of the Attorney General, *A.G. Schneiderman Announces Settlement with Purdue Pharma That Ensures Responsible and Transparent Marketing Of Prescription Opioid Drugs By The Manufacturer* (August 20, 2015), available at https://ag.ny.gov/press-release/ag-schneiderman-announces-settlement-purdue-pharma-ensures-responsible-and-transparent (last accessed December 20, 2017).

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

1    able to direct and exert control over each of these activities through their KOLs. Notably, the

2    2016 CDC Guideline recognizes that treatment guidelines can "change prescribing practices."

3        156.    Pro-opioid KOLs have admitted to making false claims about the effectiveness of

4    opioids. For example, Dr. Russell Portenoy received research support, consulting fees, and other

5    compensation from Teva, Endo, Janssen, and Purdue, among others. Dr. Portenoy subsequently

6    admitted that he "gave innumerable lectures ... about addictions that weren't true." His lectures

7    as a pro-opioid KOL falsely claimed that fewer than 1 percent of patients would become

8    addicted to opioids, but Dr. Portenoy later admitted that the primary goal was to "destigmatize"

9    opioid. Dr. Portenoy conceded that "[d]ata about the effectiveness of opioids does not exist."

10   According to Dr. Portenoy, "Did I teach about pain management, specifically about opioid

11   therapy, in a way that reflects misinformation? Well, . . . I guess I did." Dr. Portenoy admitted

12   that "[i]t was clearly the wrong thing to do."[20]

13       157.    Dr. Portenoy also made frequent media appearances promoting opioids and

14   spreading misrepresentation, such as his claim "the likelihood that the treatment of pain using an

15   opioid drug which is prescribed by a doctor will lead to addiction is extremely low." He even

16   appeared on Good Morning America in 2010 to discuss the use of opioids long-term to treat

17   chronic pain. On this widely-watched program broadcast across the country, Dr. Portenoy

18   claimed: "Addiction, when treating pain, is distinctly uncommon. If a person does not have a

19   history, a personal history, of substance abuse, and does not have a history in the family of

20   substance abuse, and does not have a very major psychiatric disorder, most doctors can feel very

21   assured that the person is not going to become addicted."[21]

22       158.    Another KOL, Dr. Lynn Webster, was the co-founder and Chief Medical Director

23   of Lifetree Clinical Research, an otherwise unknown pain clinic in Salt Lake City, Utah. Dr.

24   Webster was President of the American Academy of Pain Medicine ("AAPM") in 2013. (He also

25

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

---

26   [20] Thomas Catan & Evan Perez, *A Pain-Drug Champion Has Second Thoughts*, Wall St. J. (Dec.
     17, 2012), available at
27   https://www.wsj.com/articles/SB10001424127887324478304578173342657044604 (last
     accessed December 20, 2017).
28   [21] Good Morning America (ABC television broadcast Aug. 30, 2010).

FIRST AMENDED COMPLAINT

1  is a Senior Editor of Pain Medicine, which is the same journal that published the Endo special

2  advertising supplements touting Opana ER.) Dr. Webster was the author of numerous CMEs

3  sponsored by Teva, Endo and Purdue, which advocated the use of chronic opioid therapy. At the

4  same time, Dr. Webster was receiving significant funding from the Manufacturer Defendants,

5  including nearly $2 million from Teva.

6      159.    Ironically, Dr. Webster created and promoted the Opioid Risk Tool, which is a

7  five-question, one-minute screening tool relying on patient self-reports that purportedly allows

8  doctors to manage the risk that their patients will become addicted to or abuse opioids. The

9  claimed ability to pre-sort patients likely to become addicted is an important tool in giving

10  doctors confidence to prescribe opioids long-term, and, for this reason, references to screening

11  appear in various industry supported guidelines. Versions of Dr. Webster's Opioid Risk Tool

12  appear on, or are linked to, websites run by Endo, Janssen and Purdue. Unaware of the flawed

13  science and industry bias underlying this tool, certain states and public entities have incorporated

14  the Opioid Risk Tool into their own guidelines, indicating their reliance on the Manufacturer

15  Defendants and those under their influence and control.

16      160.    In 2011, Dr. Webster presented a webinar program sponsored by Purdue entitled

17  "Managing Patient's Opioid Use: Balancing the Need and the Risk." Dr. Webster recommended

18  use of risk screening tools, urine testing, and patient agreements as a way to prevent "overuse of

19  prescriptions" and "overdose deaths." This webinar was available to and was intended to reach

20  doctors in Plaintiffs' communities and doctors treating their residents.[22]

21      161.    Dr. Webster also was a leading proponent of the concept of "pseudoaddiction,"

22  which is the notion that addictive behaviors should be seen as indications of undertreated pain

23  and not a warning. In Dr. Webster's description, the only way to differentiate the two was to

24  increase a patient' dose of opioids. As he and co-author Beth Dove wrote in their 2007 book

25  *Avoiding Opioid Abuse While Managing Pain*—a book that remains available online—when

26  

27  ---
[22] *See* Emerging Solutions in Pain, *Managing Patient's Opioid Use: Balancing the Need and the Risk*, available at http://www.emergingsolutionsinpain.com/ce-
education/opioidmanagement?option=com_continued&view=frontmatter&Itemid=303&course=2

28  09 (last visited Aug. 22, 2017).

FIRST AMENDED COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

1  faced with signs of aberrant behavior, increasing the dose "in most cases ... should be the

2  clinician's first response."[23] Upon information and belief, Endo distributed this book to doctors.

3  Years later, Dr. Webster reversed himself, acknowledging that "[pseudoaddiction] obviously

4  became too much of an excuse to give patients more medication."[24]

5      162.   On information and belief, the Manufacturer Defendants also entered into

6  arrangements with seemingly unbiased and independent patient and professional organizations to

7  promote opioids for the treatment of chronic pain. Under the direction and control of the

8  Manufacturer Defendants, these "Front Groups"—which include, but are not limited to, the

9  American Pain Foundation ("APF")[25] and the American Academy of Pain Medicine—generated

10 treatment guidelines, unbranded materials, and programs that favored chronic opioid therapy.

11 The evidence did not support these guidelines, materials, and programs at the time they were

12 created, and the scientific evidence does not support them today. Indeed, they stand in marked

13 contrast to the 2016 CDC Guideline.

14      163.   The Manufacturer Defendants worked together through Front Groups to spread

15 their deceptive messages about the risks and benefits of long-term opioid therapy. Indeed, the

16 Manufacturer Defendants spent millions on the Front Groups to generate false opioid-friendly

17 messaging.[26] The amount of industry funding, and its sources, is obscured by a lack of

18 transparency on behalf of both the opioid industry and the Front Groups.

19      164.   On information and belief, these Front Groups also assisted the Manufacturer

20 Defendants by responding to negative articles, advocating against regulatory or legislative

21 changes that would limit opioid prescribing in accordance with the scientific evidence, and

22 conducting outreach to vulnerable patient populations targeted by the Manufacturer Defendants.

23      165.   These Front Groups depended on the Manufacturer Defendants for funding and,

24 in some cases, for their very survival. On information and belief, the Manufacturer Defendants

25

26  [23] Lynn Webster & Beth Dove, *Avoiding Opioid Abuse While Managing Pain* (2007).
    [24] John Fauber, *Painkiller Boom Fueled by Networking*, Milwaukee Wisc. J. Sentinel, (Feb. 18,
27  2012).
    [25] Dr. Portenoy was a member of the board of the APF.
28  [26] *See* Neuman & Kodjack, *supra* note 18.

61577634.1                                    - 40 -

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

1  exercised control over programs and materials created by these groups by collaborating on,

2  editing, and approving their content, and by funding their dissemination. In doing so, the

3  Manufacturer Defendants made sure that the Front Groups would only generate messages the

4  Manufacturer Defendants wanted to distribute. Despite this, the Front Groups held themselves

5  out as independent experts serving the needs of their members, whether patients suffering from

6  pain or doctors treating those patients.

7      166.    In particular, Teva, Endo, Janssen, and Purdue utilized many Front Groups,

8  including many of the same ones. Several of the most prominent Front Groups are described in

9  greater detail below, but there are many others, including the American Pain Society, American

10  Geriatrics Society, the Federation of State Medical Boards, American Chronic Pain Association,

11  the Center for Practical Bioethics, the U.S. Pain Foundation, and the Pain & Policy Studies

12  Group.[27]

13      167.    Organizations, including the U.S. Senate Finance Committee, began to investigate

14  the American Pain Foundation ("APF") in 2012 to determine the links, financial and otherwise,

15  between APF and the opioid industry.[28] The investigation revealed that APF received 90 percent

16  of its funding from the drug and medical-device industry, and "its guides for patients, journalists

17  and policymakers had played down the risks associated with opioid painkillers while

18  exaggerating the benefits from the drugs." Within days, APF dissolved "due to irreparable

19  economic circumstances."

20      168.    Another one of the Front Groups for the Manufacturer Defendants was the

21  American Academy of Pain Medicine ("AAPM"). With the assistance, prompting, involvement,

22  and funding of the Manufacturer Defendants, the AAPM issued purported treatment guidelines

23  and sponsored and hosted medical education programs essential to the Manufacturer Defendants'

24

25  [27] *See generally, e.g.*, Letter from Sen. Ron Wyden, U.S. Senate Comm. on Fin., to Sec. Thomas E. Price, U.S. Dep't of Health and Human Servs., (May 5, 2015).

26  [28] Charles Ornstein & Tracy Weber, *Senate Panel Investigates Drug Companies Ties to Pain Groups*, Wash. Post (May 8, 2012), available at

27  https://www.washingtonpost.com/national/health-science/senate-panel-investigates-drug-companies-ties-to-paid-groups/2012/05/08/gIQA2X4qBU_story.html (last accessed December

28  19, 2017).

FIRST AMENDED COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

1    deceptive marketing of chronic opioid therapy.

2        169.    AAPM received substantial funding from opioid manufacturers. For example,

3    AAPM maintained a corporate relations council, whose members paid $25,000 per year (on top

4    of other funding) to participate. The benefits included allowing members to present educational

5    programs at off-site dinner symposia in connection with AAPM's marquee event—its annual

6    meeting held in Palm Springs, California, or other resort locations. AAPM describes the annual

7    event as an "exclusive venue" for offering education programs to doctors. Membership in the

8    corporate relations council also allows drug company executives and marketing staff to meet

9    with AAPM executive committee members in small settings. Defendants Endo, Purdue, and

10    Teva were members of the council and presented deceptive programs to doctors who attended

11    these annual events.

12        170.    On information and belief, AAPM is viewed internally by Endo as "industry

13    friendly," with Endo advisors and speakers among its active members. Endo attended AAPM

14    conferences, funded its CMEs, and distributed its publications. The conferences sponsored by

15    AAPM heavily emphasized sessions on opioids—37 out of roughly 40 at one conference alone.

16    AAPM's presidents have included top industry-supported KOLs like Lynn Webster and Perry

17    Fine of the University of Utah. Dr. Webster was even elected as AAPM's president while under

18    DEA investigation.

19        171.    The Manufacturer Defendants were able to influence AAPM through both their

20    significant and regular funding and the leadership of pro-opioid KOLs within the organization.

21        172.    In 1996, AAPM and APS jointly issued a consensus statement entitled "The Use

22    of Opioids for the Treatment of Chronic Pain," which endorsed opioids to treat chronic pain

23    while claiming that the risk of a patient's addiction to opioids was low. Dr. Haddox, who co-

24    authored the AAPM/APS statement, was a paid speaker for Purdue at the time. Dr. Portenoy was

25    the sole consultant. The consensus statement remained on AAPM's website until 2011, and upon

26    information and belief, was taken down from AAPM's website only after a doctor complained.[29]

27

28    [29] *The Use of Opioids for the Treatment of Chronic Pain: A Consensus Statement From the American Academy of Pain Medicine and the American Pain Society*, 13 Clinical J. Pain 6

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

1    173.    AAPM and APS issued their own guidelines in 2009 ("AAPM/APS Guidelines")

2    and continued to recommend the use of opioids to treat chronic pain while minimizing the risk of

3    addiction.[30] Treatment guidelines like these have been relied upon by doctors, especially the

4    general practitioners and family doctors targeted by the Manufacturer Defendants, to prescribe

5    opioids to treat chronic pain. Treatment guidelines not only directly inform doctors' prescribing

6    practices, but they also are cited throughout the scientific literature and referenced by third-party

7    payors in determining whether they should cover treatments for specific indications.

8    Pharmaceutical sales representatives employed by Endo, Actavis, and Purdue discussed

9    treatment guidelines with doctors during individual sales visits.

10    174.    At least 14 of the 21 panel members who drafted the AAPM/APS Guidelines,

11    including KOLs Dr. Portenoy and Dr. Perry Fine, received support from Janssen, Teva, Endo,

12    and Purdue. The 2009 AAPM/APS Guidelines promote opioids as "safe and effective" for

13    treating chronic pain, despite acknowledging limited evidence, and conclude that the risk of

14    addiction is manageable for patients regardless of past abuse histories.[31] One panel member, Dr.

15    Joel Saper, Clinical Professor of Neurology at Michigan State University and founder of the

16    Michigan Headache & Neurological Institute, resigned from the panel because of his concerns

17    that the 2009 AAPM/APS Guidelines were influenced by contributions from drug companies,

18    including Manufacturer Defendants, to the sponsoring organizations and committee members.

19    The 2009 AAPM/APS Guidelines have been a particularly effective channel of deception and

20    have influenced not only treating physicians, but also the body of scientific evidence on opioids.

21    The 2009 AAPM/APS Guidelines have been cited hundreds of times in academic literature, were

22    disseminated in Plaintiffs' communities during the relevant time period, are still available online,

23    and were often reprinted in the Journal of Pain, which is the official journal of the American Pain

24    Society. The Manufacturer Defendants widely referenced and promoted the 2009 AAPM/APS

25    Guidelines without disclosing the lack of evidence to support their conclusions or the

26    _____

(1997).

27    [30] Roger Chou et al., *Clinical Guidelines for the Use of Chronic Opioid Therapy in Chronic Non-Cancer Pain*, 10 J. Pain 113 (2009).

28    [31] *Id.*

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

1    Manufacturer Defendants' financial support to members of the panel.

2         175.    On information and belief, the Manufacturer Defendants combined their efforts

3    through the Pain Care Forum ("PCF"), which began in 2004 as an APF project. PCF is

4    comprised of representatives from opioid manufacturers (including Endo, Janssen, and Purdue)

5    and various Front Groups, almost all of which received substantial funding from the

6    Manufacturer Defendants. Among other projects, PCF worked to ensure that an FDA-mandated

7    education project on opioids was not unacceptably negative and did not require mandatory

8    participation by prescribers. PCF also worked to address a lack of coordination among its

9    members and develop cohesive industry messaging.

10        176.    On information and belief, through Front Groups and KOLs, the Manufacturer

11   Defendants wrote or influenced prescribing guidelines that reflected the messaging the

12   Manufacturer Defendants wanted to promote rather than scientific evidence regarding dangers of

13   addiction.

14        177.    Through these means, and likely others still concealed, the Manufacturer

15   Defendants collaborated to spread deceptive messages about the risks and benefits of long-term

16   opioid use.

17   **C.    The Manufacturer Defendants' Statements about the Safety of Opioids Were Patently False**

18

19        178.    To convince doctors and patients that opioids carry a low risk of addiction,

20   Manufacturer Defendants deceptively trivialized and failed to disclose the risks of long-term

21   opioid use, particularly the risk of addiction, through a series of misrepresentations that the FDA

22   and CDC conclusively debunked.

23        179.    These misrepresentations reinforced each other and created the dangerously

24   misleading impressions, among others, that: (a) starting patients on opioids was low-risk because

25   most patients would not become addicted, and because those who were at greatest risk of

26   addiction could be readily identified and managed; (b) patients who displayed signs of addiction

27   probably were not addicted and, in any event, could easily be weaned from the drugs; (c) the use

28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

61577634.1

- 44 -

1    of higher opioid doses, which many patients need to sustain pain relief as they develop tolerance

2    to the drugs, do not pose special risks; and (d) abuse-deterrent opioids both prevent abuse and

3    overdose and are inherently less addictive.

4        180.    Some examples of these false and misleading claims that were made by, are

5    continuing to be made by, and/or have not been corrected by Manufacturing Defendants,

6    include:

7            a.    Actavis Pharma, Inc.'s predecessor caused a patient education brochure,

8        Managing Chronic Back Pain, to be distributed beginning in 2003 that admitted that

9        opioid addiction is possible, but falsely claimed that it is "less likely if you have never

10       had an addiction problem." Based on Actavis's acquisition of its predecessor's marketing

11       materials along with the rights to Kadian, it appears that Actavis continued to use this

12       brochure in 2009 and beyond.

13           b.    Teva and Purdue sponsored APF's Treatment Options: A Guide for

14       People Living with Pain (2007), which suggests that addiction is rare and limited to

15       extreme cases of unauthorized dose escalations, obtaining duplicative prescriptions, or

16       theft. This publication remains available today.[32]

17           c.    Endo sponsored a website, "PainKnowledge," which, upon information

18       and belief, claimed in 2009 that "[p]eople who take opioids as prescribed usually do not

19       become addicted." Upon information and belief, another Endo website, PainAction.com,

20       stated "Did you know? Most chronic pain patients do not become addicted to the opioid

21       medications that are prescribed for them." Endo also distributed an "Informed Consent"

22       document on PainAction.com that misleadingly suggested that only people who "have

23       problems with substance abuse and addiction" are likely to become addicted to opioid

24       medications.

25           d.    Upon information and belief, Endo and Teva distributed a pamphlet with

26       the Endo logo entitled Living with Someone with Chronic Pain, which stated that "[m]ost

27

28   [32] Available at https://assets.documentcloud.org/documents/277605/apf-treatmentoptions.pdf (last
     accessed December 19, 2017).

FIRST AMENDED COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

1  health care providers who treat people with pain agree that most people do not develop

2  an addiction problem." A similar statement appeared on the Endo website

3  www.opana.com.

4       e.     Janssen reviewed, edited, approved, and distributed a patient education

5  guide entitled Finding Relief:  Pain Management for Older Adults (2009), which

6  described as "myth" the claim that opioids are addictive, and asserted as fact that

7  "[m]any studies show that opioids are rarely addictive when used properly for the

8  management of chronic pain." This guide is still available online.

9       f.     Janssen currently runs a website, *Prescriberesponsibly.com* (last updated

10  July 2, 2015), which claims that concerns about opioid addiction are "overestimated."[33]

11       g.     Purdue sponsored APF's *A Policymaker's Guide to Understanding Pain*

12  *& Its Management* – which claims that less than 1% of children prescribed opioids will

13  become addicted and that pain is undertreated due to "misconceptions about opioid

14  addiction[]." This publication is still available online.[34]

15       h.     Purdue created a website, *In The Face of Pain*, that promoted pain

16  treatment by urging patients to "overcome" their "concerns about addiction."

17  Testimonials on the website that were presented as personal stories were in fact by

18  Purdue consultants, whom Purdue had paid tens of thousands of dollars to promote its

19  drugs.

20       i.     Purdue distributed a pamphlet for doctors, *Providing Relief, Preventing*

21  *Abuse: A Reference Guide To Controlled Substance Prescribing Practices*, which

22  advised that addiction "is not caused by drugs." Instead, Purdue assured doctors that

23  addiction happens when the wrong patients get drugs and abuse them: "it is triggered in a

24  susceptible individual by exposure to drugs, most commonly through abuse."

25       j.     Another Purdue publication, *Resource Guide for People with Pain*, falsely

---

[33] Available at, http://www.prescriberesponsibly.com/articles/opioid-pain-management (last accessed December 19, 2017).

[34] Available at, http://s3.documentcloud.org/documents/277603/apf-policymakers-guide.pdf (last accessed December 20, 2017).

61577634.1

- 46 -

FIRST AMENDED COMPLAINT

Exhibit C

assured patients and doctors that opioid medications are not addictive: "Many people living with pain and even some healthcare providers believe that opioid medications are addictive. The truth is that when properly prescribed by a healthcare professional and taken as directed, these medications give relief – not a 'high.'" Purdue falsely denied the risk of addiction, falsely implied that addiction requires patients to get "high," and falsely promised that patients would not become addicted if they took opioids as prescribed.

k.      Detailers for the Manufacturer Defendants in California have minimized or omitted and continue to minimize or omit any discussion with doctors or their medical staff in California, including in Plaintiffs' communities, about the risk of addiction; misrepresented the potential for abuse of opioids with purportedly abuse-deterrent formulations; and routinely did not correct the misrepresentations noted above.

181.    As another example, Purdue funded a book to target veterans, *Exit Wounds*, which was packaged as the story of a wounded veteran but was really part of Purdue's deceptive marketing campaign. The book repeated Purdue's lie that patients would not become addicted to opioids:

> The pain-relieving properties of opioids are unsurpassed; they are today considered the 'gold standard' of pain medications, and so are often the main medications used in the treatment of chronic pain. Yet, despite their great benefits, opioids are underused. For a number of reasons, healthcare providers may be afraid to prescribe them, and patients may be afraid to take them. At the core of this wariness is the fear of addiction, so I want to tackle this issue head-on ... Long experience with opioids shows that people who are not predisposed to addiction are unlikely to become addicted to opioid pain medications.

182.    The Manufacturer Defendants engaged in this campaign of misinformation in an intentional effort to deceive doctors and patients and thereby increase the use of their opioid products.

183.    The Manufacturer Defendants' misrepresentations have been conclusively debunked by the FDA and CDC, and are contrary to longstanding scientific evidence.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

184.    As noted in the 2016 CDC Guideline[35] endorsed by the FDA, there is "extensive evidence" of the "possible harms of opioids (including opioid use disorder [an alternative term for opioid addiction])." The Guideline points out that "[o]pioid pain medication use presents serious risks, including ... opioid use disorder" and that "continuing opioid therapy for three (3) months substantially increases risk for opioid use disorder."

185.    The FDA further exposed the falsity of Defendants' claims about the low risk of addiction when it announced changes to the labels for extended-release/long-acting opioids in 2013 and for immediate-release opioids in 2016. In its announcements, the FDA found that "most opioid drugs have '*high potential for abuse*'" and that opioids "are associated with a *substantial risk of misuse*, abuse, NOWS [neonatal opioid withdrawal syndrome], addiction, overdose, and death." (Emphasis added.)[36] According to the FDA, because of the "*known serious risks*" associated with long-term opioid use, including "risks of addiction, abuse, and misuse, *even at recommended doses*, and because of the greater risks of overdose and death," opioids should be used only "in patients for whom alternative treatment options" like non-opioid drugs have failed. (Emphasis added.) The FDA further acknowledged that the risk is not limited to patients who seek drugs illicitly; addiction "can occur in patients appropriately prescribed [opioids]."

186.    The Manufacturer Defendants have been and are aware that their misrepresentations about opioids are false.

187.    In a 2016 settlement agreement with Endo, the NY AG found that opioid "use

---

[35] Deborah Dowell et al., *CDC Guideline for Prescribing Opioids for Chronic Pain—United States, 2016*, Morbidity & Mortality Wkly Rep. (Mar. 18, 2016) [hereinafter 2016 CDC Guideline], available at https://www.cdc.gov/mmwr/volumes/65/rr/rr6501e1.htm (last accessed December 20, 2017).

[36] Letter from Janet Woodcock, M.D., Dir., Ctr. For Drug Evaluation and Research, U.S. Food & Drug Admin., U.S. Dep't of Health and Human Servs., to Andrew Koldny, M.D., President, Physicians for Responsible Opioid Prescribing (Sept. 10, 2013), available at https://www.regulations/gov/contentStreamer?documentId=FDA-2012-P-0818-0793&attachmentNumber=1&contentType=pdf (last accessed December 19, 2017); Letter from Janet Woodcock, M.D., Dir., Ctr. For Drug Evaluation and Research, U.S. Food & Drug Admin., U.S. Dep't of Health and Human Servs., to Peter R. Mathers & Jennifer A. Davidson, Kleinfeld, Kaplan & Becker, LLP (Mar. 22, 2016), available at https://www.regulations.gov/contentStreamer?documentId=FDA-2014-P-0205-0006&attachmentNumber=1&contentType=pdf (last accessed December 19, 2017).

disorders appear to be highly prevalent in chronic pain patients treated with opioids, with up to 40% of chronic pain patients treated in specialty and primary care outpatient centers meeting the clinical criteria for an opioid use disorder."[37] While Endo claimed until at least April 2012 on its www.opana.com website that "[m]ost healthcare providers who treat patients with pain agree that patients treated with prolonged opioid medicines usually do not become addicted," the NY AG found that Endo had no evidence for that statement. Consistent with this finding, Endo agreed not to "make statements that ... opioids generally are non-addictive" or "that most patients who take opioids do not become addicted" in New York. This prohibition did not extend to California.

188.    The Manufacturer Defendants falsely instructed doctors and patients that the signs of addiction are actually signs of undertreated pain and should be treated by prescribing more opioids. The Manufacturer Defendants called this phenomenon "pseudoaddiction"—a term coined by Dr. David Haddox, who went to work for Purdue, and popularized by Drs. Portenoy and Webster—and falsely claimed that pseudoaddiction is substantiated by scientific evidence. Some illustrative examples of these deceptive claims that were made by, and are continuing to be made by Defendants are described below:

a.    Teva, Endo, and Purdue sponsored *Responsible Opioid Prescribing* (2007), which taught that behaviors such as "requesting drugs by name," "demanding or manipulative behavior," seeing more than one doctor to obtain opioids, and hoarding, are all signs of pseudoaddiction, rather than true addiction. *Responsible Opioid Prescribing* remains for sale online.[38]

b.    On information and belief, Janssen sponsored, funded, and edited the *Let's Talk Pain* website, which in 2009 stated: "pseudoaddiction . . . refers to patient behaviors that may occur when pain *is under-treated* . . . . Pseudoaddiction is different from true

---

[37] Assurance of Discontinuance, *In re Endo Health Solutions Inc. and Endo Pharm. Inc.* (Assurance No. 15-228), at 13, available at https://ag.ny.gov/pdfs/Endo_AOD_030116-Fully_Executed.pdf (last accessed December 19, 2017).
[38] *See* Scott M. Fishman, M.D., *Responsible Opioid Prescribing: A Physician's Guide* (2d ed. 2012).

FIRST AMENDED COMPLAINT

addiction because such behaviors can be resolved with effective pain management."

c.     Endo sponsored a National Initiative on Pain Control ("NIPC") CME program in 2009 entitled "Chronic Opioid Therapy: Understanding Risk While Maximizing Analgesia," which, upon information and belief, promoted pseudoaddiction by teaching that a patient's aberrant behavior was the result of untreated pain. Endo appears to have substantially controlled NIPC by funding NIPC projects; developing, specifying, and reviewing content; and distributing NIPC materials.

d.     Purdue published a pamphlet in 2011 entitled Providing Relief, Preventing Abuse, which, upon information and belief, described pseudoaddiction as a concept that "emerged in the literature" to describe the inaccurate interpretation of [drug- seeking behaviors] in patients who have pain that has not been effectively treated."

e.     Upon information and belief, Purdue sponsored a CME program titled "Path of the Patient, Managing Chronic Pain in Younger Adults at Risk for Abuse" in 2011. In a role play, a chronic pain patient with a history of drug abuse tells his doctor that he is taking twice as many hydrocodone pills as directed. The narrator notes that because of pseudoaddiction, the doctor should not assume the patient is addicted even if he persistently asks for a specific drug, seems desperate, hoards medicine, or "overindulges in unapproved escalating doses." The doctor treats this patient by prescribing a high-dose, long acting opioid.

f.     Details for Purdue have directed doctors and their medical staffs in California, including in Plaintiffs' communities, to PartnersAgainstPain.com, which contained false and misleading materials describing pseudoaddiction.

g.     Purdue and Teva sponsored APF's Treatment Options: A Guide for People Living with Pain (2007), which states: "Pseudo-addiction describes patient behaviors that may occur when pain is undertreated…Pseudo-addiction can be distinguished from true addiction in that this behavior ceases when pain is effectively treated."

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

### 1. **Deceptive Claims of Pseudoaddiction**

189.     The concept of pseudoaddiction is fictional. The 2016 CDC Guideline rejects pseudoaddiction and does not recommend that opioid dosages be increased if a patient is not experiencing pain relief. Instead, the Guideline explains that "[p]atients who do not experience clinically meaningful pain relief early in treatment ... are unlikely to experience pain relief with longer-term use," and that physicians should "reassess[] pain and function within 1 month" in order to decide whether to "minimize risks of long-term opioid use by discontinuing opioids" because the patient is "not receiving a clear benefit."

190.     In connection with its 2016 settlement with the NY AG, Endo was forced to admit that the concept of pseudoaddiction was a sham. Indeed, the NY AG found that "[t]he pseudoaddiction concept has never been empirically validated and in fact has been abandoned by some of its proponents" and reported that despite the fact that Endo trained its sales representative to use the concept of pseudoaddiction, "Endo's Vice President for Pharmacovigilance and Risk Management testified to [the NY AG] that he was not aware of any research validating the 'pseudoaddiction' concept" and acknowledged the difficulty in distinguishing "between addiction and 'pseudoaddiction.'"[39] Consistent with the NY AG's conclusions, Endo agreed not to "use the term 'pseudoaddiction' in any training or marketing" in New York. Endo made no such agreement with respect to California.

191.     The Manufacturer Defendants also falsely instructed doctors and patients that addiction risk screening tools, patient contracts, urine drug screens, and similar strategies allow them to reliably identify and safely prescribe opioids to patients predisposed to addiction. These misrepresentations were especially insidious because the Manufacturer Defendants aimed them at general practitioners and family doctors who lack the time and expertise to closely manage higher-risk patients on opioids. The Manufacturer Defendants' misrepresentations made these doctors feel more comfortable prescribing opioids to their patients, and patients more comfortable starting on opioid therapy for chronic pain. Some illustrative examples of these

---

[39] *See supra* note 37, at 7.

FIRST AMENDED COMPLAINT

**Exhibit C**

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

1    deceptive claims that were made by, and are continuing to be made by Defendants after March

2    21, 2011, are described below:

3            a.      On information and belief, Endo paid for a 2007 supplement in the

4    *Journal of Family Practice* written by a doctor who became a member of Endo's

5    speakers bureau in 2010. The supplement, entitled *Pain Management Dilemmas in*

6    *Primary Care: Use of Opioids*, emphasized the effectiveness of screening tools, claiming

7    that patients at high risk of addiction could safely receive chronic opioid therapy using a

8    "maximally structured approach" involving toxicology screens and pill counts.

9            b.      On information and belief, Purdue sponsored a November 2011 webinar,

10   *Managing Patient's Opioid Use: Balancing the Need and Risk*, which claimed that

11   screening tools, urine tests, and patient agreements prevent "overuse of prescriptions"

12   and "overdose deaths."

13           c.      On information and belief, as recently as 2015, Purdue has represented in

14   scientific conferences that "bad apple" patients – and not opioids – are the source of the

15   addiction crisis and that once those "bad apples" are identified, doctors can safely

16   prescribe opioids without causing addiction.

17           d.      On information and belief, detailers for the Manufacturer Defendants have

18   touted and continue to tout to doctors in California, including within Plaintiffs' borders,

19   the reliability and effectiveness of screening or monitoring patients as a tool for

20   managing opioid abuse and addiction.

21           e.      A Purdue presentation for doctors titled *Medication Therapy Management*

22   recited what had been the consensus view for decades: "Many medical students are

23   taught that if opioids are prescribed in high doses or for a prolonged time, the patient will

24   become an addict." Purdue then assured doctors that this traditional concern about

25   addiction was wrong — that patients instead suffer from "pseudoaddiction" because

26   "opioids are frequently prescribed in doses that are inadequate."

27           f.      A Purdue pamphlet titled *Clinical Issues in Opioid Prescribing* urged

28   doctors to look for pseudoaddiction: "A term which has been used to describe patient

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

                                                          FIRST AMENDED COMPLAINT

                                    **68**                                    **Exhibit C**

behaviors that may occur when pain is undertreated. Patients with unrelieved pain may become focused on obtaining medications, may 'clock watch," and may otherwise seem inappropriately "drug-seeking.' Even such behaviors as illicit drug use and deception can occur in the patient's efforts to obtain relief. Pseudoaddiction can be distinguished from true addiction in that the behaviors resolve when the pain is effectively treated."

192. Once again, the 2016 CDC Guideline confirms that these types of statements were false, misleading, and unsupported at the time they were made by the Manufacturer Defendants. The 2016 CDC Guideline notes that there are *no* studies assessing the effectiveness of risk mitigation strategies—such as screening tools, patient contracts, urine drug testing, or pill counts widely believed by doctors to detect and deter abuse—"for improving outcomes related to overdose, addiction, abuse, or misuse." As a result, the 2016 CDC Guideline recognizes that available risk screening tools "show ***insufficient accuracy*** for classification of patients as at low or high risk for [opioid] abuse or misuse" and counsels that doctors "should not overestimate the ability of these tools to rule out risks from long-term opioid therapy." (Emphasis added.)

193. To underplay the risk and impact of addiction and make doctors feel more comfortable starting patients on opioids, the Manufacturer Defendants falsely claimed that opioid dependence can easily be addressed by tapering and that opioid withdrawal is not a problem, and failed to disclose the increased difficulty of stopping opioids after long-term use.

194. For example, on information and belief, a 2011 non-credit educational program sponsored by Endo, entitled *Persistent Pain in the Older Adult*, claimed that withdrawal symptoms can be avoided by tapering a patient's opioid dose by 10%-20% for 10 days.

195. Purdue sponsored APF's *A Policymaker's Guide to Understanding Pain & Its Management*, which claimed that "[s]ymptoms of physical dependence can often be ameliorated by gradually decreasing the dose of medication during discontinuation" without mentioning any hardships that might occur.[40] This publication was available on APF's website until the organization dissolved in May 2012.

---

[40] Available at, http://s3.documentcloud.org/documents/277603/apf-policymakers-guide.pdf (last accessed December 19, 2017).

FIRST AMENDED COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

1    196.    Detailers for Janssen have told and continue to tell doctors in California,

2    including in Plaintiffs' communities, that their patients would not experience withdrawal if they

3    stopped using opioids.

**2.  Deceptive Minimization of Opioid Withdrawal**

5    197.    The Manufacturer Defendants also deceptively minimized the significant

6    symptoms of opioid withdrawal—described in the 2016 CDC Guideline as including drug

7    craving, anxiety, insomnia, abdominal pain, vomiting, diarrhea, tremor, and rapid heartbeat—

8    and grossly understated the difficulty of tapering, particularly after long-term opioid use.

9    198.    Contrary to the Manufacturer Defendants' representations, the 2016 CDC

10    Guideline recognizes that the duration of opioid use and the dosage of opioids prescribed should

11    be "limit[ed]" to "minimize the need to taper opioids to prevent distressing or unpleasant

12    withdrawal symptoms," because "physical dependence on opioids is an expected physiologic

13    response in patients exposed to opioids for *more than a few days*." (Emphasis added.) The 2016

14    CDC Guideline states that "more than a few days of exposure to opioids significantly increases

15    hazards" and "each day of unnecessary opioid use increases likelihood of physical dependence

16    without adding benefit." The 2016 CDC Guideline further states that "tapering opioids can be

17    especially challenging after years on high dosages because of physical and psychological

18    dependence" and highlights the difficulties, including the need to carefully identify "a taper slow

19    enough to minimize symptoms and signs of opioid withdrawal" and to "pause[] and restart[]"

20    tapers depending on the patient's response. The CDC also acknowledges the lack of any "high-

21    quality studies comparing the effectiveness of different tapering protocols for use when opioid

22    dosage is reduced or opioids are discontinued."

**3.  Deceptive Claims that Opioid Dosages Could Be Increased without Added Risk**

25    199.    The Manufacturer Defendants also falsely claimed that doctors and patients could

26    increase opioid dosages indefinitely without added risk and failed to disclose the greater risks to

27    patients at higher dosages. The ability to escalate dosages was critical to the Manufacturer

28    Defendants' efforts to market opioids for long-term use to treat chronic pain because, absent this

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

61577634.1

- 54 -

FIRST AMENDED COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

misrepresentation, doctors would have abandoned treatment when patients built up tolerance and lower dosages did not provide pain relief. Some illustrative examples of these deceptive claims that were made by, and are continuing to be made by Defendants, are described below:

a. On information and belief, Actavis's predecessor created a patient brochure for Kadian in 2007 that stated, "Over time, your body may become tolerant of your current dose. You may require a dose adjustment to get the right amount of pain relief. This is not addiction." Upon information and belief, based on Actavis' acquisition of its predecessor's marketing materials along with the rights to Kadian, Actavis continued to use these materials in 2009 and beyond.

b. Teva and Purdue sponsored APF's *Treatment Options: A Guide for People Living with Pain* (2007), which claims that some patients "need" a larger dose of an opioid, regardless of the dose currently prescribed. The guide stated that opioids have "no ceiling dose" and are therefore the most appropriate treatment for severe pain. This guide is still available online.[41]

c. Endo sponsored a website, "PainKnowledge," which, upon information and belief, claimed in 2009 that opioid dosages may be increased until "you are on the right dose of medication for your pain."

d. Endo distributed a pamphlet edited by a KOL entitled *Understanding Your Pain: Taking Oral Opioid Analgesics* (2004 endo Pharmaceuticals PM-0120), on Endo's website. In Q&A format, it asked "If I take the opioid now, will it work later when I really need it?" The response is, "The dose can be increased... You won't 'run out' of pain relief."[42]

e. Janssen, on information and belief, sponsored a patient education guide entitled *Finding Relief: Pain Management for Older Adults* (2009), which was distributed by its sales force. This guide listed dosage limitations as "disadvantages" of other pain

---

[41] Available at, https://assets.documentcloud.org/documents/277605/apf-treatmentoptions.pdf (last accessed December 19, 2017).
[42] Margo McCaffery & Chris Pasero, Endo Pharm., *Understanding Your Pain: Taking Oral Opioid Analgesics* (Russell K Portenoy, M.D., ed., 2004).

61577634.1

- 55 -

FIRST AMENDED COMPLAINT

71        **Exhibit C**

1    medicines but omitted any discussion of risks of increased opioid dosages.

2         f.    On information and belief, through March 2015, Purdue's *In the Face of*

3    *Pain* website promoted the notion that if a patient's doctor does not prescribe what, in the

4    patient's view, is a sufficient dosage of opioids, he or she should find another doctor who

5    will.

6         g.    Purdue sponsored APF's *A Policymaker's Guide to Understanding Pain*

7    *& Its Management*, which taught that dosage escalations are "sometimes necessary,"

8    even unlimited ones, but did not disclose the risks from high opioid dosages.[43]

9         h.    In 2007, Purdue sponsored a CME entitled "Overview of Management

10   Options" that was available for CME credit. The CME was edited by a KOL and taught

11   that NSAIDs and other drugs, but not opioids, are unsafe at high dosages.

12        i.    Seeking to overturn the criminal conviction of a doctor for illegally

13   prescribing opioids, the Front Group APF and others argued to the United States Fourth

14   Circuit Court of Appeals that "there is no 'ceiling dose'" for opioids.[44]

15        j.    Purdue presented a 2015 paper at the College on the Problems of Drug

16   Dependence challenging the correlation between opioid dosage and overdoes.

17        k.    On information and belief, Purdue's detailers have told doctors in

18   California, including within Plaintiffs' borders, that they should increase the dose of

19   OxyContin, rather than the frequency of use, to address early failure.

20   200.   These claims conflict with the scientific evidence, as confirmed by the FDA and

21   CDC. As the CDC explained in its 2016 Guideline, the "[b]enefits of high-dose opioids for

22   chronic pain are not established" while the "risks for serious harms related to opioid therapy

23   increase at higher opioid dosage." More specifically, the CDC explained that "there is now an

24   established body of scientific evidence showing that overdose risk is increased at higher opioid

25   dosages." The CDC also stated that there are "increased risks for opioid use disorder, respiratory

26

27   [43] Available at, http://s3.documentcloud.org/documents/277603/apf-policymakers-guide.pdf (last accessed December 19, 2017).

28   [44] Brief of the APF et al. in support of Appellant, *United States v. Hurowitz*, No. 05-4474, at 9 (4th Cir. Sept. 8, 2005).

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

61577634.1                          - 56 -

FIRST AMENDED COMPLAINT

depression, and death at higher dosages." This is why the CDC advised doctors to "avoid increasing dosages" above 90 morphine milligram equivalents per day.

201.     The 2016 CDC Guideline reinforces earlier findings announced by the FDA. In 2013, the FDA acknowledged "that the available data do suggest a relationship between increasing opioid dose and risk of certain adverse events." For example, the FDA noted that studies "appear to credibly suggest a positive association between high-dose opioid use and the risk of overdose and/or overdose mortality." In fact, a recent study found that 92% of persons who died from an opioid-related overdose were initially prescribed opioids for chronic pain.

**D.     Deceptive Advertising of Abuse Deterrent Opioids**

202.     The Manufacturer Defendants' deceptive marketing of the so-called abuse-deterrent properties of some of their opioid formulations also has created false impressions that these opioids can prevent and curb addiction and abuse. Indeed, in a 2014 survey of 1,000 primary care physicians, nearly half reported that they believed abuse-deterrent formulations are inherently less addictive.

203.     These abuse deterrent formulations (AD opioids) purportedly: (a) are harder to crush, chew, or grind; (b) become gelatinous when combined with a liquid, making them harder to inject; or (c) contain a counteragent such as naloxone that is activated if the tablets are tampered. Despite this, AD opioids can be defeated—often quickly and easily—by those determined to do so. The 2016 CDC Guideline states that "[n]o studies" support the notion that "abuse-deterrent technologies [are] a risk mitigation strategy for deterring or preventing abuse," noting that the technologies—even when they work—do not prevent opioid abuse through oral intake, the most common route of opioid abuse, and can still be abused by non-oral routes. Moreover, they do **not** reduce the rate of misuse and abuse by patients who become addicted after using opioids long-term as prescribed or who escalate their use by taking more pills or higher doses. Tom Frieden, the Director of the CDC, has further reported that his staff could not find "any evidence showing the updated opioids [ADFs] actually reduce rates of addiction,

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

61577634.1

- 57 -

FIRST AMENDED COMPLAINT

73                                                Exhibit C

1   overdoses, or death."[45]

2       204.    Because of these significant limitations on AD opioids, as well as the heightened

3   risk for misconceptions and the false belief that AD opioids can be prescribed safely, the FDA

4   has cautioned that "[a]ny communications from the sponsor companies regarding AD properties

5   must be truthful and not misleading (based on a product's labeling), and supported by sound

6   science taking into consideration the totality of the data for the particular drug. Claims for AD

7   opioid products that are false, misleading, and/or insufficiently proven do not serve the public

8   health."

9       205.    Despite this lack of evidence, the Manufacturer Defendants have made and

10  continue to make misleading claims about the ability of their so-called abuse-deterrent opioid

11  formulations to prevent or reduce abuse and addiction and the safety of these formulations.

12      206.    For example, Endo has marketed Opana ER[46] as tamper- or crush-resistant and

13  less prone to misuse and abuse even though: (a) the FDA rejected Endo's petition to approve

14  Orpana ER as abuse-deterrent in 2012; (b) the FDA warned in a 2013 letter that there was *no*

15  evidence that Opana ER would provide a reduction in oral, intranasal or intravenous abuse; and

16  (c) Endo's own studies, which it failed to disclose, showed that Opana ER could still be ground

17  and chewed. Nonetheless, Endo's advertisements for the 2012 reformulation of Opana ER

18  falsely claimed that it was designed to be crush resistant, in a way that suggested it was more

19  difficult to abuse. Since 2012, Plaintiffs are informed and believe that detailers for Endo have

20  informed California doctors, including doctors in Plaintiffs' communities, that Opana ER is

21  harder to abuse and given demonstrations to nurse practitioners about Opana ER's purported

22

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

---

23  [45] Matthew Perrone et al., *Drugmakers push profitable, but unproven, opioid solution*, Center for
24  Public Integrity (Dec. 15, 2016), available at
    https://www.publicintegrity.org/2016/12/15/20544/drugmakers-push-profitable-unproven-opioid-
    solution (last accessed December 20, 2017).
25  [46] Because Opana ER could be "readily prepared for injection" and was linked to outbreaks of
26  HIV and a serious blood disease, in May 2017, an FDA advisory committee recommended that
    Opana ER be withdrawn from the market. The FDA adopted this recommendation on June 8,
27  2017 and requested that Endo withdraw Opana ER from the market. Press Release, "FDA
    requests removal of Opana ER for risks related to abuse," June 8, 2017, available at
28  https://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm562401.htm (last
    accessed December 20, 2017).

1   abuse deterrent properties.

2       207.   In its 2016 settlement with the NY AG, Endo agreed to no longer make

3   statements in New York that Opana ER was "designed to be, or is crush resistant." The NY AG

4   found those statements to be false and misleading because there was no difference in the ability

5   to extract the narcotic from Opana ER. The NY AG also found that Endo failed to disclose its

6   own knowledge of the crushability of redesigned Opana ER in its marketing to formulary

7   committees and pharmacy benefit managers.

8       208.   Because Orpana ER could be "readily prepared for injection" and was linked to

9   outbreaks of HIV and a serious blood disease, an FDA advisory committee recommended that

10   Opana ER be withdrawn from the market in May 2017. The FDA adopted this recommendation

11   on June 8, 2017, and requested that Endo withdraw Opana ER from the market.

12       209.   Likewise, Purdue has engaged and continues to engage in deceptive marketing of

13   its AD opioids—i.e., reformulated Oxycontin and Hysingla. Before April 2013, Purdue did not

14   market its opioids based on their abuse deterrent properties. However, Plaintiffs are informed

15   and believe that beginning in 2013 and continuing today, detailers from Purdue regularly uses

16   the so-called abuse deterrent properties of Purdue's opioid products as a primary selling point to

17   differentiate Purdue's products from its competitors. Specifically, these detailers: (a) falsely

18   claim that Purdue's AD opioids prevent tampering and cannot be crushed or snorted; (b) falsely

19   claim that Purdue's AD opioids prevent or reduce opioid misuse, abuse, and diversion, are less

20   likely to yield a euphoric high, and are disfavored by opioid abusers; (c) falsely claim Purdue's

21   AD opioids are "safer" than other opioids; and (d) fail to disclose that Purdue's AD opioids do

22   not impact oral abuse or misuse, and that its abuse deterrent properties can be defeated.

23       210.   These statements and omissions by Purdue are false and misleading, and conflict

24   with or are inconsistent with the FDA-approved label for Purdue's AD opioids, which indicates

25   that (a) abusers seek them because of their high "likability" when snorted, (b) their abuse

26   deterrent properties can be defeated, and (c) they can be abused orally notwithstanding their

27   abuse deterrent properties. Notably, the FDA-approved label for Purdue's AD opioids does **not**

28   indicate that AD opioids prevent or reduce abuse, misuse, or diversion.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

61577634.1          - 59 -

FIRST AMENDED COMPLAINT

211.    For example, in 2014, Purdue placed three articles in *The Atlantic* as sponsored content, including one titled *Take My Pain Away ... A Physician's Perspective of Prescription Opioids and Pain Management* by Dr. Gerald Aronoff. That article calls the tamper-resistant formulations "safer alternatives" and encourages physicians to "embrace these additional choices, rather than decide to leave opioid prescribing."

212.    Purdue further created an unbranded marketing initiative, *Opioids with Abuse Deterrent Properties*, to encourage prescribers to switch to Purdue opioids. The initiative included a website, ads in medical journals, medical education events touting the benefits of the tamper-resistant drugs, and payments to doctors to promote Purdue opioids.

213.    Purdue's deceptive marketing convinced doctors of the falsehood that Purdue drugs are less addictive. In a national survey, conducted by the Johns Hopkins Bloomberg School of Public Health, almost half of doctors believed that tamper-resistant opioids were less addictive than other opioids, when in fact they are equally addictive.

214.    Purdue knew and should have known that reformulated OxyContin is not better at tamper resistance than the original OxyContin and is still regularly tampered with and abused. A 2015 study also shows that many opioid addicts are abusing Purdue's AD opioids through oral intake or by defeating the abuse deterrent mechanism. Indeed, ***one-third*** of the patients in the study defeated the abuse deterrent mechanism and were able to continue inhaling or injecting the drug. And to the extent that the abuse of Purdue's AD opioids was reduced, those addicts simply shifted to other drugs such as heroin.[47] Despite this, J. David Haddox—the Vice President of Health Policy for Purdue—falsely claimed in 2016 that the evidence does not show that Purdue's AD opioids are being abused in large numbers.[48]

215.    Testimony in litigation against Purdue and other evidence indicates that Purdue

---

[47] Cicero, Theodore J., and Matthew S. Ellis, "Abuse-deterrent formulations and the prescription opioid abuse epidemic in the United States: lessons learned from Oxycontin" (2015) 72.5 *JAMA Psychiatry* 424–430.
[48] *See* Harrison Jacobs, *There is a big problem with the government's plan to stop the drug-overdose epidemic*, Business Insider (Mar. 14, 2016), available at http://www.businessinsider.com/robert-califf-abuse-deterrent-drugs-have-a-big-flaw-2016-3 (last accessed December 20, 2017).

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

61577634.1

- 60 -

FIRST AMENDED COMPLAINT

knew and should have known that "reformulated OxyContin is not better at tamper resistance than the original OxyContin" and is still regularly tampered with and abused. Websites and message boards used by drug abusers, such as bluelight.org and reddit, also report a variety of ways to tamper with OxyContin and Hysingla, including through grinding, microwaving then freezing, or drinking soda or fruit juice in which the tablet has been dissolved. Even Purdue's own website describes a study it conducted that found continued abuse of OxyContin with so-called abuse deterrent properties. Finally, there are no studies indicating that Purdue's AD opioids are safer than any other opioid products.

216.    The development, marketing, and sale of AD opioids is a continuation of the Manufacturer Defendants' strategy of using misinformation to drive profit. The Manufacturer Defendants' claims that AD opioids are safe falsely assuage doctors' concerns about the toll caused by the explosion in opioid abuse, causing doctors to prescribe more AD opioids, which are far more expensive than other opioid products even though they provide little or no additional benefit in the prevention of opioid abuse.

217.    These false and misleading claims about the abuse deterrent properties of their opioids are especially troubling. First, Manufacturer Defendants are using these claims in a spurious attempt to rehabilitate their image as responsible opioid manufacturers. Plaintiffs are informed and believe that Purdue has conveyed to prescribers that its sale of AD opioids is "atonement" for its earlier sins (even though its true motive was to preserve the profits it otherwise would have lost when its patent for OxyContin expired). Indeed, Purdue introduced its first AD opioid days before its patent for its non-AD opioid would have expired. Purdue even petitioned the FDA to withdraw its non-AD opioid as unsafe as a way to prevent generic competition. Second, these claims are falsely assuaging doctors' concerns about the toll caused by the explosion in opioid prescriptions and use, and encouraging doctors to prescribe AD opioids under the mistaken belief that these opioids are safer, even though they are not. Finally, these claims are causing doctors to prescribe more AD opioids, which are far more expensive than other opioid products even though they provide little or no additional benefit in the prevention of opioid abuse.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

218.     These numerous, longstanding misrepresentations of the risks of long-term opioid use spread by Defendants successfully convinced doctors and patients to discount those risks.

**E.      The Manufacturer Defendants Misrepresented the Benefits of Chronic Opioid Therapy**

219.     To convince doctors and patients that opioids should be used to treat chronic pain, the Manufacturer Defendants also had to persuade them that there was significant upside to long-term opioid use.

220.     The 2016 CDC Guideline makes clear, there is "***insufficient evidence*** to determine long-term benefits of opioid therapy for chronic pain." (Emphasis added.) In fact, the CDC found that "[n]o evidence shows a long-term benefit of opioids in pain and function versus no opioids for chronic pain with outcomes examined at least 1 year later (with most placebo-controlled randomized trials ≤ 6 weeks in duration)" and that other treatments were more or equally beneficial and less harmful than long-term opioid use.

221.     In 2013, the FDA also stated that it was "not aware of adequate and well-controlled studies of opioids use longer than 12 weeks."

222.     Despite this, the Manufacturer Defendants falsely and misleadingly touted the benefits of long-term opioid use, and falsely and misleadingly suggested that these benefits were supported by scientific evidence. Not only have the Manufacturer Defendants failed to correct these false and misleading claims, but they have continued to make them today.

223.     For example, the Manufacturer Defendants falsely claimed that long-term opioid use improved patients' function and quality of life. Some illustrative examples of these deceptive claims that were made by, and are continuing to be made by Defendants are described below:

   a.      On information and belief, Actavis distributed an advertisement that claimed that the use of Kadian to treat chronic pain would allow patients to return to work, relieve "stress on your body and your mental health," and help patients enjoy their lives.

   b.      Endo distributed advertisements that claimed that the use of Opana ER for

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

chronic pain would allow patients to perform demanding tasks like construction work or work as a chef and portrayed seemingly healthy, unimpaired subjects.

c.     On information and belief, Janssen sponsored and edited a patient education guide entitled *Finding Relief: Pain Management for Older Adults* (2009) – which states as "a fact" that "opioids may make it easier for people to live normally." The guide lists expected functional improvements from opioid use, including sleeping through the night, returning to work, recreation, sex, walking, and climbing stairs and states that "[u]sed properly, opioid medications can make it possible for people with chronic pain to 'return to normal.'"

d.     *Responsible Opioid Prescribing* (2007), sponsored and distributed by Endo and Purdue, taught that relief of pain by opioids, by itself, improved patients' function. The book remains for sale online.

e.     APF's Treatment Options: A Guide for People Living with Pain, sponsored by Teva and Purdue, counseled patients that opioids "give [pain patients] a quality of life we deserve." This publication is still available online.

f.     Endo's NIPC website *painknowledge.com* claimed in 2009 that with opioids, "your level of function should improve; you may find you are now able to participate in activities of daily living, such as work and hobbies, that you were not able to enjoy when your pain was worse." Elsewhere, the website touted improved quality of life (as well as "improved function") as benefits of opioid therapy.  The grant request that Endo approved for this project specifically indicated NIPC's intent to make misleading claims about function, and Endo closely tracked visits to the site.

g.     Endo was the sole sponsor, through NIPC, of a series of non-credit educational programs titled Persistent Pain in the Older Patient, which claimed that chronic opioid therapy has been "shown to reduce pain and improve depressive symptoms and cognitive functioning." The CME was disseminated via webcast.

h.     On information and belief, Janssen sponsored, funded, and edited a website, *Let's Talk Pain*, in 2009, which featured an interview edited by Janssen claiming

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

FIRST AMENDED COMPLAINT

that opioids allowed a patient to "continue to function." This video is still available today on YouTube.

    i.     Purdue sponsored the development and distribution of APF's *A Policymaker's Guide to Understanding Pain & Its Management*, which claimed that "multiple clinical studies" have shown that opioids are effective in improving daily function, psychological health, and health-related quality of life for chronic pain patients." The Policymaker's Guide was originally published in 2011 is still available online today.

    j.     In a 2015 video on Forbes.com[49] discussing the introduction of Hysingla ER, Purdue's Vice President of Health Policy, J. David Haddox, talked about the importance of opioids, including Purdue's opioids, to chronic pain patients' "quality of life," and complained that CDC statistics do not take into account that patients could be driven to suicide without pain relief.

    k.     Purdue's, Endo's, Teva's and Janssen's sales representatives have conveyed and continue to convey to prescribers in California, including in Plaintiffs' communities, the message that opioids will improve patient function.

224.    The above claims find no support in the scientific literature. The FDA and other federal agencies have made this clear for years. Most recently, the 2016 CDC Guideline approved by the FDA concluded that "there is *no good evidence* that opioids improve pain or function with long-term use, and ... complete relief of pain is unlikely." (Emphasis added.) The CDC reinforced this conclusion throughout its 2016 Guideline, finding:

    a.     "No evidence shows a long-term benefit of opioids in pain and function versus no opioids for chronic pain with outcomes examined at least 1 year later . . . ."

    b.     "Although opioids can reduce pain during short-term use, the clinical evidence review found insufficient evidence to determine whether pain relief is sustained

---

[49] Matthew Harper, *Why Supposedly Abuse-Proof Pills Won't Stop Opioid Overdose Deaths*, Forbes (Apr. 17, 2015), available at https://www.forbes.com/sites/matthewherper/2015/04/17/why-supposedly-abuse-proof-pills-pill-wont-stop-opioid-overdose-deaths/#6a4e41f06ce1 (last accessed December 20, 2017).

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

FIRST AMENDED COMPLAINT

Exhibit C

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

and whether function or quality of life improves with long-term opioid therapy."

  c. "[E]vidence is limited or insufficient for improved pain or function with long-term use of opioids for several chronic pain conditions for which opioids are commonly prescribed, such as low back pain, headache, and fibromyalgia."

225. The CDC also noted that the risks of addiction and death "can cause distress and inability to fulfill major role obligations." As a matter of common sense (and medical evidence), drugs that can kill patients or commit them to a life of addiction or recovery do not improve their function and quality of life.

226. The 2016 CDC Guideline was not the first time a federal agency repudiated the Manufacturer Defendants' claim that opioids improved function and quality of life. In 2010, the FDA warned Actavis that "[w]e are not aware of substantial evidence or substantial clinical experience demonstrating that the magnitude of the effect of the drug [Kadian] has in alleviating pain, taken together with any drug-related side effects patients may experience … results in any overall positive impact on a patient's work, physical and mental functioning, daily activities, or enjoyment of life."[50] And, in 2008 the FDA sent a warning letter to an opioid manufacturer, making it publicly clear "that [the claim that] patients who are treated with the drug experience an improvement in their overall function, social function, and ability to perform daily activities . . . has not been demonstrated by substantial evidence or substantial clinical experience."

227. The Manufacturer Defendants also falsely and misleadingly emphasized or exaggerated the risks of competing products like NSAIDs, so that doctors and patients would look to opioids first for the treatment of chronic pain. For example, the Manufacturer Defendants frequently contrasted the lack of a ceiling dosage for opioids with the risks of a competing class of analgesics: over-the-counter nonsteroidal anti-inflammatories (or NSAIDs). The Manufacturer Defendants deceptively describe the risks from NSAIDs while failing to disclose the risks from

---

[50] Warning Letter from Thomas Abrams, Dir., FDA Div. of Mktg., Adver., & Commc'ns, to Doug Boothe, CEO, Actavis Elizabeth LLC (Feb. 18, 2010), available at http://wayback.archive-it.org/7993/20170112063027/http://www.fda.gov/Drugs/GuidanceComplianceRegulatoryInformation/EnforcementActivitiesbyFDA/WarningLettersandNoticeofViolationLetterstoPharmaceuticalCompanies/ucm259240.htm (last accessed December 20, 2017).

FIRST AMENDED COMPLAINT

1  opioids.[51] The Manufacturer Defendants have overstated the number of deaths from NSAIDS

2  and have prominently featured the risks of NSAIDS, while minimizing or failing to mention the

3  serious risks of opioids. Once again, these misrepresentations by the Manufacturer Defendants

4  contravene pronouncements by and guidance from the FDA and CDC based on the scientific

5  evidence. Indeed, the FDA changed the labels for ER/LA opioids in 2013 and IR opioids in 2016

6  to state that opioids should only be used as a last resort "in patients for which alternative

7  treatment options" like non-opioid drugs "are inadequate."  And the 2016 CDC Guideline states

8  that NSAIDs, not opioids, should be the first-line treatment for chronic pain, particularly arthritis

9  and lower back pain.

10      228.    In addition, Purdue has misleadingly promoted OxyContin as being unique

11  among opioids in providing 12 continuous hours of pain relief with one dose. Plaintiffs are

12  informed and believe that Purdue's detailers have told prescribers in California within the last

13  two years that OxyContin lasts 12 hours. In fact, OxyContin does not last for 12 hours, which is

14  an indisputable fact that Purdue has known at all times relevant to this action. Upon information

15  and belief, Purdue's own research shows that OxyContin wears off in under six hours in one

16  quarter of patients and in under 10 hours in more than half. This is because OxyContin tablets

17  release approximately 40% of their active medicine immediately, after which release tapers. This

18  triggers a powerful initial response, but provides little or no pain relief at the end of the dosing

19  period, when less medicine is released. This phenomenon is known as "end of dose" failure, and

20  the FDA found in 2008 that a "substantial proportion" of chronic pain patients taking OxyContin

21  experience it. This not only renders Purdue's promise of 12 hours of relief false and deceptive, it

22  also makes OxyContin more dangerous because the declining pain relief patients experience

23  toward the end of each dosing period drives them to take more OxyContin before the next dosing

24  period begins, quickly increasing the amount of drug they are taking and spurring growing

25  dependence.

26

27  [51] *See, e.g., Case Challenges in Pain Management: Opioid Therapy for Chronic Pain* (Endo) (describing massive gastrointestinal bleeds from long-term use of NSAIDs and recommending

28  opioids), available at http://www.painmedicinenews.com/download/BtoB_Opana_WM.pdf (last accessed December 19, 2017).

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

61577634.1                    - 66 -

FIRST AMENDED COMPLAINT

229.     Teva deceptively marketed its opioids Actiq and Fentora for chronic pain even though the FDA has expressly limited their use to the treatment of cancer pain in opioid tolerant individuals. Both Actiq and Fentora are extremely powerful fentanyl-based IR opioids. Neither is approved for, or has been shown to be safe or effective for, chronic pain. Indeed, the FDA expressly prohibited Teva from marketing Actiq for anything but cancer pain, and refused to approve Fentora for the treatment of chronic pain because of the potential harm.

230.     Despite this, Plaintiffs are informed and believe that Teva conducted and continues to conduct a well-funded campaign to promote Actiq and Fentora for chronic pain and other non-cancer conditions for which it was not approved, appropriate, or safe.[52] As part of this campaign, Teva used CMEs, speaker programs, KOLs, journal supplements, and detailing by its sales representatives to give doctors the false impression that Actiq and Fentora are safe and effective for treating non-cancer, chronic pain.

231.     Teva's deceptive marketing gave doctors and patients the false impression that Actiq and Fentora were not only safe and effective for treating chronic pain, but were also approved by the FDA for such uses. For example:

a.     Teva paid to have a CME it sponsored, Opioid-Based Management of Persistent and Breakthrough Pain, published in a supplement of Pain Medicine News in 2009. The CME instructed doctors that "[c]linically, broad classification of pain syndromes as either cancer- or non-cancer-related has limited utility" and recommended Actiq and Fentora for patients with chronic pain.

b.     Upon information and belief, Teva's sales representatives set up hundreds of speaker programs for doctors, including many non-oncologists, which promoted Actiq and Fentora for the treatment of non-cancer pain.

c.     In December 2011, Teva widely disseminated a journal supplement entitled "Special Report: An Integrated Risk Evaluation and Mitigation Strategy for

---

[52] *See* Press Release, U.S. Dep't of Justice, *Biopharmaceutical Company, Cephalon, to Pay $425 million & Enter Plea To Resolve Allegations of Off-Label Marketing* (Sept. 29, 2008), available at https://www.justice.gov/archive/opa/pr/2008/September/08-civ-860.html (last accessed December 21, 2017).

61577634.1

- 67 -

FIRST AMENDED COMPLAINT

83                                                              **Exhibit C**

Fentanyl Buccal Tablet (FENTORA) and Oral Transmucosal Fentanyl Citrate (ACTIQ)" to Anesthesiology News, Clinical Oncology News, and Pain Medicine News – three publications that are sent to thousands of anesthesiologists and other medical professionals. The Special Report openly promotes Fentora for "multiple causes of pain" – and not just cancer pain.

232.     Purdue's sales representatives have pressed doctors to prescribe its opioids in order to be rewarded with talks paid by Purdue. Plaintiffs are informed and believe that Purdue sale representatives have told doctors that in California that they will no longer be asked to give paid talks unless they increase their prescribing of Purdue's drugs.

233.     Separate and apart from the obligations imposed by California common law and regulations, the U.S. Drug Enforcement Agency (DEA) has repeatedly informed Purdue about its legal "obligation to design and operate a system to disclose ... suspicious orders of controlled substances" and to inform the DEA "of suspicious orders when discovered." Purdue, however, unlawfully failed to report or address illicit and unlawful prescribing of its drugs despite knowing about it for years. *See* 21 C.F.R. § 1301.74(b); 21 U.S.C. § 823(e).

234.     For over a decade, Purdue has been able to track the distribution and prescribing of its opioids down to the retail and prescriber levels. Through its extensive network of sales representatives, Purdue had and continues to have knowledge of the prescribing practices of thousands of doctors in California and could identify California doctors who displayed red flags for diversion, including doctors whose waiting rooms were overcrowded, parking lots had numerous out-of-state vehicles, and patients seemed young and healthy, or homeless. Using this information, Purdue has maintained a database since 2002 of doctors suspected of inappropriately prescribing its drugs.

235.     Incredibly, rather than report these doctors to state medical boards or law enforcement authorities (as Purdue is legally obligated to do) or cease marketing to them, Purdue used the list to demonstrate the high rate of diversion of OxyContin—the same OxyContin that Purdue had promoted as less addictive—in order to persuade the FDA to bar the manufacture and sale of generic copies of the drug because the drug was too likely to be abused. In an

ROBINS KAPLAN LLP<br>ATTORNEYS AT LAW<br>MINNEAPOLIS

61577634.1                                    - 68 -

1    interview with the Los Angeles Times, Purdue's senior compliance officer acknowledged that in

2    five years of investigating suspicious pharmacies, Purdue failed to take action, including in

3    circumstances where Purdue employees personally witnessed the diversion of its drugs. Purdue

4    also failed to take action with prescribers. Despite its knowledge of illegal prescribing, Purdue

5    did not report until years after law enforcement shut down a Los Angeles clinic that prescribed

6    more than 1.1 million OxyContin tablets and that Purdue's district manager described internally

7    as "an organized drug ring." In doing so, Purdue protected its own profits at the expense of

8    public health and safety.

9        236.    In 2016, the NY AG found that, between January 1, 2008 and March 7, 2015,

10   Purdue's sales representatives failed to timely report suspicious prescribing and continued to

11   detail those prescribers even after they were placed on a "no-call" list.

12       237.    As Dr. Mitchell Katz, director of the Los Angeles County Department of Health

13   Services, said in a Los Angeles Times article, "Any drug company that has information about

14   physicians potentially engaged in illegal prescribing or prescribing that is endangering people's

15   lives has a responsibility to report it." The NY AG's settlement with Purdue specifically cited the

16   company for failing to adequately address suspicious prescribing. Yet, on information and belief,

17   Purdue continues to profit from the prescriptions by such prolific prescribers.

18       238.    Like Purdue, Endo has been cited for its failure to set up an effective system for

19   identifying and reporting suspicious prescribing. In its settlement agreement with Endo, the NY

20   AG found that Endo: (a) failed to require sales representatives to report signs of abuse, diversion,

21   and inappropriate prescribing; (b) paid bonuses to sales representatives for detailing prescribers

22   who were subsequently arrested or convicted for illegal prescribing; and (c) failed to prevent

23   sales representatives from visiting prescribers whose suspicious conduct had caused them to be

24   placed on a no-call list. The NY AG also found that, in certain cases where Endo's sales

25   representatives detailed prescribers who were convicted of illegal prescribing of opioids, those

26   representatives could have recognized potential signs of diversion and reported those prescribers

27   but failed to do so.

28       239.    The Manufacturer Defendants made, promoted, and profited from their

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

61577634.1                                         - 69 -

1    misrepresentations about the risks and benefits of opioids for chronic pain even though they

2    knew that their misrepresentations were false and misleading. The history of opioids, as well as

3    research and clinical experience over the last 20 years, established that opioids were highly

4    addictive and responsible for a long list of very serious adverse outcomes. The Manufacturer

5    Defendants had access to scientific studies, detailed prescription data, and reports of adverse

6    events, including reports of addiction, hospitalization, and deaths – all of which made clear the

7    harms from long-term opioid use and that patients are suffering from addiction, overdoses, and

8    death in alarming numbers. More recently, the FDA and CDC have issued pronouncements

9    based on the medical evidence that conclusively expose the known falsity of the Manufacturer

10   Defendants' misrepresentations, and Endo and Purdue have recently entered into agreements

11   prohibiting them from making some of the same misrepresentations described in this Complaint.

12        240.    On information and belief, the Manufacturer Defendants coordinated their

13   messaging through national and regional sales and speaker trainings and coordinated

14   advertisements and marketing materials.

15        241.    Moreover, at all times relevant to this Complaint, the Manufacturer Defendants

16   took steps to avoid detection of and to fraudulently conceal their deceptive marketing. For

17   example, the Manufacturer Defendants disguised their own role in the deceptive marketing of

18   chronic opioid therapy by funding and working through third parties like Front Groups and

19   KOLs. The Manufacturer Defendants purposefully hid behind the assumed credibility of these

20   individuals and organizations, and relied on them to vouch for the accuracy and integrity of the

21   Manufacturer Defendants' false and misleading statements about the risks and benefits of long-

22   term opioid use for chronic pain.

23        242.    Manufacturer Defendants also never disclosed their role in shaping, editing, and

24   approving the content of information and materials disseminated by these third parties.

25   Manufacturer Defendants exerted considerable influence on these promotional and "educational"

26   materials in emails, correspondence, and meetings with KOLs, Front Groups, and public

27   relations companies that were not, and have not yet become, public. For example,

28   painknowledge.org, which is run by the NIPC, did not disclose Endo's involvement. Other

- 70 -

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

1   Manufacturer Defendants, such as Purdue and Janssen, ran similar websites that masked their

2   own direct role.

3       243.   Finally, the Manufacturer Defendants manipulated their promotional materials

4   and the scientific literature to make it appear that the information and materials disseminated by

5   third parties were accurate, truthful, and supported by objective evidence when they were not.

6   The Manufacturer Defendants distorted the meaning or import of studies they cited and offered

7   them as evidence for propositions the studies did not support. The lack of support for the

8   Manufacturer Defendants' deceptive messages was not apparent to medical professionals who

9   relied upon them in making treatment decisions, nor could it have been detected by Plaintiffs.

10       244.   The Manufacturer Defendants' efforts to artificially increase the number of opioid

11   prescriptions directly and predictably caused a corresponding increase in opioid abuse. In a 2016

12   report, the CDC explained that "[o]pioid pain reliever prescribing has quadrupled since 1999 and

13   has increased in parallel with [opioid] overdoses."[53] Many abusers start with legitimate

14   prescriptions. For these reasons, the CDC concluded that efforts to rein in the prescribing of

15   opioids for chronic pain are critical "[t]o reverse the epidemic of opioid drug overdose deaths

16   and prevent opioid-related morbidity."[54] Accordingly, the Manufacturer Defendants' false and

17   misleading statements directly caused the current opioid epidemic. The Manufacturer

18   Defendants' misrepresentations deceived and continue to deceive doctors and patients in

19   California, including in Plaintiffs' communities, about the risks and benefits of long-term opioid

20   use. California doctors confirm this. Studies also reveal that many doctors and patients are not

21   aware of or do not understand these risks and benefits. Indeed, patients often report that they

22   were not warned they might become addicted to opioids prescribed to them. As reported in

23   January 2016, a 2015 survey of more than 1,000 opioid patients found that 4 out of 10 were not

24   told opioids were potentially addictive. Plaintiffs are informed and believe that California

25

26   [53] Rose A Rudd, et al., *Increases in Drug and Opioid Overdose Deaths – United States, 2000-2014*, Morbidity and Mortality Wkly Rep. (Jan. 1, 2016), available at

27   https://www.cdc.gov/mmwr/preview/mmwrhtml/mm6450a3.htm (last accessed December 20, 2017).

28   [54] *Id.*

FIRST AMENDED COMPLAINT

    Exhibit C

residents were never told that they might become addicted to opioids when they started taking them, were told that they could easily stop using opioids, or were told that the opioids they were prescribed were less addictive than other opioids.

245.    Numerous doctors and substance abuse counselors in California note that many of their patients who misuse or abuse opioids started with legitimate prescriptions, confirming the important role that doctors' prescribing habits have played in the opioid epidemic. Treatment centers in California report that they treat a significant percentage – i.e., as high as 80% – of patients for opioid addiction.

246.    The Manufacturer Defendants knew and should have known that their misrepresentations about the risks and benefits of long-term opioid use were false and misleading when they made them.

247.    The Manufacturer Defendants' deceptive marketing of the abuse-deterrent properties of their opioids caused and continue to cause doctors in California, including doctors in Plaintiffs' communities, to prescribe opioids for chronic pain conditions such as back pain, headaches, arthritis, and fibromyalgia, rather than prescribing less addictive medications. Absent Manufacturers Defendants' deceptive marketing scheme, these doctors would not have prescribed as many opioids to as many patients, and there would not have been as many opioids available for misuse and abuse or as much demand for those opioids.

248.    Manufacturer Defendants' deceptive marketing of the abuse-deterrent properties of their opioids have caused and continue to cause the prescribing and use of opioids to explode in California, including in Plaintiffs' communities. Opioids are the most common means of treatment for chronic pain; 20% of office visits now include the prescription of an opioid, and 4 million Americans per year are prescribed a long-acting opioid.

249.    In California, including in Plaintiffs' communities, Manufacturer Defendants' deceptive marketing of the abuse-deterrent properties of their opioids during the past few years has been particularly effective. For example, one survey reports that pain specialists were more likely to recognize that OxyContin had abuse deterrent properties and to prescribe OxyContin specifically because of those properties. Further, prescribers who knew of OxyContin's abuse

1   deterrent properties were using more of it than those who did not know it was an AD opioid.

2   Although sales of AD opioids still represent only a small fraction of opioids sold (less than 5%

3   of all opioids sold in 2015), they represent a disproportionate share of opioid sales revenue ($2.4

4   billion or approximately 25% in opioid sales revenue in 2015).

5       250.    The dramatic increase in opioid prescriptions and use corresponds with the

6   dramatic increase in Manufacturer Defendants' spending on their deceptive marketing scheme.

7   Manufacturer Defendants' spending on opioid marketing totaled approximately $91 million in

8   2000. By 2011, that spending had tripled to $288 million.

9   **F.    All Defendants Created an Illicit Market for Opioids**

10      251.    In addition to the allegations above, all Defendants played a role in the creation of

11  an illicit market for prescription opioids, further fueling the opioid epidemic.

12      252.    Defendants' distribution of opioids was driven by national policies, coordination,

13  plans, and procedures that were the same in California as they were across the rest of the United

14  States. Defendants worked together in an illicit enterprise, engaging in conduct that was not only

15  illegal, but in certain respects anti-competitive, with the common purpose and achievement of

16  vastly increasing their respective profits and revenues by exponentially expanding a market that

17  the law intended to restrict. At all relevant times, Defendants were in possession of national,

18  regional, state, and local prescriber- and patient-level data that allowed them to track prescribing

19  patterns over time. Defendants utilized this data to further their distribution scheme and to ensure

20  the largest possible financial return.

21      253.    Each participant in the supply chain shares the responsibility for controlling the

22  availability of prescription opioids. Opioid "diversion" occurs whenever the supply chain of

23  prescription opioids is broken, allowing drugs to be transferred from a legitimate channel of

24  distribution or use to an illegitimate channel of distribution or use.

25      254.    Diversion can occur at any point in the opioid supply chain.

26      255.    For example, diversion can occur at the wholesale level of distribution when

27  distributors allow opioids to be lost or stolen in transit, or when distributors fill suspicious orders

28  of opioids from buyers, retailers, or prescribers. Suspicious orders include orders of unusually

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

61577634.1                          - 73 -

large size, orders that are disproportionately large in comparison to the population of a community served by the pharmacy, orders that deviate from a normal pattern, and/or orders of unusual frequency.

256.  Diversion can occur at pharmacies or retailers when a pharmacist fills a prescription despite having reason to believe it was not issued for a legitimate medical purpose or not in the usual course of practice. Some of the signs that a prescription may have been issued for an illegitimate medical purpose include when the patient seeks to fill multiple prescriptions from different doctors (known as doctor shopping), when they travel great distances between the doctor or their residence and the pharmacy to get the prescription filled, when they present multiple prescriptions for the largest dose of more than one controlled substance, or when there are other "red flags" surrounding the transaction. These red flags should trigger closer scrutiny of the prescriptions by the pharmacy and lead to a decision that the patient is not seeking the medication to treat a legitimate medical condition.

257.  Diversion occurs through the use of stolen or forged prescriptions or the sale of opioids without prescriptions, including patients seeking prescription opioids under false pretenses. Opioids can also be diverted when stolen by employees or others.

258.  Opioid diversion occurs at an alarming rate in the United States.

259.  Each participant in the supply chain, including each Defendant, has a common law duty to prevent diversion by using reasonable care under the circumstances. This includes a duty not to create a foreseeable risk of harm to others. Additionally, one who engages in affirmative conduct and thereafter realizes or should realize that such conduct has created an unreasonable risk of harm to another is under a duty to exercise reasonable care to prevent the threatened harm.

260.  Defendants, and not Plaintiffs, controlled the manufacture, marketing, and distribution of prescription opioids within Plaintiffs' boundaries. As such, Defendants were in the best position to protect Plaintiffs and the public from the risk of harm of misuse of these products. Defendants owed Plaintiffs a common law duty of care in light of that foreseeable risk.

261.  Manufacturer Defendants owed Plaintiffs a duty to exercise reasonable care in the

- 74 -

1   promotion of prescription opioids in and around Plaintiffs' boundaries. Defendants breached that

2   duty in their misleading and inaccurate promotion of prescription opioids.

3       262.    Distributor Defendants owed Plaintiffs a duty to exercise reasonable care in the

4   sale and distribution of opioids in and around Plaintiffs' boundaries. *See* Cal. Civ. Code § §

5   1714(a); *Goonewardene v. ADP, LLC*, 6 Cal. 5th 817, 837 (2019); *Cabral v. Ralphs Grocery*

6   *Co.*, 51 Cal. 4th 764, 771 (2011). Defendants breached that duty in their failure to prevent

7   diversion of prescription opioids and in their refusal to report and halt suspicious orders.

8       263.    In addition to their common law duties, Defendants possess duties under

9   California law to develop and maintain a system to track suspicious orders of prescription

10  opioids. Both Manufacturer and Distributor Defendants are subject to the reporting requirements

11  of 16 CCR § 1782, and Distributor Defendants are further subject to California Business &

12  Professions Code §§ 4164 and 4169.1.

13      264.    California law requires Defendants to report suspicious orders of dangerous drugs

14  subject to abuse, and to develop and maintain systems to detect and report such activity. This

15  framework acts as a system of checks and balances from the manufacturing level through

16  delivery of the controlled substance to the patient or ultimate user.

17      265.    Thus, all opioid distributors are required to maintain effective controls against

18  opioid diversion. They are required to create and use a system to identify and report to the

19  California State Board of Pharmacy downstream suspicious orders of controlled substances, such

20  as orders of unusually large size, orders that are disproportionate, orders that deviate from a

21  normal pattern, and/or orders of unusual frequency. To comply with these requirements,

22  distributors must know their customers, must conduct due diligence, must report suspicious

23  orders, and must terminate orders if there are indications of diversion.

24      266.    Defendants' repeated and prolific violations of these requirements show that they

25  have failed to meet the relevant standard of conduct that society expects of them: the duty to

26  exercise reasonable care in the promotion of prescription opioids. In doing so, they acted with

27  willful disregard for Plaintiffs and the people therein.

28      267.    Separately, Defendants also are subject to federal statutory requirements of the

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

Controlled Substances Act, 21 U.S.C. § 801 *et seq.* (the "CSA"), and its implementing regulations. Congress passed the CSA partly out of a concern about "the widespread diversion of [controlled substances] out of legitimate channels into the illegal market." H.R. Rep. No. 91-1444, 1970 U.S.C.C.A.N. 4566, 4572.

268.    Moreover, every person or entity that manufactures, distributes, or dispenses opioids must obtain a registration with the DEA. Registrants at every level of the supply chain must fulfill their obligations under the CSA.

269.    Under the CSA, anyone authorized to handle controlled substances must track shipments. The DEA's Automation of Reports and Consolidation Orders System ("ARCOS") is an automated drug reporting system that records and monitors the flow of Schedule II controlled substances from the point of manufacture through distribution to the point of sale. ARCOS accumulates data on distributors' controlled substances and transactions, which are then used to identify diversion. Each person or entity registered to distribute ARCOS reportable controlled substances, including opioids, must report each acquisition and distribution transaction to the DEA. *See* 21 U.S.C. § 827; 21 C.F.R. § 1304.33. Each registrant must also maintain a complete, accurate, and current record of each substance manufactured, imported, received, sold, delivered, exported, or otherwise disposed of.

270.    Plaintiffs do not bring causes of action based on violations of federal statutes and regulations. However, the existence of these complicated regulatory schemes shows Defendants' intimate knowledge of the dangers of diversion of prescription opioids and the existence of a thriving illicit market for these drugs. Defendants breached their duties to Plaintiffs despite this knowledge and longstanding regulatory guidance of how to deter and prevent diversion of prescription opioids.

### 1.    The Distributor Defendants Negligently Failed to Control the Flow of Opioids to Plaintiffs Through Illicit Channels

271.    The Distributor Defendants have been and continue to be well-aware of problems posed by their failure to combat diversion of opioids. For example, the DEA has provided guidance to distributors on how to combat opioid diversion, and Plaintiffs are informed and

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

1  believe that the DEA has conducted one-on-one briefings with distributors regarding

2  downstream customer sales, due diligence, and regulatory responsibilities since 2006.

3      272.   Plaintiffs are further informed and believe that the DEA also provides distributors

4  with data on controlled substance distribution patterns and trends, including data on the volume

5  and frequency of orders and the percentage of controlled versus non-controlled purchases. The

6  distributors are also given case studies, legal findings against other registrants, and ARCOS

7  profiles of their customers whose previous purchases may have reflected suspicious ordering

8  patterns. The DEA even pointed out "red flags" that the Distributor Defendants should look for

9  in order to identify potential diversion.

10     273.   Since 2007, the DEA has hosted at least five conferences to provide registrants

11 with updated information about diversion trends and regulatory changes that affect the drug

12 supply chain, the distributor initiative, and suspicious order reporting. All of the major

13 distributors, including McKesson, AmerisourceBergen, and Cardinal, attended at least one of

14 these conferences. The conferences allowed the registrants to ask questions and raise concerns.

15 These registrants could also request clarification on DEA policies, procedures, and

16 interpretations of the CSA and implementing regulations.

17     274.   Since 2008, the DEA also has participated in numerous meetings and events with

18 the legacy Healthcare Distribution Management Association (HDMA), now known as the

19 Healthcare Distribution Alliance (HAD), an industry trade association for wholesalers and

20 distributors. DEA representatives have provided guidance to the association concerning

21 suspicious order monitoring, and the association has published guidance documents for its

22 members on suspicious order monitoring, reporting requirements, and the diversion of controlled

23 substances. (HDMA, "Industry Compliance Guidelines: Reporting Suspicious Orders and

24 Preventing Diversion of Controlled Substances," (2008).)

25     275.   On September 27, 2006, and December 27, 2007, the DEA Office of Diversion

26 Control sent letters to all registered distributors providing guidance on suspicious order

27 monitoring and the responsibilities and obligations of registrants to prevent diversion.

28     276.   On December 27, 2007, the Office of Diversion Control sent a follow-up letter to

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

61577634.1                          - 77 -

1  DEA registrants providing guidance and reinforcing the legal requirements outlined in the

2  September 2006 correspondence. The December 2007 letter reminded registrants that suspicious

3  orders must be reported when discovered and monthly transaction reports of excessive purchases

4  did not meet the regulatory criteria for suspicious order reporting. The letter also advised

5  registrants that they must perform an independent analysis of a suspicious order prior to the sale

6  to determine if controlled substances would likely be diverted, and that filing a suspicious order

7  and then completing the sale does not absolve the registrant from legal responsibility.

8       277.   Distributor Defendants' own industry group, the Healthcare Distribution

9  Management Association, published Industry Compliance Guidelines titled "Reporting

10  Suspicious Orders and Preventing Diversion of Controlled Substances" emphasizing the critical

11  role of each member of the supply chain in distributing controlled substances. These industry

12  guidelines stated: "At the center of a sophisticated supply chain, distributors are uniquely

13  situated to perform due diligence in order to help support the security of controlled substances

14  they deliver to their customers."

15       278.   Opioid distributors have admitted to the magnitude of the problem and, at least

16  superficially, their legal responsibility to prevent diversion. They have made statements assuring

17  the public they supposedly are undertaking a duty to curb the opioid epidemic.

18       279.   For example, a Cardinal executive recently claimed that it uses "advanced

19  analytics" to monitor its supply chain; Cardinal assured the public it was being "as effective and

20  efficient as possible in constantly monitoring, identifying, and eliminating any outside criminal

21  activity."

22       280.   McKesson has publicly stated that it has a "best-in-class controlled substance

23  monitoring program to help identify suspicious orders" and claimed it is "deeply passionate

24  about curbing the opioid epidemic in our country."

25       281.   On their face, these assurances that they would identify and eliminate criminal

26  activity and curb the opioid epidemic, create a duty for the Distributor Defendants to take

27  reasonable measures to do just that.

28       282.   Despite their duties to prevent diversion, the Distributor Defendants have

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

FIRST AMENDED COMPLAINT

knowingly or negligently allowed diversion.[55]

283.    Their misconduct and negligent failure to prevent diversion is demonstrated by the fact that the DEA has been repeatedly forced to take action to force compliance, including (a) 178 registrant actions between 2008 and 2012, (b) 76 orders to show cause issued by the Office of Administrative Law Judges, and (c) 41 actions involving immediate suspension orders.[56] The Distributor Defendants' wrongful conduct and inaction have resulted in numerous civil fines and other penalties, including:

a.    In a 2017 Administrative Memorandum of Agreement between McKesson and the DEA, McKesson admitted that it "did not identify or report to [the] DEA certain orders placed by certain pharmacies which should have been detected by McKesson as suspicious based on the guidance contained in the DEA Letters." McKesson was fined $150,000,000;[57]

b.    McKesson has a history of repeatedly failing to perform its duties. In May 2008, McKesson entered into a settlement with the DEA on claims that McKesson failed to maintain effective controls against diversion of controlled substances. McKesson allegedly failed to report suspicious orders from rogue Internet pharmacies around the country, resulting in millions of doses of controlled substances being diverted. McKesson's system for detecting "suspicious orders" from pharmacies was so ineffective and dysfunctional that at one of its facilities in Colorado between 2008 and 2013, it filled

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

---

[55] Scott Higham and Lenny Bernstein, *The Drug Industry's Triumph Over the DEA*, Wash. Post (Oct. 15, 2017), available at https://www.washingtonpost.com/graphics/2017/investigations/dea-drug-industry-congress/?utm_term=.75e86f3574d3 (last accessed December 21, 2017); Lenny Bernstein, David S. Fallis, and Scott Higham, *How drugs intended for patients ended up in the hands of illegal users: 'No one was doing their job,'* Wash. Post (Oct. 22, 2016), available at https://www.washingtonpost.com/investigations/how-drugs-intended-for-patients-ended-up-in-the-hands-of-illegal-users-no-one-was-doing-their-job/2016/10/22/10e79396-30a7-11e6-8ff7-7b6c1998b7a0_story.html?tid=graphics-story&utm_term=.4f439ef106a8 (last accessed December 21, 2017).
[56] Evaluation and Inspections Div., Office of the Inspector Gen., U.S. Dep't of Justice, *The Drug Enforcement Administration's Adjudication of Registrant Actions* 6 (2014), available at https://oig.justice.gov/reports/2014/e1403.pdf (last accessed January 8, 2018).
[57] Administrative Memorandum of Agreement between the U.S. Dep't of Justice, the Drug Enf't Admin., and the McKesson Corp. (Jan. 17, 2017), available at https://www.justice.gov/opa/press-release/file/928476/download (last accessed December 21, 2017).

FIRST AMENDED COMPLAINT

more than 1.6 million orders, for tens of millions of controlled substances, but it reported just 16 orders as suspicious, all from a single consumer;

c.      On November 28, 2007, the DEA issued an Order to Show Cause and Immediate Suspension Order against a Cardinal Health facility in Auburn, Washington, for failure to maintain effective controls against diversion;

d.      On December 5, 2007, the DEA issued an Order to Show Cause and Immediate Suspension Order against a Cardinal Health facility in Lakeland, Florida, for failure to maintain effective controls against diversion;

e.      On December 7, 2007, the DEA issued an Order to Show Cause and Immediate Suspension Order against a Cardinal Health facility in Swedesboro, New Jersey, for failure to maintain effective controls against diversion;

f.      On January 30, 2008, the DEA issued an Order to Show Cause and Immediate Suspension Order against a Cardinal Health facility in Stafford, Texas, for failure to maintain effective controls against diversion;

g.      In 2008, Cardinal paid a $34 million penalty to settle allegations about opioid diversion taking place at seven of its warehouses in the United States;[58]

h.      On February 2, 2012, the DEA issued another Order to Show Cause and Immediate Suspension Order against a Cardinal Health facility in Lakeland, Florida, for failure to maintain effective controls against diversion;

i.      In 2012, Cardinal reached an administrative settlement with the DEA relating to opioid diversion between 2009 and 2012 in multiple states;

j.      In December 2016, the Department of Justice announced a multi-million dollar settlement with Cardinal for violations of the Controlled Substances Act;[59]

---

[58] Lenny Bernstein and Scott Higham, *Cardinal Health fined $44 million for opioid reporting violations*, Wash. Post (Jan. 11, 2017), available at https://www.washingtonpost.com/national/health-science/cardinal-health-fined-44-million-for-opioid-reporting-violations/2017/01/11/4f217c44-d82c-11e6-9a36-1d296534b31e_story.html?utm_term=.0c8e17245e66 (last accessed December 21, 2017).
[59] Press Release, United States Dep't of Justice, *Cardinal Health Agrees to $44 Million Settlement for Alleged Violations of Controlled Substances Act*, Dec. 23, 2016, available at https://www.justice.gov/usao-md/pr/cardinal-health-agrees-44-million-settlement-alleged-

61577634.1                                    - 80 -

FIRST AMENDED COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

k.      On information and belief, in connection with the investigations of Cardinal, the DEA uncovered evidence that Cardinal's own investigator warned Cardinal against selling opioids to a particular pharmacy in Wisconsin that was suspected of opioid diversion. Cardinal did nothing to notify the DEA or cut off the supply of drugs to the suspect pharmacy. Cardinal did just the opposite, pumping up opioid shipments to the pharmacy to almost 2,000,000 doses of oxycodone in one year, while other comparable pharmacies were receiving approximately 69,000 doses/year;

l.      In 2007, AmerisourceBergen lost its license to send controlled substances from a distribution center amid allegations that it was not controlling shipments of prescription opioids to Internet pharmacies; and

m.      In 2012, AmerisourceBergen was implicated for failing to protect against diversion of controlled substances into non-medically necessary channels.

284.    Although distributors have been penalized by law enforcement authorities, these penalties have not changed their conduct. They pay fines as a cost of doing business in an industry that generates billions of dollars in revenue and profit.

285.    The Distributor Defendants' failure to prevent the foreseeable injuries from opioid diversion created an enormous black market for prescription opioids, which market extended to Plaintiffs and their residents. Each Distributor Defendant knew or should have known that the opioids reaching Plaintiffs' communities were not being consumed for medical purposes and that the amount of opioids flowing to Plaintiffs was far in excess of what could be consumed for medically necessary purposes.

286.    The Distributor Defendants negligently or intentionally failed to adequately control their supply lines to prevent diversion. A reasonably-prudent distributor of Schedule II controlled substances would have anticipated the danger of opioid diversion and protected against it by, for example: (a) taking greater care in hiring, training, and supervising employees; (b) providing greater oversight, security, and control of supply channels; (c) looking more

violations-controlled-substances-act (last accessed December 21, 2017).

61577634.1                          - 81 -

FIRST AMENDED COMPLAINT

97                                Exhibit C

closely at the pharmacists and doctors who were purchasing large quantities of commonly-abused opioids in amounts greater than the populations in those areas would warrant; (d) investigating demographic or epidemiological facts concerning the increasing demand for narcotic painkillers in and around Plaintiffs' communities; (e) providing information to pharmacies and retailers about opioid diversion; and (f) in general, simply following applicable common law, statutes, regulations, professional standards, and guidance from government agencies and using a little bit of common sense.

287. On information and belief, the Distributor Defendants made little to no effort to visit the pharmacies servicing the areas around Plaintiffs to perform due diligence inspections to ensure that the controlled substances the Distributor Defendants had furnished were not being diverted to illegal uses.

288. On information and belief, the compensation the Distributor Defendants provided to certain of their employees was affected, in part, by the volume of their sales of opioids to pharmacies and other facilities servicing the areas around Plaintiffs, thus improperly creating incentives that contributed to and exacerbated opioid diversion and the resulting epidemic of opioid abuse.

289. It was reasonably foreseeable to the Distributor Defendants that their conduct in flooding the market in and around Plaintiffs with highly addictive opioids would allow opioids to fall into the hands of children, addicts, criminals, and other unintended users.

290. It was reasonably foreseeable to the Distributor Defendants that, when unintended users gain access to opioids, tragic preventable injuries will result, including addiction, overdoses, and death. It was also reasonably foreseeable that many of these injuries would be suffered by Plaintiffs' residents, and that the costs of these injuries would be borne by Plaintiffs.

291. The Distributor Defendants knew or should have known that the opioids being diverted from their supply chains would contribute to the opioid epidemic faced by Plaintiffs, and would create access to opioids by unauthorized users, which, in turn, perpetuates the cycle of addiction, demand, illegal transactions, economic ruin, and human tragedy.

292. The Distributor Defendants were aware of widespread prescription opioid abuse

61577634.1

- 82 -

FIRST AMENDED COMPLAINT

Exhibit C

in and around Plaintiffs' communities, but, on information and belief, they nevertheless persisted in a pattern of distributing commonly abused and diverted opioids in geographic areas, in such quantities, and with such frequency that they knew or should have known these commonly abused controlled substances were not being prescribed and consumed for legitimate medical purposes.

293.     The use of opioids by Plaintiffs' residents who were addicted or who did not have a medically necessary purpose could not have occurred without the knowing cooperation, assistance, or negligent failure to act of and by the Distributor Defendants. If the Distributor Defendants adhered to effective controls to guard against diversion, Plaintiffs and their residents would have avoided significant injury.

294.     The Distributor Defendants made substantial profits over the years based on the diversion of opioids into Plaintiffs' communities. The Distributor Defendants knew that Plaintiffs would be unjustly forced to bear the costs of these injuries and damages.

295.     The Distributor Defendants' intentional distribution of excessive amounts of prescription opioids showed an intentional or reckless disregard for the safety of Plaintiffs and their residents. Their conduct poses a continuing threat to the health, safety, and welfare of Plaintiffs' residents.

296.     The state laws at issue here are public safety laws.

297.     The Distributor Defendants' violations constitute prima facie evidence of negligence under state law.

### 2.  The Manufacturer Defendants Negligently Failed to Control the Flow of Opioids to Plaintiffs Through Illicit Channels

298.     The same legal duties to prevent diversion, and to monitor, report, and prevent suspicious orders of prescriptions opioids that were incumbent upon the Distributor Defendants were also legally required of the Manufacturer Defendants under California law.

299.     In addition to a common law duty to exercise reasonable care in the promotion and marketing of opioids, the Manufacturer Defendants also are required to report all sales of dangerous drugs subject to abuse as designated by the California Board of Pharmacy in excess of

61577634.1                              - 83 -

FIRST AMENDED COMPLAINT

99                                          Exhibit C

1  amounts determined by the Board. *See* 16 CCR 1782.

2      300.   On information and belief, for over a decade the Manufacturer Defendants have

3  been able to track the distribution and prescribing of their opioids down to the retail and

4  prescriber level. Thus, the Manufacturer Defendants had actual knowledge of the prescribing

5  practices of doctors, including red flags indicating diversion. The Manufacturer Defendants did

6  not report those red flags, nor did they cease marketing to those doctors. Like the Distributor

7  Defendants, the Manufacturer Defendants breached their duties under state law.

8      301.   The Manufacturer Defendants had access to and possession of the information

9  necessary to monitor, report, and prevent suspicious orders and to prevent diversion. The

10  Manufacturer Defendants engaged in the practice of paying "chargebacks" to opioid distributors.

11  A chargeback is a payment made by a manufacturer to a distributor after the distributor sells the

12  manufacturer's product at a price below a specified rate. After a distributor sells a

13  manufacturer's product to a pharmacy, for example, the distributor requests a chargeback from

14  the manufacturer and, in exchange for the payment, the distributor identifies to the manufacturer

15  the product, volume and the pharmacy to which it sold the product. Thus, the Manufacturer

16  Defendants knew the volume, frequency, and pattern of opioid orders being placed and filled.

17  The Manufacturer Defendants built receipt of this information into the payment structure for the

18  opioids provided to the opioid distributors.

19      302.   The Manufacturer Defendants' actions and omission in failing to effectively

20  prevent diversion and failing to monitor, report, and prevent suspicious orders have enabled the

21  unlawful diversion of opioids into Plaintiffs' communities.

22      **G.**    **The Defendants Knowingly Profited from an Interstate Opioid Crisis**

23      303.   As the demand for prescription opioids grew, fueled by their potency and purity,

24  interstate commerce flourished: opioids moved from areas of high supply to areas of high

25  demand, traveling across state, city, and county lines in a variety of ways.

26      304.   First, prescriptions written in one state would, under some circumstances, be

27  filled in a different state. But even more significantly, individuals transported opioids from one

28  jurisdiction specifically to sell them in another.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

61577634.1        - 84 -

FIRST AMENDED COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

305.    When authorities in one state cracked down on opioid suppliers, out-of-state suppliers filled the gaps. Florida in particular assumed a prominent role because its lack of regulatory oversight created a fertile ground for pill mills. Residents of many states would simply drive to Florida, stock up on pills from a pill mill, and transport them back to home to sell. The practice became so common that authorities dubbed these individuals "prescription tourists."

306.    The facts surrounding numerous criminal prosecutions illustrate this common practice. For example, in May 2018 a mother son crime duo based out of New Jersey was caught flying to California in attempts to obtain additional sources of supply for their drug operation which consisted of trafficking counterfeit prescription pills, other opiates, cocaine and marijuana.[60]

307.    In another example, a man from Warren County, Ohio, who was sentenced to four years for transporting prescription opioids from Florida to Ohio, explained that he could get a prescription for 180 pills from a quick appointment in West Palm Beach, and then sell them back home in Ohio for as  much as $100 a pill—ten times the pharmacy price.[61] In Columbus, Ohio, a DEA investigation led to the 2011 prosecution of sixteen individuals involved in the "oxycodone pipeline between Ohio and Florida."[62] When officers searched the Ohio home of the alleged leader of the group, they found thousands of prescriptions pills, including oxycodone and hydrocodone, and $80,000 in cash. In 2015, another Columbus man was sentenced for the same conduct—paying couriers to travel to Florida and bring back thousands of prescription opioids, and, in the words of U.S. District Judge Michael Watson, contributing to a "pipeline of death."[63]

---

[60] *United States of America v. Candace Gottlieb*, Case No. 18-1015 (AMD), (D.N.J. May 30, 2018).
[61] Andrew Welsh-Huggins, Associated Press, *'Prescription Tourists' Thwart States' Crackdown on Illegal Sale of Painkillers*, NBC News, available at http://www.nbcnews.com/id/48111639/ns/us_news-crime_and_courts/t/prescription-tourists-thwart-states-crackdown-illegal-sale-painkillers/#.WtdyKE2Wy71 (last updated July 8, 2012, 12:28 PM).
[62] *16 Charged in 'Pill Mill' Pipeline*, Columbus Dispatch (June 7, 2011), available at http://www.dispatch.com/content/stories/local/2011/06/07/16-charged-in-pill-mill-pipeline.html (last accessed July 25, 2018).
[63] Associated Press, Leader of Ohio Pill-Mill Trafficking Scheme Sentenced, Star Beacon (July 16, 2015), available at http://www.starbeacon.com/news/leader-of-ohio-pill-mill-trafficking-

FIRST AMENDED COMPLAINT

308.   Outside of Atlanta, Georgia, four individuals pled guilty in 2015 to operating a pill mill; the U.S. attorney's office found that most of the pain clinic's customers came from other states.[64] Another investigation in Atlanta led to the 2017 conviction of two pharmacists who dispensed opioids to customers of a pill mill across from the pharmacy. Again, many of those customers were from other states.[65]

309.   In yet another case, defendants who operated a pill mill in south Florida within Broward County were tried in eastern Kentucky based on evidence that large numbers of customers transported oxycodone back to the area for both use and distribution by local drug trafficking organizations. As explained by the Sixth Circuit in its decision upholding the venue decision, "[d]uring its existence, the clinic generated over $10 million in profits. To earn this sum required more business than the local market alone could provide. Indeed, only about half of the [Pain Center of Broward]'s customers came from Florida. Instead, the clinic grew prosperous on a flow of out-of-state traffic, with prospective patients traveling to the clinic from locations far outside Ft. Lauderdale, including from Ohio, Georgia, and Massachusetts."[66] The court further noted that the pill mill "gained massive financial benefits by taking advantage of the demand for oxycodone by Kentucky residents."[67]

310.   The route from Florida and Georgia to Kentucky, Ohio, and West Virginia was so well traveled that it became known as the Blue Highway, a reference to the color of the 30mg Roxicodone pills manufactured by Mallinckrodt.[68] Eventually, as police began to stop vehicles with certain out-of-state tags cruising north on I-75, the prescription tourists adapted. They

---

scheme-sentenced/article_5fb058f5-deb8-5963-b936-d71c279ef17c.html (last accessed July 25, 2018).
[64] Press Release, U.S. Dep't of Just., U.S. Atty's Off., Northern District of Ga., *Four Defendants Plead Guilty to Operating a "Pill Mill" in Lilburn, Georgia* (May 14, 2015), available at https://www.justice.gov/usao-ndga/pr/four-defendants-plead-guilty-operating-pill-mill-lilburn-georgia (last accessed July 25, 2018).
[65] Press Release, U.S. Dep't of Just., U.S. Atty's Off., Northern District of Ga., Two Pharmacists Convicted for Illegally Dispensing to Patients of a Pill Mill (Mar. 29, 2017), available at https://gdna.georgia.gov/press-releases/2017-03-30/two-pharmacists-convicted-illegally-dispensing-patients-pill-mill (last accessed July 25, 2018).
[66] *United States v. Elliott*, 876 F.3d 855, 858 (6th Cir. 2017).
[67] *Id.* at 861.
[68] John Temple, *American Pain, How a Young Felon and His Ring of Doctors Unleashed America's Deadliest Drug Epidemic* 171 (2016).

61577634.1

- 86 -

FIRST AMENDED COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

1    rented cars just over the Georgia state line to avoid the telltale out-of-state tag.[69] If they were

2    visiting multiple pill mills on one trip, they would stop at FedEx between clinics to mail the pills

3    home and avoid the risk of being caught with multiple prescriptions if pulled over.[70] Or they

4    avoided the roads altogether: Allegiant Air, which offered several flights between Appalachia

5    and Florida, was so popular with drug couriers that it was nicknamed the "Oxy Express."[71]

6        311.    While the I-75 corridor was well utilized, prescription tourists also came from

7    other states. The director of the Georgia drugs and narcotics agency observed that visitors to

8    Georgia pill mills come from as far away as Arizona and Nebraska.[72]

9        312.    Similar pipelines developed in other regions of the country. For example, the I-95

10   corridor was another transport route for prescription pills. As the director of the Maine Drug

11   Enforcement Agency explained, the oxycodone in Maine was coming up extensively from

12   Florida, Georgia and California.[73] And, according to the FBI, Michigan plays an important role

13   in the opioid epidemic in other states; opioids prescribed in Michigan are often trafficked down

14   to West Virginia, Ohio, and Kentucky.

15       313.    Along the west coast, over a million pills were transported from the Lake Medical

16   pain clinic in Los Angeles and cooperating pharmacies to the City of Everett, Washington.[74]

17   Couriers drove up I-5 through California and Oregon, or flew from Los Angeles to Seattle.[75] The

18   Everett-based dealer who received the pills from southern California wore a diamond necklace in

19   the shape of the West Coast states with a trail of green gemstones—the color of 80-milligram

20

21   [69] *Id.* at 172
     [70] *Id.* at 171

22   [71] *Id.*
     [72] Andrew Welsh-Huggins, Associated Press, *'Prescription Tourists' Thwart States' Crackdown*

23   *on Illegal Sale of Painkillers*, NBC News, available at
     http://www.nbcnews.com/id/48111639/ns/usnews-crimeandcourts/t/prescription-tourists-thwart-

24   states-crackdown-illegal-sale-painkillers/#.WtdyKE2Wy71 (last accessed July 25, 2018).
     [73] Nok-Noi Ricker, *Slaying of Florida firefighter in Maine Puts Focus on Interstate 95 Drug*

25   *Running*, Bangor Daily News (March 9, 2012), available at
     http://bangordailynews.com/2012/03/09/state/slaying-of-florida-firefighter-in-maine-puts-

26   focus-on-interstate-95-drug-running (last accessed July 25, 2018)
     [74] Harriet Ryan et al., How Black-Market OxyContin Spurred a Town's Descent into Crime,

27   Addiction and Heartbreak, Los Angeles Times (July 10, 2016), available at
     http://www.latimes.com/projects/la-me-oxycontin-everett/ (last accessed July 25, 2018)

28   [75] *Id.*

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

1   OxyContin—connecting Los Angeles and Washington state.

2       314.   Defendants certainly were aware, or should have been aware, that pill mills from

3   around the country were pushing its products. Defendants purchased nationwide, regional, state,

4   and local prescriber- and patient-level data from data vendors that allowed them to track

5   prescribing trends, identify suspicious orders, identify patients who were doctor shopping,

6   identify pill mills, etc. The data vendors' information purchased by the Defendants allowed them

7   to view, analyze, compute, and track their competitors' sales, and to compare and analyze market

8   share information.

9       315.   Similarly, Wolters Kluwer, an entity that eventually owned data mining

10   companies that were created by McKesson (Source) and Cardinal Health (ArcLight), provided

11   the Defendants with charts analyzing the weekly prescribing patterns of multiple physicians,

12   organized by territory, regarding competing drugs, and analyzed the market share of those drugs.

13       316.   Not only were Defendants aware of the pill mills, but Defendants' sales

14   incentives rewarded sales representatives who happened to have pill mills within their territories,

15   enticing those representatives to look the other way even when their in-person visits to such

16   clinics should have raised numerous red flags. In one example, a pain clinic in South Carolina

17   was diverting massive quantities of OxyContin. People traveled to the clinic from towns as far as

18   100 miles away to get prescriptions, the DEA's diversion unit raided the clinic, and prosecutors

19   eventually filed criminal charges against the doctors. But Purdue's sales representative for that

20   territory, Eric Wilson, continued to promote OxyContin sales at the clinic. He reportedly told

21   another local physician that this clinic accounted for 40% of the OxyContin sales in his territory.

22   At that time, Wilson was Purdue's top-ranked sales representative. In response to news stories

23   about this clinic, Purdue issued a statement, declaring that "if a doctor is intent on prescribing

24   our medication inappropriately, such activity would continue regardless of whether we contacted

25   the doctor or not. [76]

26       317.   In another example, a Purdue sales manager informed her supervisors in 2009

27

28   [76] Barry Meier, *Pain Killer: A "Wonder" Drug's Trail of Addiction and Death* 204, 289-399 (Rodale 2003).

61577634.1               - 88 -

FIRST AMENDED COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

1  about a suspected pill mill in Los Angeles, reporting over email that when she visited the clinic

2  with her sales representative "it was packed with a line out the door, with people who looked like

3  gang members," and that she felt "very certain that this an organized drug ring[.]"[77] She wrote,

4  "This is clearly diversion. Shouldn't the DEA be contacted about this?" But her supervisor at

5  Purdue responded that while they were "considering all angles," it was "really up to [the

6  wholesaler] to make the report."[78] This pill mill was the source of 1.1 million pills trafficked to

7  Everett, Washington, a city of around 100,000 people. Purdue waited until after the clinic was

8  shut down in 2010 to inform the authorities.

9      318.   Abundant evidence therefore establishes that prescription opioids migrated

10  between states, counties, and cities, and Defendants were aware of it. As a result, Defendants'

11  public nuisance is not limited to the local or state level, but is national in scope. Additionally,

12  prescription data from any particular jurisdiction does not capture the full scope of the misuse,

13  oversupply and diversion problem in that specific area. As the criminal prosecutions referenced

14  above show, if prescription opioid pills were hard to get in one area, they migrated from another.

15  The manufacturers and distributors were fully aware of this phenomenon and profited from it.

16      319.   Defendants each knew or should have known that opioid diversion and abuse was

17  occurring on a nationwide scale, and Defendants each profited from disregarding the nationwide

18  illicit prescription opioid trade. In search of even greater profits, the Defendants facilitated and

19  allowed to continue the unlawful diversion of opioids into Plaintiffs' communities.

20  **H.    Defendants' Unlawful Conduct and Breaches of Legal Duties Caused the**
   **Harm Alleged Herein and Substantial Damages**

21

22      320.   As the Manufacturer Defendants' efforts to expand the market for opioids

23  increased, so have the rates of prescription and the sale of their products, as well as the rates of

24  opioid-related substance abuse, hospitalization, and death among Plaintiffs' residents and across

25  the nation. Meanwhile, the Distributor Defendants have continued to unlawfully ship massive

26

27  [77] Harriet Ryan *et al.*, *More Than 1 Million OxyContin Pills Ended Up in the Hands of Criminals and Addicts. What the Drugmaker Knew*, Los Angeles Time (July 10, 2016), http://www.latimes.com/projects/la-me-oxycontin-part2/. (last accessed July 30, 2018)

28  [78] *Id.*

FIRST AMENDED COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

**105**                                    **Exhibit C**

1    quantities of opioids into communities like Plaintiffs', fueling the epidemic.

2        321.    There is a "parallel relationship between the availability of prescription opioid

3    analgesics through legitimate pharmacy channels and the diversion and abuse of these drugs and

4    associated adverse outcomes."[79]

5        322.    Opioids are widely diverted and improperly used, and the widespread use of the

6    drugs has resulted in a national epidemic of opioid overdose deaths and addictions.[80]

7        323.    The epidemic is "directly related to the increasingly widespread misuse of

8    powerful opioid pain medications."[81]

9        324.    The increased abuse of prescription opioids—along with growing sales—has

10   contributed to a large number of overdoses and deaths.

11       325.    As shown above, the opioid epidemic has escalated in Plaintiffs' communities

12   with devastating effects. Substantial opiate-related substance abuse, hospitalization, and death

13   mirror Defendants' increased distribution of opioids.

14       326.    Because of the well-established relationship between the use of prescription

15   opioids and the use of non-prescription opioids, such as heroin, the massive distribution of

16   opioids to Plaintiffs' communities and areas from which opioids are being diverted to Plaintiffs'

17   communities, has caused the opioid epidemic to include heroin addiction, abuse, and death.

18       327.    Prescription opioid abuse, addiction, morbidity, and mortality are hazards to

19   public health and safety in Plaintiffs' communities.

20       328.    Heroin abuse, addiction, morbidity, and mortality are hazards to public health and

21   safety in Plaintiffs' communities.

22       329.    Defendants repeatedly and purposefully breached their duties under state law, and

23   such breaches are direct and proximate causes of, and/or substantial factors leading to, the

24   widespread diversion of prescription opioids for nonmedical purposes in Plaintiffs' communities.

25       330.    The unlawful diversion of prescription opioids is a direct and proximate cause of,

26

27   [79] See Richard C. Dart et al., *Trends in Opioid Analgesic Abuse and Mortality in the United States*, 372 N. Eng. J. Med. 241 (2015).
     [80] Volkow & McLellan, *supra* note 1.

28   [81] Califf, *supra* note 2.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

61577634.1                                    - 90 -

                                                    FIRST AMENDED COMPLAINT

1    and/or substantial factor leading to, the opioid epidemic, prescription opioid abuse, addiction,

2    morbidity, and morality in Plaintiffs' communities. This diversion and the resulting epidemic are

3    direct causes of foreseeable harms incurred by Plaintiffs and their residents.

4        331.    Defendants' intentional and unlawful conduct resulted in direct and foreseeable,

5    past and continuing, economic damages for which Plaintiffs seek relief, as alleged herein.

6    Plaintiffs also seek the means to abate the epidemic created by the Defendants.

7        332.    Plaintiffs seek economic damages from the Defendants as reimbursement for the

8    costs associated with past efforts to eliminate the hazards to public health and safety.

9        333.    Plaintiffs seek economic damages from the Defendants to pay for the costs to

10   permanently eliminate the hazards to public health and safety and abate the public nuisance.

11       334.    Plaintiffs seek economic damages from the Defendants to pay for the reduction to

12   tax revenues caused by the epidemic created by the Defendants.

13       335.    To eliminate the hazard to public health and safety, and abate the public nuisance,

14   a "multifaceted, collaborative public health and law enforcement approach is urgently needed."[82]

15       336.    A comprehensive response to this crisis must focus on preventing new cases of

16   opioid addiction, identifying early opioid-addicted individuals, and ensuring access to effective

17   opioid addiction treatment while safely meeting the need of patients experiencing pain.[83]

18       337.    The community-based problems require community-based solutions that have

19   been limited by budgetary constraints.

20       338.    Having profited enormously through the aggressive sale, misleading promotion,

21   and irresponsible distribution of opioids, Defendants should be required to take responsibility for

22   the financial burdens their conduct has inflicted upon Plaintiffs' communities.

23       339.    The opioid epidemic still rages because the fines and suspensions imposed by the

24   DEA do not change the conduct of the industry. The Defendants pay fines as a cost of doing

25   _____

[82] Rudd, *supra* note 53.
26   [83] *See* Johns Hopkins Bloomberg School of Public Health, *The Prescription Opioid Epidemic: An
     Evidence-Based Approach* (G. Caleb Alexander et al., eds., 2015), available at
27   https://www.jhsph.edu/research/centers-and-institutes/center-for-drug-safety-and-
     effectiveness/research/prescription-opioids/JHSPH_OPIOID_EPIDEMIC_REPORT.pdf (last
28   accessed January 8, 2018).

61577634.1                            - 91 -

FIRST AMENDED COMPLAINT

**107**                              **Exhibit C**

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

business in an industry that generates billions of dollars in annual revenue. They hold multiple DEA registration numbers and when one facility is suspended, they simply ship from another facility.

340.    The Defendants have abandoned their duties imposed by the law, taken advantage of a lack of DEA enforcement, and abused the privilege of distributing controlled substances in Plaintiffs' communities.

341.    In the course of conduct described in this Complaint, Defendants have acted with oppression, fraud, and malice, both actual and presumed.

**I.      The Impact of Opioid Abuse on Plaintiffs and their Residents**

342.    Defendants' creation, through false and misleading advertising and a failure to prevent diversion, of a virtually limitless opioid market has significantly harmed Plaintiffs and resulted in an abundance of drugs available for non-medical and criminal use and fueled a new wave of addiction and injury. It has been estimated that approximately 60% of the opioids that are abused come, directly or indirectly, through doctors' prescriptions.

343.    As the FDA observed in 2016, the opioid epidemic is getting worse, not better. For example, the California Department of Public Health (CDPH) issued a Drug Overdose Health Alert on April 8, 2016 entitled "Fentanyl-Contaminated Street Norco." This alert described the report of 48 overdoses and at least 10 deaths over a 10-day period in Sacramento County that appear to be associated with the consumption of a counterfeit version of the prescription drug Norco (acetaminophen and hydrocodone) contaminated with fentanyl. In Los Angeles County, there has been a concerning increase in reported fentanyl-related deaths. While there were on average 40 fentanyl-related deaths reported each year from 2011-2013, there were 62 reported deaths in 2014. The Los Angeles County Department of Public Health (LAC DPH) is concerned about a further increase in deaths due to the lethality of fentanyl and reports that it is being found in street drugs and in counterfeit prescription drugs. The deaths in Sacramento County further enhanced this concern.

344.    Opioid deaths represent the tip of the iceberg. Hospital admissions and emergency

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

FIRST AMENDED COMPLAINT

**Exhibit C**

room visits have also skyrocketed.[84]  For every opioid overdose death, there are 10 treatment admissions for abuse, 32 emergency room visits, 130 people who are addicted to opioids, and 825 nonmedical users of opioids.[85]  And as reported in May 2016, in California, opioid overdoses resulting in hospital visits increased by 25% (accounting for population growth) from 2011 to 2014.

345.    Even Plaintiffs' youngest residents bear the consequences of the opioid abuse epidemic fueled by Defendants' conduct. In 1992, only 2 percent of women admitted for drug treatment services during pregnancy abused opioids. By 2012, opioids were the most commonly abused substance by pregnant women, accounting for 38 percent of all drug treatment admissions.[86] Many women in Plaintiffs' communities have become addicted to prescription opioids and have used these drugs during their pregnancies. As a result, many infants in Plaintiffs' communities suffer from opioid withdrawal and Neonatal Abstinence Syndrome ("NAS").[87]

346.    The impact of NAS can be life-long. Most NAS infants are immediately transferred to a neonatal intensive care unit for a period of days, weeks, or even months. NAS can also require an emergency evacuation for care to save the infant's life. Such emergency transportation can cost thousands of dollars for each occurrence.

347.    Many NAS infants have short-term and long-term developmental issues that

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

[84] Lisa Girion and Karen Kaplan, *Opioids prescribed by doctors led to 92,000 overdoses in ERs in one year*, LA Times (Oct. 27, 2014), available at http://beta.latimes.com/nation/la-sci-sn-opioid-overdose-prescription-hospital-er-20141026-story.html (last accessed December 21, 2017).
[85] Jennifer DuPuis, Associate Dir., Human Servs. Div., Fond du Lac Band of Lake Superior Chippewa, *The Opioid Crisis in Indian Country*, at 37, available at https://www.nihb.org/docs/06162016/Opioid%20Crisis%20Part%20in%20Indian%20Country.pdf (last accessed December 21, 2017); Gery P. Guy, Jr., et al., *Emergency Department Visits Involving Opioid Overdoses, US., 2010-2014*, Am. J. of Preventive Medicine (Jan. 2018), available at http://www.ajpmonline.org/article/S0749-3797(17)30494-4/fulltext (last accessed December 21, 2017).
[86] Naana Afua Jumah, *Rural, Pregnant and Opioid Dependent: A Systematic Review*, National Institutes of Health, available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4915786/ (last accessed December 21, 2017).
[87] Jean Y, Ko et al., *CDC Grand Rounds, Public Health Strategies to Prevent Neonatal Abstinence Syndrome*, U.S. C.D.C. Morbidity and Mortality Weekly Report, available at https://www.cdc.gov/mmwr/volumes/66/wr/pdfs/mm6609a2.pdf (last accessed December 21, 2017).

61577634.1

FIRST AMENDED COMPLAINT

Exhibit C

prevent them from meeting basic cognitive and motor-skills milestones. Many will suffer from vision and digestive issues; some are unable to attend full days of school. These disabilities follow these children through elementary school and beyond.

348.    Many of the parents of these children continue to relapse into prescription opioid use and abuse. As a result, many of these children are placed in foster care or adopted.

349.    Opioid addiction is now the primary reason that Californians seek substance abuse treatment, and admissions to drug treatment facilities in California more than doubled from 2006/2007 to 2010/2011. Addiction treatment centers indicate that many of their patients – for one facility in northern California, up to 90% – started on legal opioid prescriptions.

350.    The explosion in opioid prescriptions and use caused by Defendants has led to a public health crisis in California. California faces skyrocketing opioid addiction and opioid-related overdoses and deaths as well as devastating social and economic consequences. This public health crisis is a public nuisance because it "is injurious to health" and interferes "with the comfortable enjoyment of life and property" (Civ. Code, § 3479) and because it affects "entire communit[ies]" and "neighborhood[s]" and "any considerable number of persons" (id., § 3480). The effects of each Defendant's deceptive marketing and distribution scheme are catastrophic and are only getting worse.

351.    There is little doubt that each Defendant's deceptive marketing and distribution scheme has precipitated this public health crisis in California, including in Plaintiffs' communities, by dramatically increasing opioid prescriptions and use. An oversupply of prescription opioids has provided a source for illicit use or sale of opioids (the supply), while the widespread use of opioids has created a population of patients physically and psychologically dependent on them (the demand). And when those patients can no longer afford or legitimately obtain opioids, they often turn to the street to buy prescription opioids or even heroin.

352.    The effects of Defendants' deceptive marketing and distribution scheme has further impacted Plaintiffs in a foreseeable way such that Plaintiffs must devote increased resources to the burden of the addicted homeless who commit drug and property crimes, to feed their addiction. For example, tax dollars are required to maintain public safety of places where

FIRST AMENDED COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

1  the addicted homeless attempt to congregate, including parks, schools and public lands. Tax

2  dollars are required to fight the infectious diseases frequently carried by addicts, and particularly

3  the addicted homeless. Hepatitis B and C, HIV, sexually transmitted disease and methicillin-

4  resistant *Staphylococcus aureus* (MRSA) are spread by opioid abuse.

5      353.    Unscrupulous opioid rehabilitation businesses, including certain DOE

6  Defendants, have recruited addicts nationally with false and misleading promises of the

7  medically supervised rehabilitation to help addicts overcome their addiction. The promotion

8  claimed that there was effective rehabilitation available in beautiful California communities.

9  These for-profit rehabilitation businesses failed to provide proper rehabilitation facilities.

10  Investigations revealed that many have provided substandard care including use of physicians

11  who have had their license revoked, operating staffs which do not actually supervise patients,

12  and facilities that do not operate programs for addicts. Instead these facilities bring addicts to

13  California, provide substandard care as long as there are third party payments available, and then

14  throw them out of the facilities to be homeless. These addicts brought to California by the

15  substandard rehab industry, have further contributed to the public's burden by discharging

16  addicted homeless into the community who require further care and rehabilitation at the public's

17  expense, and who commit crimes in California in order to further feed their addiction. The

18  manufacturer and distributor Defendants were aware at all relevant times when they deceptively

19  marketed their products as non-addictive that such addiction would be highly difficult to

20  overcome. Defendants knew or should have known that municipalities, including in Plaintiffs'

21  communities, would bear the burden of costs associated with rehabilitation business of all types.

22      354.    The role of Defendants' deceptive marketing and distribution scheme in causing

23  this public health crisis has been well established. In her May 2014 testimony to the Senate

24  Caucus on International Narcotics Control on behalf of the National Institutes of Health (NIH),

25  Dr. Nora Volkow explained that "aggressive marketing by pharmaceutical companies" is "likely

26  to have contributed to the severity of the current prescription drug abuse problem." And in

27  August 2016, the former U.S. Surgeon General expressly connected the "urgent health crisis" to

28  "heavy marketing of opioids to doctors ... [m]any of [whom] were even taught – incorrectly –

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

61577634.1                                    - 95 -

1   that opioids are not addictive when prescribed for legitimate pain." California doctors, addiction

2   treatment specialists, and law enforcement and public health officials confirm that prescription

3   opioids lawfully prescribed by doctors have fueled this epidemic.

4       355.   Absent each Defendant's deceptive marketing scheme and improper distribution,

5   opioid prescribing, use, misuse, abuse, and addiction would not have become so widespread, and

6   the opioid epidemic that now exists would have been averted or much less severe.

7       356.   By falsely downplaying the risks and grossly exaggerating the benefits of long-

8   term opioid use through their deceptive marketing claims despite their knowledge of the falsity

9   of those claims, and by improperly distributing prescription opioids as set forth herein,

10  Defendants have not only engaged in false advertising, they have also created or assisted in the

11  creation of a public nuisance. Every act of malfeasance committed by each Defendant since the

12  late 1990s to the present is part of its deceptive marketing and distribution scheme and subjects

13  that Defendant to liability for public nuisance because there is no statute of limitations for a

14  public nuisance claim. *See* Cal. Civ. Code § 3490 ("No lapse of time can legalize a public

15  nuisance, amounting to an actual obstruction of public right"); *Wade v. Campbell,* (1962) 200

16  Cal.App.2d 54, 61 ("the maintenance of a public nuisance may not be defended on the ground of

17  laches or the statute of limitations").

18      357.   Accordingly, Defendants' conduct, both individually and collectively, has

19  violated and continues to violate the False Advertising Law, Cal. Bus. & Prof. Code, §§ 17500 *et*

20  *seq.*, and the Public Nuisance Law, Cal. Civ. Code, §§ 3479 and 3480. Plaintiffs do not seek to

21  limit the ability of doctors in California to prescribe opioids. Plaintiffs do not ask this Court to

22  weigh the risks and benefits of long-term opioid use. Instead, Plaintiffs seek an order requiring

23  Defendants to cease their unlawful promotion and distribution of opioids, to correct their

24  misrepresentations, and to abate the public nuisance they have created. To redress and punish

25  Defendants' previous and current violations of law that cause and continue to cause harm to

26  Plaintiffs and their residents, Plaintiffs seek a judgment requiring Defendants to pay civil

27  penalties, and any fees or costs permitted under law.

28      358.   By this action, Plaintiffs further seek to recoup tax dollars spent already for the

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

61577634.1

- 96 -

consequences of Defendants' wrongful conduct in causing the opioid epidemic and crisis and its impact on this county and its communities, and to abate the opioid nuisance so Plaintiffs will not be required to spend further taxpayer dollars on the epidemic and crisis wrought by Defendants' wrongful conduct as alleged herein.

359.   The rise in opioid addiction caused by Defendants' deceptive marketing scheme has also resulted in an explosion in heroin use. Almost 80% of those who used heroin in the past year previously abused prescription opioids. And as reported in May 2016, heroin overdose deaths in California spiked by 34% from 2011 to 2013.

360.   Opioid abuse also contributes to a range of social problems including physical and mental consequences, crime, delinquency, and mortality.  Other adverse social outcomes include child abuse and neglect, family dysfunction, criminal behavior, poverty, property damage, unemployment, and despair. More and more of Plaintiffs' resources are needed to combat these problems. Plaintiffs face a growing employment staffing problem, as critical services such as social services and victims' assistance programs have experienced high rates of employee turnover due to the opioid-related nature of the work. The prescription opioid crisis also diminishes Plaintiffs' available workforce, decreases productivity, increases poverty, and requires greater governmental expenditures by Plaintiffs.

361.   The prescription opioid crisis has directly financially injured Plaintiffs. The crisis has led to an increased demand for, *inter alia*, security services (such as police, EMS, detention), child protective services, health services, clean-up services, and legal services. Plaintiffs have also had to hire additional staff and expend additional resources to manage the demand.

362.   Plaintiffs' medical services have seen an increase in opioid-related health problems among Plaintiffs' residents, including, but not limited to, infants born with opioid-related medical conditions. This has resulted in increased demand, difficulty retaining staff, and increased expenses.

363.   Plaintiffs have also suffered substantial financial damages in the form of lost productivity of Plaintiffs' employees and residents, lost economic activity, lost reputation and good will, and the lost opportunity for growth. These damages have been suffered and continue

FIRST AMENDED COMPLAINT

**113**                                                                    **Exhibit C**

1    to be suffered directly by Plaintiffs.

2    364.    Many patients who become addicted to opioids will lose their jobs. Some will

3    lose their homes and their families. Some will get treatment and fewer will successfully

4    complete it; many of those patients will relapse, returning to opioids or some other drug. Of

5    those who continue to take opioids, some will overdose – some fatally, some not. Others will die

6    prematurely from related causes – falling or getting into traffic accidents due to opioid-induced

7    somnolence; dying in their sleep from opioid-induced respiratory depression; suffering assaults

8    while engaging in illicit drug transactions; or dying from opioid-induced heart or neurological

9    disease.

10    365.    Plaintiffs also have suffered substantial financial damages in the form of lost

11    taxes paid by its residents and businesses as a result of lost earnings and productivity.

12    366.    While the use of opioids has taken an enormous toll on Plaintiffs and their

13    residents, Defendants have realized blockbuster profits. In 2014 alone, opioids generated $11

14    billion in revenue for drug companies like the Defendants. Indeed, on information and belief,

15    each Defendant experienced a material increase in sales, revenue, and profits from the unlawful

16    conduct described above.

17    **J.    The Statutes of Limitations Are Tolled and Defendants Are Estopped from Asserting Statutes of Limitations As Defenses**

18

19    367.    Defendants' conduct has continued from the early 1990s through today and

20    remains ongoing. The continued tortious and unlawful conduct by the Defendants has caused a

21    repeated or continuous injury. The damages have not occurred all at once but have continued to

22    occur and have increased as time progresses. The tort is not completed nor have all the damages

23    been incurred until the wrongdoing ceases. The wrongdoing and unlawful activity by Defendants

24    has not ceased. The public nuisance remains unabated.

25    368.    Defendants are equitably estopped from relying upon a statute of limitations

26    defense because they undertook efforts to purposefully conceal their unlawful conduct and

27    fraudulently assure the public that they were undertaking efforts to comply with their obligations

28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

61577634.1

- 98 -

FIRST AMENDED COMPLAINT

114                                                        Exhibit C

1   under the controlled substances laws, all with the goal of continuing to generate profits.

2       369.   For example, a Cardinal Health executive claimed that it uses "advanced

3   analytics" to monitor its supply chain, and assured the public it was being "as effective and

4   efficient as possible in constantly monitoring, identifying, and eliminating any outside criminal

5   activity."[88]

6       370.   Similarly, McKesson publicly stated that it has a "best-in-class controlled

7   substance monitoring program to help identify suspicious orders," and claimed it is "deeply

8   passionate about curbing the opioid epidemic in our country."[89]

9       371.   Defendants, through their trade associations, filed an amicus brief that represented

10  that Defendants took their duties seriously, complied with their statutory and regulatory

11  responsibilities, and monitored suspicious orders using advanced technology.[90]

12      372.   Defendants purposely concealed their wrongful conduct, including by assuring

13  the public and governmental authorities that they were complying with their obligations and

14  were acting to prevent diversion and drug abuse. Defendants also misrepresented the impact of

15  their behavior by providing the public with false information about opioids and have continued

16  to use Front Groups and third parties to minimize the risks of Defendants' conduct. Defendants'

17  conduct is continuing to this day.

18      373.   Defendants have also concealed and prevented discovery of information,

19  including until recently data from the ARCOS database, which will confirm their identities and

20  the extent of their wrongful and illegal activities.

21

22  [88] Lenny Bernstein et al., *How Drugs Intended for Patients Ended Up in the Hands of Illegal Users: "No One Was Doing Their Job,"* Wash. Post (Oct. 22, 2016), available at
23  https://www.washingtonpost.com/investigations/how-drugs-intended-for-patients-ended-up-in-the-hands-of-illegal-users-no-one-was-doing-their-job/2016/10/22/10e79396-30a7-11e6-8ff7-
24  7b6c1998b7a0_story.html (last accessed December 21, 2017)
    [89] Scott Higham et al., *Drug Industry Hired Dozens of Officials from the DEA as the Agency*
25  *Tried to Curb Opioid Abuse*, Wash. Post, (Dec. 22, 2016), available at
    https://www.washingtonpost.com/investigations/key-officials-switch-sides-from-dea-to-
26  pharmaceutical-industry/2016/12/22/55d2e938-c07b-11e6-b527-949c5893595e_story.html (last accessed December 21, 2017).
27  [90] Br. for Healthcare Distribution Mgmt. Ass'n and Nat'l Ass'n of Chain Drug Stores as Amici Curiae in Support of Neither Party, Case No. 15-1335, 2016 WL 1321983, at *3-4, *25 (filed in
28  the 2d Cir. Apr. 4, 2016).

61577634.1                                    - 99 -

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

FIRST AMENDED COMPLAINT

115                                           Exhibit C

374.   Defendants also lobbied Congress and actively attempted to halt DEA investigations and enforcement actions and to subvert the ability of agencies to regulate their conduct.[91] As a result, there was a sharp drop in enforcement actions and the standard for the DEA to revoke a distributor's license was raised.

375.   In addition, the Defendants fraudulently attempted to convince the public that they were complying with their legal obligations and working to curb the opioid epidemic.

376.   Because the Defendants concealed the facts surrounding the opioid epidemic, Plaintiffs did not know if the existence or scope of the Defendants' misconduct, and could not have acquired such knowledge earlier through the exercise of reasonable diligence.

377.   Defendants intended that their false statements and omissions be relied upon, including by Plaintiffs and their residents.

378.   Defendants knew of their wrongful acts and had material information pertinent to their discovery, but concealed that information from the public, including Plaintiffs and their residents. Only Defendants knew of their widespread misinformation campaign and of their repeated, intentional failures to prevent opioid diversion.

379.   Defendants cannot claim prejudice due to a late filing because this suit was filed upon discovering the facts essential to the claim. Indeed, the existence, extent, and damage of the opioid crisis have only recently come to light.

380.   Defendants had actual knowledge that their conduct was deceptive, and they intended it to be deceptive.

381.   Plaintiffs were unable to obtain vital information regarding these claims absent any fault or lack of diligence on Plaintiffs' part.

## V.   FACTS PERTAINING TO DEFENDANTS' CONSPIRACY

### A.   The Marketing Scheme

382.   Knowing that their opioids were highly addictive, ineffective, and unsafe for the treatment of long-term, chronic pain, non-acute, and non-cancer pain, Manufacturer Defendants

---

[91] *See* Higham and Bernstein, *supra* note 55.

FIRST AMENDED COMPLAINT

Exhibit C

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

conspired with the Front Groups and KOLs described above to engage in a scheme to increase their profits and sales unlawfully, and grow their share of the prescription painkiller market, through repeated and systematic misrepresentations about the safety and efficacy of opioids for treating long-term, chronic pain. Through their personal relationships, the members of this marketing scheme had the opportunity to form and take actions in furtherance of their common purpose. The Manufacturer Defendants' substantial financial contribution to the marketing scheme, and the advancement of opioids-friendly messaging, fueled the U.S. opioids epidemic.

383.    The Manufacturer Defendants, through their marketing scheme, concealed the true risks and dangers of opioids from the medical community and the public, including Plaintiffs, and made misleading statements and misrepresentations about opioids that downplayed the risk of addiction and exaggerated the benefits of opioid use. The misleading statements included, among others, that: (a) addiction is rare among patients taking opioids for pain; (b) addiction risk can be effectively managed; (c) symptoms of addiction exhibited by opioid patients are actually symptoms of an invented condition the Manufacturer Defendants named "pseudoaddiction"; (d) withdrawal is easily managed; (e) increased dosing presents no significant risks; (f) long-term use of opioids improves function; (g) the risks of alternative forms of pain treatment are greater than the adverse effects of opioids; (h) use of time-released dosing prevents addiction; and (i) abuse-deterrent formulations provide a solution to opioid abuse.

384.    The marketing scheme devised, implemented and conducted by the Manufacturer Defendants was designed to ensure that they unlawfully increased their sales and profits through concealment and misrepresentations about the addictive nature and effective use of their drugs. The Manufacturer Defendants, the Front Groups, and the KOLs acted together for a common purpose and perpetuated the marketing scheme, including through the unbranded promotion and marketing network as described above.

385.    There was regular communication between the Manufacturer Defendants, Front Groups and KOLs, in which information was shared, misrepresentations coordinated, and payments exchanged. Typically, the coordination, communication and payment occurred, and continues to occur, through the repeated and continuing use of the wires and mail in which the

FIRST AMENDED COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

Manufacturer Defendants, Front Groups, and KOLs share information regarding overcoming objections and resistance to the use of opioids for chronic pain. The Manufacturer Defendants, Front Groups and KOLs functioned as a continuing unit for the purpose of implementing the marketing scheme, and each agreed and took actions to hide the scheme and continue its existence.

386.    At all relevant times, the Front Groups were aware of the Manufacturer Defendants' conduct, were knowing and willing participants in and beneficiaries of that conduct. Each Front Group also knew, but did not disclose, that the other Front Groups were engaged in the same marketing scheme, to the detriment of consumers, prescribers, and Plaintiffs. But for the Manufacturer Defendants, Front Groups and KOLs' unlawful fraud, the Front Groups would have had incentive to disclose the deceit by the Manufacturer Defendants and the marketing scheme to their members and constituents. By failing to disclose this information, Front Groups perpetuated the marketing scheme, and reaped substantial benefits.

387.    At all relevant times, the KOLs were aware of the Manufacturer Defendants' conduct, were knowing and willing participants in that conduct, and reaped benefits from that conduct. The Manufacturer Defendants selected KOLs solely because they favored the aggressive treatment of chronic pain with opioids. The Manufacturer Defendants' support helped the KOLs become respected industry experts. And, as they rose to prominence, the KOLs falsely touted the benefits of using opioids to treat chronic pain, repaying the Manufacturer Defendants by advancing their marketing goals. The KOLs also knew, but did not disclose, that the other KOLs and Front Groups were engaged in the same marketing scheme, to the detriment of consumers, prescribers, and Plaintiffs. But for the Manufacturer Defendants, Front Groups and KOLs' unlawful conduct, the KOLs would have had incentive to disclose the deceit by the Manufacturer Defendants and the marketing scheme, and to protect their patients and the patients of other physicians. By failing to disclose this information, KOLs furthered the marketing scheme, and reaped substantial benefits.

388.    As public scrutiny and media coverage focused on how opioids ravaged communities in California and throughout the United States, the Front Groups and KOLS did not

61577634.1

- 102 -

**Exhibit C**

challenge the Manufacturer Defendants' misrepresentations, seek to correct their previous misrepresentations, terminate their role in the marketing scheme, nor disclose publicly the risks of using opioids for chronic pain.

389.    The Manufacturer Defendants, Front Groups and KOLs engaged in certain discrete categories of activities in furtherance of the marketing scheme. As described herein, the Manufacturer Defendants, Front Groups and KOLs' conduct in furtherance of the common purpose of the marketing scheme involved: (a) misrepresentations regarding the risk of addiction and safe use of prescription opioids for long-term chronic pain (described in detail above); (b) lobbying to defeat measures to restrict over-prescription; (c) efforts to criticize or undermine CDC guidelines; and (d) efforts to limit prescriber accountability.

390.    In addition to disseminating misrepresentations about the risks and benefits of opioids, Manufacturer Defendants, Front Groups and KOLs also furthered their common purpose by criticizing or undermining CDC guidelines. Manufacturer Defendants, Front Groups and KOLs criticized or undermined the CDC Guidelines which represented "an important step – and perhaps the first major step from the federal government - toward limiting opioid prescriptions for chronic pain."

391.    Several Front Groups, including the U.S. Pain Foundation and the AAPM, criticized the draft guidelines in 2015, arguing that the "CDC slides presented on Wednesday were not transparent relative to process and failed to disclose the names, affiliation, and conflicts of interest of the individuals who participated in the construction of these guidelines."

392.    The AAPM criticized the prescribing guidelines in 2016, through its immediate past president, stating "that the CDC guideline makes disproportionately strong recommendations based upon a narrowly selected portion of the available clinical evidence."

393.    The Manufacturer Defendants alone could not have accomplished the purpose of the marketing scheme without the assistance of the Front Groups and KOLs, who were perceived as "neutral" and more "scientific" than the Manufacturer Defendants themselves. Without the work of the Front Groups and KOLs in spreading misrepresentations about opioids, the marketing scheme could not have achieved its common purpose.

FIRST AMENDED COMPLAINT

1    394.    The impact of the marketing scheme remains in place—i.e., the opioids continue

2    to be prescribed and used for chronic pain throughout Plaintiffs' communities, and the epidemic

3    continues to injure Plaintiffs, and consume the resources of Plaintiffs' health care and law

4    enforcement systems.

5    395.    As a result, it is clear that the Manufacturer Defendants, the Front Groups, and the

6    KOLs were each willing participants in the marketing scheme, had a common purpose and

7    interest in the object of the scheme, and functioned within a structure designed to effectuate the

8    scheme's purpose.

9    **B.**    **The Distribution Scheme**

10    396.    Faced with the reality that they will now be held accountable for the

11    consequences of the opioid epidemic they created, members of the industry resort to "a

12    categorical denial of any criminal behavior or intent."[92] Defendants' actions went far beyond

13    what could be considered ordinary business conduct. For more than a decade, the Distributor

14    Defendants worked together in an illicit enterprise, engaging in conduct that was not only illegal,

15    but in certain respects anti-competitive, with the common purpose and achievement of vastly

16    increasing their respective profits and revenues by exponentially expanding a market that the law

17    intended to restrict.

18    397.    Knowing that dangerous drugs have a limited place in our society, and that their

19    dissemination and use must be vigilantly monitored and policed to prevent the harm that drug

20    abuse and addiction causes to individuals, society and governments, California enacted

21    California Business and Professions Code §§ 4164 and 4169.1, and adopted 16 CCR § 1782,

22    which require Defendants to report suspicious orders of dangerous drugs subject to abuse and to

23    maintain systems to detect and report such activity.

24    398.    If morality and the law did not suffice, competition dictates that the Distributor

25    Defendants would turn in their rivals when they had reason to suspect suspicious activity.

26

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

27    [92] McKesson Responds to Recent 60 Minutes Story About January 2017 Settlement With the

28    Federal Government, McKesson, available at http://www.mckesson.com/about-mckesson/fighting-opioid-abuse/60-minutes-response (last visited Apr. 21, 2018).

61577634.1    - 104 -

FIRST AMENDED COMPLAINT

1    Indeed, if a manufacturer or distributor could gain market share by reporting a competitor's

2    illegal behavior (causing it to lose a license to operate, or otherwise inhibit its activity), ordinary

3    business conduct dictates that it would do so.

4        399.    The Distributor Defendants' scheme required the participation of all. If any one

5    member broke rank, its compliance activities would highlight deficiencies of the others, and the

6    artificially high quotas they maintained through their scheme would crumble. But, if all the

7    members of the enterprise conducted themselves in the same manner, it would be difficult for

8    California authorities or the DEA to go after any one of them. Accordingly, through the

9    connections they made as a result of their participation in the Healthcare Distribution Alliance

10   ("HDA"), the Distributor Defendants chose to flout the closed system designed to protect the

11   citizens. Publicly, in 2008, they announced their formulation of "Industry Compliance

12   Guidelines: Reporting Suspicious Orders and Prevention Diversion of Controlled Substances."

13   But, privately, the Distributor Defendants refused to act. Indeed, despite the issuance of these

14   Industry Compliance Guidelines, which recognize these Defendants' duties under the law, as

15   illustrated by the subsequent industry-wide enforcement actions and consent orders issued after

16   that time, none of them complied. John Gray, President and CEO of the HDA said to Congress in

17   2014, it is "difficult to find the right balance between proactive anti-diversion efforts while not

18   inadvertently limiting access to appropriately prescribed and dispensed medications." Yet, the

19   Distributor Defendants apparently all found the same profit-maximizing balance – intentionally

20   remaining silent to ensure the largest possible financial return.

21       400.    As described above, at all relevant times, the Distributor Defendants conspired

22   together for the purpose of unlawfully increasing sales, revenues and profits. In support of this

23   common purpose and fraudulent scheme, the Distributor Defendants jointly agreed to disregard

24   their common law and statutory duties to identify, investigate, halt and report suspicious orders

25   of opioids and diversion of their drugs into the illicit market so that those orders would not result

26   in a decrease, or prevent an increase in, the necessary quotas.

27       401.    At all relevant times, as described above, the Distributor Defendants exerted

28   control over, conducted and/or participated in distribution scheme by fraudulently claiming that

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

1   they were complying with their duties under California law to report suspicious orders and to

2   maintain systems to detect and report such activity.

3      402.   While participating in their distribution scheme, Distributor Defendants applied

4   political pressure at the state and federal level to limit regulators' ability to quickly and

5   effectively police suspicious drug shipments. As part of these efforts, the Distributor Defendants

6   lobbied Congress to pass the "Ensuring Patient Access and Effective Drug Enforcement Act."[93]

7      403.   The Distributor Defendants knowingly and intentionally furnished false or

8   fraudulent information in their reports to the DEA about suspicious orders, and/or omitted

9   material information from reports, records and other document required to be filed with the

10   California Board of Pharmacy and the DEA including the Manufacturer Defendants'

11   applications for production quotas. Specifically, the Distributor Defendants were aware of

12   suspicious orders of prescription opioids and the diversion of their prescription opioids into the

13   illicit market, and failed to report this information to the California Board of Pharmacy and the

14   DEA in their mandatory reports.

15   **VI.   THE SACKLER DEFENDANTS**

16      **A.   The Sackler Family Integrated Advertising and Medicine**

17      404.   Given the history of opioid abuse in the United States and the medical

18   profession's resulting wariness, the commercial success of Defendants' prescription opioids

19

20   [93] *HDMA is Now the Healthcare Distribution Alliance*, Pharmaceutical Commerce, available at http://pharmaceuticalcommerce.com/business-and-finance/hdma-now-healthcare-

21   distribution-alliance/ (last updated July 6, 2016); Lenny Bernstein & Scott Higham, *Investigation: The DEA Slowed Enforcement While the Opioid Epidemic Grew Out of Control*, Wash. Post (Oct.

22   22, 2016), available at https://www.washingtonpost. com/investigations/the-dea-slowed-enforcement-while-the- opioid-epidemic-grew-out-of-control/2016/10/22/aea2bf8e-7f71-11e6-

23   8d13- d7c704ef9fd9_story.html (last accessed December 21, 2017); Lenny Bernstein & Scott Higham, *Investigation: U.S. Senator Calls for Investigation of DEA Enforcement Slowdown Amid*

24   *Opioid Crisis*, Wash. Post (Mar. 6, 2017), available at

25   https://www.washingtonpost.com/investigations/us-senator-calls-for-investigation-of-dea-enforcement-slowdown/2017/03/06/5846ee60-028b-11e7-b1e9-a05d3c21f7cf_story.html (last

26   accessed December 21, 2017); Eric Eyre, *DEA Agent: "We Had no Leadership" in WV Amid Flood of Pain Pills*, Charleston Gazette-Mail (Feb. 18, 2017), available at

27   http://www.wvgazettemail.com/news/20170218/dea-agent-we-had-no-leadership-in-wv-amid-flood-of-pain-pills- (last accessed December 21, 2017).

28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

FIRST AMENDED COMPLAINT

1  would not have been possible without a fundamental shift in prescribers' perception of the risks

2  and benefits of opioid use.

3     405.   As it turned out, Purdue was uniquely positioned to execute just such a maneuver,

4  thanks to the legacy of a man named Arthur Sackler. The Sackler family is the sole owner of

5  Purdue and one of the wealthiest families in America, with a net worth of $13 billion as of 2016.

6  All of the company's profits go to Sackler family trusts and entities.  David Armstrong, *The Man*

7  *at the Center of the Secret OxyContin Files*, STAT News (May 12, 2016),

8  https://www.statnews.com/2016/05/12/man-center-secret-oxycontin-files/.  Yet the Sacklers

9  have avoided publicly associating themselves with Purdue, letting others serve as the

10  spokespeople for the company.

11     406.   The Sackler brothers—Arthur, Mortimer, and Raymond—purchased a small

12  patent-medicine company called The Purdue Frederick Company, Inc. in 1952. It was Arthur

13  Sackler who created the pharmaceutical advertising industry as we know it, laying the

14  groundwork for the OxyContin promotion that would make the Sacklers billionaires.

15     407.   Arthur Sackler was both a psychiatrist and a marketing executive. He pioneered

16  both print advertising in medical journals and promotion through physician "education" in the

17  form of seminars and continuing medical education courses. He also understood the persuasive

18  power of recommendations from fellow physicians, and did not hesitate to manipulate

19  information when necessary. For example, one promotional brochure produced by his firm for

20  Pfizer showed business cards of physicians from various cities as if they were testimonials for

21  the drug, but when a journalist tried to contact these doctors, he discovered that they did not

22  exist.  Barry Meier, *Pain Killer: A "Wonder" Drug's Trail of Addiction and Death* (Rodale

23  2003) (hereinafter "Meier"), at 204.

24     408.   It was Arthur Sackler who, in the 1960s, made Valium into the first $100-million

25  drug, so popular it became known as "Mother's Little Helper." When Arthur's client, Roche,

26  developed Valium, it already had a similar drug, Librium, another benzodiazepine, on the market

27  for treatment of anxiety. So Arthur invented a condition he called "psychic tension"—essentially

28  stress—and pitched Valium as the solution. *Id.* at 202; *see also One Family Reaped Billions*

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

61577634.1                                    - 107 -

1  *From Opioids*, WBUR On Point (Oct. 23, 2017), http://www.wbur.org/onpoint/2017/10/23/one-

2  family-reaped-billions-from-opioids. The campaign, for which Arthur was compensated based

3  on volume of pills sold, was a remarkable success. Meier, *supra*, at 201-203.

4      409.    Arthur Sackler created not only the advertising for his clients but also the vehicle

5  to bring their advertisements to doctors—a biweekly newspaper called the Medical Tribune,

6  which was distributed for free to doctors nationwide. Arthur also conceived a company now

7  called IMS Health Holdings Inc., which monitors prescribing practices of every doctor in the

8  United States and sells this valuable data to pharmaceutical companies like Marketing

9  Defendants, who utilize it to target and tailor their sales pitches to individual physicians.

10     **B.    Purdue and the Development of OxyContin**

11     410.    After the Sackler brothers acquired The Purdue Frederick Company, Inc. in 1952,

12  Purdue sold products ranging from earwax remover to antiseptic, and it became a profitable

13  business. As an advertising executive, Arthur Sackler was not involved, on paper at least, in

14  running Purdue, which would have been a conflict of interest. Raymond Sackler became

15  Purdue's head executive, while Mortimer Sackler ran Purdue's UK affiliate.

16     411.    In the 1980s, Purdue, through its UK affiliate, acquired a Scottish drug producer

17  that had developed a sustained-release technology suitable for morphine. Purdue marketed this

18  extended-release morphine as MS Contin, and it quickly became Purdue's bestseller. As the

19  patent expiration for MS Contin loomed, Purdue searched for a drug to replace it. Around that

20  time, Raymond's oldest son, Richard Sackler, who was also a trained physician, became more

21  involved in the management of the company. Richard Sackler had grand ambitions for the

22  company, and according to a long-time Purdue sales representative, "Richard really wanted

23  Purdue to be big—I mean really big."[94] Richard Sackler believed Purdue should develop another

24  use for its "Contin" timed release system.

25     412.    In 1990, Plaintiffs are informed and believe that Purdue's vice president of

26  clinical research, Robert Kaiko, sent a memo to Richard Sackler and other executives

27

28  [94] Christopher Glazek, The Secretive Family Making Billions from the Opioid Crisis, Esquire
(Oct. 16, 2017), http://www.esquire.com/news-politics/a12775932/sacklerfamily- oxycontin/.

FIRST AMENDED COMPLAINT

1  recommending that the company work on a pill containing oxycodone. At the time, oxycodone

2  was perceived as less potent than morphine, largely because it was most commonly prescribed as

3  Percocet, a relatively weak oxycodone-acetaminophen combination pill. MS Contin was not only

4  approaching patent expiration but had always been limited by the stigma associated with

5  morphine. Oxycodone did not have that problem, and what's more, it was sometimes mistakenly

6  called "oxycodeine," which also contributed to the perception of relatively lower potency,

7  because codeine is weaker than morphine. Purdue acknowledged using this to its advantage

8  when it later pled guilty to criminal charges of "misbranding" in 2007, admitting that it was

9  "well aware of the incorrect view held by many physicians that oxycodone was weaker than

10  morphine" and "did not want to do anything 'to make physicians think that oxycodone was

11  stronger or equal to morphine' or to 'take any steps ... that would affect the unique position that

12  OxyContin'" held among physicians.

13  **C.    The Sackler Family and the Purdue Board**

14      413.    Plaintiffs are informed and believe that eight members of a single family made

15  many of the choices that caused much of the opioid epidemic: Richard Sackler, Jonathan D.

16  Sackler, Ilene Sackler Lefcourt, Kathe Sackler, Beverly Sackler, Mortimer D.A. Sackler, Theresa

17  Sackler, and David Sackler. The Sacklers were, in the words of one long-time company

18  executive, the "de facto CEO" of Purdue. As members of the Purdue Board and the boards of

19  various Purdue entities, the Sacklers oversaw all aspects of Purdue's marketing and promotion of

20  opioid products. As board members who were personally active in overseeing and directing

21  Purdue's operations, the Sackler Defendants knew, or should have known, of Purdue's deceptive

22  marketing tactics for its opioid products. Moreover, an ordinarily prudent person, knowing what

23  the Sackler Defendants knew during their time on the Purdue Board and the boards of other

24  Purdue entities, would *not* have acted similarly under the circumstances. *See Frances T. v. Vill.*

25  *Green Owners Ass'n.*, 42 Cal. 3d 490, 508–09 (1986).

26      414.    Since at least 1999, Plaintiffs are informed and believe that the Sackler

27  Defendants were aware of potential liability for Purdue, as well as those acting in concert with

28  Purdue, because of the addictive nature of Oxycontin. Intending to shield the proceeds of their

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

61577634.1                              - 109 -

1   wrongdoing from creditors, the Sackler Defendants have stripped Purdue each and every year of

2   hundreds of millions of dollars of profits from the sale of Oxycontin and other opioid-containing

3   medications. All such transfers were and are fraudulent and all such transferred funds should be

4   clawed back from the Sackler Defendants in order to satisfy the opioid related liabilities of the

5   companies from which they were transferred.

6       415.   Plaintiffs are informed and believe that the Sackler Defendants'

7   micromanagement of Purdue was so intrusive that Purdue staff begged for relief. As one officer

8   wrote to the CEO: "Anything you can do to reduce the direct contact of Richard into the

9   organization is appreciated." To convince the Sackler Defendants to make him CEO, Craig

10  Landau wrote a business plan in May 2017 that he titled: "SACKLER PHARMA

11  ENTERPRISE," which admitted that the Sacklers in fact controlled Purdue "with the Board of

12  Directors serving as the 'de-facto' CEO." Several months later, the Sacklers made Mr. Landau

13  CEO. The Sackler Defendants concealed their ongoing, extensive involvement with Purdue and

14  its sales and marketing practices

15      416.   As reports of overdoses and deaths flowed into the company, Plaintiffs are

16  informed and believe that the Sacklers sought to protect their profits by blaming addicts and

17  doubling down on Purdue's aggressive marketing tactics. Once the opioid epidemic had

18  undeniably materialized and opioid prescribing began to decline, the Sacklers planned to replace

19  lost revenue by moving into new product ventures: drugs to treat opioid overdose and opioid

20  addiction. This expansion was characterized as the logical coverage of a "spectrum" in which

21  Purdue could be the "end-to-end pain provider."

22      417.   Plaintiffs are informed and believe that the Sackler Defendants also were aware of

23  specific examples of deceptive marketing through receipt of call note reviews in their capacities

24  as members of the Purdue Board and the boards of other Purdue entities. On information and

25  belief, the Sacklers received reports of opioid overdoses and reports of misuse and abuse in their

26  capacities as board members. Adverse event reports circulated to the Sacklers included reports of

27  abuse, addiction, withdrawal, overdoses, and deaths from OxyContin.

28      418.   Plaintiffs are informed and believe that the Sackler Defendants were personally

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

61577634.1                           - 110 -

1 aware that: (1) OxyContin was being prescribed without proper care; (2) OxyContin was widely

2 abused, including orally, and not just through snorting or injecting; (3) Purdue failed to

3 adequately disclose the risks of abuse and diversion; and (4) OxyContin was wrongly, and

4 dangerously, perceived as safer than morphine.

5      419.   In the mid-2000s, federal and state law enforcement began investigating Purdue

6 for deceptively marketing and misbranding OxyContin. During the time period covered by the

7 investigation, at least three Sackler board members were among the highest executives inside the

8 company: Richard Sackler was Chief Executive Officer, and Jonathan and Kathe Sackler were

9 Vice Presidents. As explained below, they and their family members were intimately involved in

10 the launch of OxyContin and the marketing campaigns that led to the explosion of

11 overprescribing.

12      420.   By 2006, prosecutors at the United States Department of Justice found damning

13 evidence that Purdue intentionally deceived doctors and patients about its opioids. The Sackler

14 Defendants voted that Defendant The Purdue Frederick Company, Inc. should plead guilty to a

15 felony for misbranding OxyContin as less addictive, less subject to abuse and diversion, and less

16 likely to cause adverse events and side effects than other pain medications.

17      421.   After the 2007 Purdue Judgment, Plaintiffs are informed and believe that the

18 Sacklers directed and approved the hiring of a large sales force. They were deeply involved in

19 guiding the strategy behind the marketing plans that directed these representatives. The Sacklers

20 met regularly as members of the Purdue Board and received detailed briefings from the staff not

21 just on the company's finances, but on the size, distribution, daily activities, tactics, and

22 compensation of the sales force. The Sacklers approved routine increases in the number of sales

23 representatives and increases to their compensation, all while receiving detailed briefings on the

24 contents of representatives' sales pitches and delivering unequivocal orders to meet the family's

25 strategic imperatives: visit prescribers more frequently, and convince them to write more opioid

26 prescriptions, over longer periods of therapy, at increasingly high doses.

27      422.   As members of the family that owns Purdue, the Sackler Defendants personally

28 benefitted from the success of OxyContin. At various points, as directors, they approved the

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

61577634.1         - 111 -

FIRST AMENDED COMPLAINT

distribution of funds from Purdue to shareholders, including themselves and their extended family.

423.   Plaintiffs are informed and believe that due to the billions of dollars in profits that have been distributed to the Sackler Defendants since the 1980's, Purdue lacks sufficient assets to satisfy its liabilities to Plaintiffs and to the multitude of other plaintiffs that have commenced litigation against Purdue nationwide for its role in creating the opioid epidemic. Accordingly, the Sackler Defendants have knowingly participated in the wrongdoing of Purdue, as well as knowingly profited and received the benefits of that wrongdoing.

424.   Even today, at the height of the opioid epidemic, Plaintiffs are informed and believe that the Sacklers seek to obscure their culpability for this crisis. The Sacklers have attempted to distance themselves from their company, and have directed Purdue to distance itself from its past misconduct. The Sacklers approved corporate messaging intended to portray Purdue as a responsible corporate citizen by depicting the opioid epidemic as principally a problem of illicit drug diversion and abuse, not overprescribing and addiction; falsely promoting the safety of Purdue's abuse-deterrent formulations; and touting Purdue's efforts to rein in diversion, even as the company failed to meaningfully investigate or report suspicious prescribing. The Sacklers received regular updates on just how many reports of suspicious prescribing-"Reports of Concern"-were coming into the company, but stood by as Purdue failed to report nearly all of these to authorities. And the Sacklers hid behind the perception that they were a normal board, one that was not steeped in the details of Purdue's marketing but merely approved budgets and broad strategies.

425.   In reality, the Sacklers were the architects and drivers of Purdue's promotional efforts. Plaintiffs are informed and believe that the Sacklers' communications were not limited to quarterly meetings of the Purdue Board. They were in touch with Purdue marketing employees throughout the year, at some points daily and on weekends-to the point that Purdue executives and staff felt harassed. The Sacklers' personal involvement in the running of the company was so long- and well-established that an implausible effort, in 2017, to issue a press statement denying the family's involvement in the company's affairs was abandoned. The initial draft statement-

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

61577634.1

- 112 -

1   "Sackler family members hold no leadership roles in the companies owned by the family trust"-

2   was watered down to "Sackler family members hold no management positions."

3       426.   Plaintiffs are informed and believe that the Sacklers knowingly and intentionally

4   sent sales representatives to promote opioids to prescribers hundreds of thousands of times. The

5   Sacklers knew and intended that the sales representatives would deceptively and misleadingly

6   promote opioid sales, including by overstating the benefits and understating the risks. The

7   Sacklers knew and intended that prescribers, pharmacists, and patients in would rely on Purdue's

8   deceptive sales campaign to prescribe, dispense, and take Purdue opioids; securing that reliance

9   was the purpose of the sales campaign. And the Sacklers knowingly and intentionally took

10  money from Purdue's deceptive business, distributing billions of dollars in Purdue profits to

11  themselves and other family members over the years.

12      427.   Incredibly, the Sacklers are poised to profit from the public health crisis that they

13  created. Richard Sackler was awarded a patent in January 2018 for a new formulation of

14  buprenorphine-one of the most effective drugs used to treat opioid addiction. In his patent

15  application, Dr. Richard Sackler described the background of his new invention:

> Over the last decades, prejudices in the medical community as to
> the use of strong opioids for treating chronic pain in patients has
> significantly decreased. Many of these prejudices were due to
> some of the characteristics being inherent to opioids. While
> opioids have always been known to be useful in pain treatment,
> they also display an addictive potential in view of their
> euphorigenic activity. Thus, if opioids are taken by healthy
> human subjects with a drug seeking behavior, they may lead to
> psychological as well as physical dependence.

22      428.   The application goes on to link addiction to crime before presenting his invention-

23  in an echo of OxyContin marketing-as less prone to diversion and abuse than other treatment

24  drugs. Buprenorphine sales in the United States topped $2.6 billion in 2017, and are expected to

25  rise as the infrastructure and funding for addiction treatment expands to meet current and

26  projected needs.

27

28

61577634.1

- 113 -

FIRST AMENDED COMPLAINT

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

Exhibit C

## VII.   MISCELLANEOUS FACTUAL ALLEGATIONS

429.   FDA approval of opioids for certain uses did not give Defendants license to misrepresent the risks and benefits of opioids. Indeed, Defendants' misrepresentations were directly contrary to pronouncements by and guidance from the FDA based on the medical evidence and their own labels.

430.   Defendants' causal role in the opioid epidemic was not broken by the involvement of doctors. Defendants' marketing efforts were ubiquitous and highly persuasive. Their deceptive messages tainted virtually every source doctors could rely on for information and prevented them from making informed treatment decisions. Defendants also were able to harness and hijack what doctors wanted to believe – namely, that opioids represented a means of relieving their patients' suffering and of practicing medicine more compassionately.

431.   Each Defendant's conduct and role in creating or assisting in the creation of the public health crisis now plaguing California is directly relevant to the amount of the civil penalties to be awarded under California Business & Professions Code § 17536.

## VIII.   CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### (Public Nuisance – Cal. Civ. Code §§ 3479-3480 –Against All Defendants)

432.   Plaintiffs reallege and incorporate herein by reference each and every allegation in paragraphs 1 through 431 above as if set forth fully herein.

433.   California Civil Code § 3479 provides that "anything which is injurious to health ... or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property ... is a nuisance."

434.   California Civil Code § 3480 defines a "public nuisance" as "one which affects at the same time an entire community or neighborhood, or any considerable number of persons, although the extent of the annoyance or damage inflicted upon individuals may be unequal."

435.   California Civil Code § 3490 states that "no lapse of time can legalize a public nuisance, amounting to an actual obstruction of public right."

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

61577634.1

- 114 -

FIRST AMENDED COMPLAINT

130                                                                        Exhibit C

436.    Pursuant to § 731 of the California Code of Civil Procedure, this action is brought by Plaintiffs to abate the public nuisance created by the Defendants.

437.    Each Defendant, acting individually and in concert, has created or assisted in the creation of a condition that is injurious to the health and interferes with the comfortable enjoyment of life and property of entire communities or neighborhoods or of any considerable number of persons in Plaintiffs in violation of California Civil Code §§ 3479 and 3480.

438.    The public nuisance is substantial and unreasonable. Defendants' actions caused and continue to cause the public health epidemic described above in Plaintiffs' communities, and that harm outweighs any offsetting benefit.

439.    Defendants knew and should have known that their promotion and distribution of opioids was false and misleading and that their deceptive marketing scheme would create or assist in the creation of the public nuisance—i.e., the opioid epidemic.

440.    Defendants' actions were, at the very least, a substantial factor in opioids becoming widely available and widely used. Defendants' actions were, at the very least, a substantial factor in deceiving doctors and patients about the risks and benefits of opioids for the treatment of chronic pain. Without Defendants' actions, opioid use, misuse, abuse, and addiction would not have become so widespread, and the opioid epidemic that now exists would have been averted or much less severe.

441.    The public nuisance—i.e., the opioid epidemic—created, perpetuated, and maintained by Defendants can be abated and further recurrence of such harm and inconvenience can be abated.

442.    Each Defendant is liable for public nuisance because its conduct at issue is intentional, unreasonable, and unlawful, and has created an epidemic which annoys, injures or endangers the safety, health, morals, comfort, or repose of a considerable number of people in Plaintiffs' communities. Defendants' conduct is also indecent or offensive to the senses, and constitutes an obstruction to the free use of property sufficient to constitute an interference with the Plaintiffs' residents' comfortable enjoyment of life or property.

443.    As more fully alleged in the preceding paragraphs of this Complaint, Defendants'

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

61577634.1

- 115 -

intentional and deliberately deceptive marketing strategy to expand opioid use, together with
their equally deliberate efforts to evade restrictions on opioid distribution has caused substantial
and unreasonable interference with Plaintiffs and their residents' public rights, including, but not
limited to, the public's right to health, safety, welfare, peace, comfort, convenience, and ability
to be free from disturbance and reasonable apprehension of danger to person or property.

444. Specifically, Manufacturer Defendants intentionally, unlawfully, and
unreasonably interfered with Plaintiffs and their residents' public rights by, *inter alia*, engaging
in a promotion and marketing scheme that pushed the use of opioids for indications not federally
approved, and by circulating false and misleading information concerning their risks, benefits,
and superiority, and/or downplaying or omitting the risk of addiction arising from their use. In so
doing, Manufacturer Defendants failed to comply with federal law.

445. Defendants have also unlawfully and intentionally distributed opioids or caused
opioids to be distributed within and without Plaintiffs' communities absent effective controls
against diversion. Such conduct was illegal, and proscribed by statute and regulation.
Defendants' failures to maintain effective controls against diversion include Defendants' failure
to effectively monitor for suspicious orders, report suspicious orders, and/or stop shipment of
suspicious orders.

446. Defendant's unreasonable interference with Plaintiffs' residents' public rights
include, but are not limited to, the effects of addiction, abuse, elevated crime, deaths, and
increased expenditures to combat and address these harms. Plaintiffs have also made payments
for opioid addiction treatment. These damages have been suffered and continue to be suffered
directly by Plaintiffs and their residents.

447. Defendants' actions have also created a palpable climate of fear, distress,
dysfunction and chaos among Plaintiffs' residents where opioid diversion, abuse, and addiction
are prevalent and where diverted opioids are used frequently. Specifically, Defendants conduct
has caused, among other things, (a) routine separation of children from their parents who have
fallen victim to easy access to opioids and/or related crime; (b) children to have easy access and
to become addicted to opioids; (c) residents to endure both the emotional and financial costs of

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

61577634.1                                   - 116 -

FIRST AMENDED COMPLAINT

caring for loved ones addicted to or injured by opioids; (d) increased crime and/or destruction of public spaces and property; (e) property crimes throughout Plaintiffs' communities; (f) employers to lose the value of productive and healthy employees; (g) increased public health and safety costs; (h) a decrease in property values within Plaintiffs' communities; and (g) a decrease in tax revenues for Plaintiffs' communities.

448.   The impact of Defendants' conduct on Plaintiffs and their residents is of a continuing nature. Defendants' conduct will undoubtedly continue to cause long-lasting effects on their public rights.

449.   Defendants knew or should have known that their actions would lead to the national opioid epidemic and to the resulting injuries to the public rights of Plaintiffs' residents.

450.   Plaintiffs have sustained a special and peculiar injury because its damages include, *inter alia*, health service expenditures, public safety expenditures, payment of opioid addiction treatment, decreased tax revenues and property values, and other costs related to opioid addiction treatment and overdose prevention.

451.   The externalized risks associated with Defendants' nuisance-creating conduct as described herein greatly exceed the internalized benefits.

452.   Defendants' actions are a direct and proximate contributing cause of the opioid epidemic and the injuries to the public rights of Plaintiffs and their residents.

453.   Defendants, individually and collectively, are at the very least, a substantial factor in causing the national opioid epidemic and of the injuries to Plaintiffs and their residents.

454.   The injuries to the public rights of Plaintiffs and their residents are indivisible injuries.

455.   Defendants' manufacture, marketing, distribution, and sale of prescription opioids, if unabated, will continue to cause an unreasonable interference with public rights of Plaintiffs and their residents.

456.   Defendants' conduct is ongoing and persistent, and Plaintiffs seek all damages flowing from Defendants' conduct. Plaintiffs seek economic losses (direct, incidental, and/or consequential pecuniary losses) resulting from Defendants' illegal and wrongful conduct

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

FIRST AMENDED COMPLAINT

Exhibit C

1  described above. Plaintiffs do not seek damages for the wrongful death, physical personal injury,

2  or emotional distress caused by Defendants' actions.

3      457.   Pursuant to Code of Civil Procedure § 731, Plaintiffs request an order providing

4  for abatement of the public nuisance that Defendants created or assisted in the creation of, and

5  enjoining Defendants from future violations of Civil Code §§ 3479 and 3480.

6  **SECOND CAUSE OF ACTION**

**(Fraud –Against All Defendants)**

7

8      458.   Plaintiffs reallege and incorporate herein by reference each and every allegation

9  in paragraphs 1 through 457 above as if set forth fully herein.

10      459.   The Defendants made fraudulent misrepresentations and omissions of material

11  fact. Defendants' knowing deceptions during the relevant period, more fully described in this

12  Complaint, were intended to induce reliance.

13      460.   Those misrepresentations and omissions were known to be untrue by the

14  Defendants, or were recklessly made.

15      461.   As alleged herein, the Manufacturer Defendants engaged in false representations

16  and concealments of material fact regarding the use of opioids to treat chronic non-cancer pain,

17  the dangers of abuse, and the risks of addiction.

18      462.   As alleged herein, Defendants made false statements and/or omissions regarding

19  their compliance with state law regarding their duties to prevent diversion, their duties to

20  monitor, report and halt suspicious orders, and/or concealed their noncompliance with these

21  requirements. Defendants also failed to disclose the prevalence of diversion of controlled

22  substances, including opioids, within Plaintiffs' communities.

23      463.   Defendants made those misrepresentations and omissions in an intentional effort

24  to deceive Plaintiffs and their residents, despite the Defendants' knowledge of the dangers of

25  such use of prescription opioids.

26      464.   In addition and independently, Defendants had a duty not to deceive Plaintiffs

27  because Defendants had in their possession unique material knowledge that was unknown, and

28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

61577634.1

- 118 -

1  not knowable, to Plaintiffs, Plaintiffs' agents, physicians, and the public.

2      465.   The Defendants continued making those misrepresentations, and failed to correct

3  those material omissions, despite repeated regulatory settlements and publications demonstrating

4  the false and misleading nature of the Defendants' omissions and/or claims.

5      466.   While Defendants had a duty to disclose the above-referenced material facts, they

6  nevertheless concealed them. These false representations and concealed facts were material to

7  the conduct and actions at issue. Defendants made these false representations and concealed facts

8  with knowledge of the falsity of their representations and did so with the intent of misleading

9  Plaintiffs, their residents, the public, and persons on whom these entities relied.

10     467.   Defendants intended and had reason to expect under the operative circumstances

11  that Plaintiffs, Plaintiffs' agents, physicians, the public, and persons on whom Plaintiffs and its

12  agents relied would be deceived by Defendants' statements, concealments, and conduct as

13  alleged herein and that these entities would act or fail to act in reasonable reliance thereon.

14     468.   Plaintiffs, their residents, and others, did in fact rightfully, reasonably, and

15  justifiably rely on Defendants' representations and/or concealments, both directly and indirectly.

16     469.   For instance, doctors, including those serving Plaintiffs and their residents, relied

17  on the Defendants' misrepresentations and omissions in prescribing opioids for chronic pain

18  relief. Patients, including Plaintiffs' residents, relied on the Defendants' misrepresentations and

19  omissions in taking prescription opioids for chronic pain relief.

20     470.   Also, as a result of these representations and/or omissions, Plaintiffs proceeded

21  under the misapprehension that the opioid crisis was simply a result of conduct by persons other

22  than Defendants. As a consequence, these Defendants prevented Plaintiffs from a more timely

23  and effective response to the opioid crisis.

24     471.   Defendants' misconduct alleged in this case is ongoing and persistent.

25     472.   Plaintiffs have experienced an unprecedented opioid addiction and overdose

26  epidemic leading to increased costs for, *inter alia*, emergency services, treatment services,

27  security services, and lost productivity to Plaintiffs' workforce.

28     473.   The injuries alleged by Plaintiffs herein were sustained as a direct and proximate

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

61577634.1                          - 119 -

result of Defendants' fraudulent conduct.

474.    As a direct and foreseeable consequence of Defendants' fraud, Plaintiffs have incurred and continues to incur damages in an amount to be proved at trial consisting of costs for opioid addiction treatment and its secondary consequences in excess of those Plaintiffs would have otherwise incurred.

475.    As alleged herein, Defendants' fraud was willful, malicious, oppressive, and fraudulent, entitling Plaintiffs to punitive damages.

## THIRD CAUSE OF ACTION
### (Negligence –Against All Defendants)

476.    Plaintiffs reallege and incorporate herein by reference each and every allegation in paragraphs 1 through 475 above as if set forth fully herein.

477.    To establish actionable negligence in California, Plaintiffs must show a duty, a breach of that duty, and injury resulting proximately therefrom.

478.    Defendants have a duty to exercise reasonable care under the circumstances, in light of the risks. This includes a duty not to cause foreseeable harm to others. In addition, these Defendants, having engaged in conduct that created an unreasonable risk of harm to others, had, and still have, a duty to exercise reasonable care to prevent the threatened harm.

479.    In addition, Defendants had a duty not to breach the standard of care established under California law, including 16 CCR § 1782 and California Business and Professions Code §§ 4164 and 4169.1, which require Defendants to report suspicious orders of dangerous drugs subject to abuse, and to develop and maintain systems to detect and report such activity.

480.    Defendants voluntarily undertook a legal duty to prevent the diversion of prescription opioids by engaging in the distribution of prescription opioids and by making public promises to prevent the diversion of prescription opioids.

481.    Defendants knew of the serious problem posed by prescription opioid diversion and were under a legal obligation to take reasonable steps to prevent diversion.

482.    Defendants knew of the highly addictive nature of prescription opioids and of the

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

61577634.1

- 120 -

FIRST AMENDED COMPLAINT

136                                                    Exhibit C

1  high likelihood of foreseeable harm to patients and communities, including Plaintiffs'

2  communities, from prescription opioid diversion.

3      483.   Defendants had a legal duty to exercise reasonable and ordinary care and skill and

4  in accordance with applicable standards of conduct in advertising, marketing, selling, and

5  distributing opioid products in a safe manner to minimize the risk of addiction in patients and

6  resultant harm to those patients, their families and their communities, and to taxpayers and

7  municipal government such as Plaintiffs, which must incur enormous expenditures for

8  prevention, treatment, emergency response and law enforcement costs and other foreseeable

9  costs related to the need to address the consequences of a large number of residents that become

10  addicted to opioids as a result of Defendants' conduct.

11      484.   As described throughout the Complaint, Defendants breached their duties to

12  exercise due care in the business of wholesale distribution of dangerous opioids by failing to

13  monitor for, failing to report, and filling highly suspicious orders time and again.

14      485.   As described throughout the Complaint, in language expressly incorporated

15  herein, Defendants misrepresented their compliance with their duties under the law and

16  concealed their noncompliance and shipments of suspicious orders of opioids to Plaintiffs'

17  communities and destinations from which they knew opioids were likely to be diverted into

18  Plaintiffs' communities, in addition to other misrepresentations alleged and incorporated herein.

19      486.   The Manufacturer Defendants breached their duty to Plaintiffs by deceptively

20  marketing opioids, including minimizing the risks of addiction and overdose and exaggerating

21  the purported benefits of long-term use of opioids for the treatment of chronic pain.

22      487.   Manufacturer Defendants knew or should have known, that their affirmative

23  misconduct in engaging in an aggressive, widespread, and misleading campaign in marketing

24  narcotic drugs created an unreasonable risk of harm. The Defendants' sales data, reports from

25  sales representatives, and internal documents, should have put them on notice that such harm

26  was not only foreseeable, but was actually occurring. Defendants nevertheless chose to

27  deceptively withhold or downplay information about the dangers of opioids from Plaintiffs,

28  physicians, patients, and the public.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

61577634.1

- 121 -

488.    Defendants' breaches were intentional and/or unlawful, and Defendants' conduct was willful, wanton, malicious, reckless, oppressive, and/or fraudulent.

489.    Defendants' misconduct alleged in this case is ongoing and persistent.

490.    Defendants acted with actual malice in repeatedly breaching their duties—i.e., they acted with a conscious disregard for the rights and safety of other persons, and said actions had a great probability of causing substantial harm.

491.    As is described throughout this Complaint, Defendants acted without even slight diligence or scant care, and with indifference, and were negligent in a very high degree, disregarding the rights and safety of other persons, and said actions have a great probability of causing substantial harm.

492.    Defendants' misconduct further meets the criteria set forth in *Rowland v. Christian* (1968) 69 Cal.2d 108, 113, for imposing on Defendants a duty to exercise ordinary care and skill in the in advertising, marketing, selling and distributing opioid products in a safe manner to minimize the risk of addiction in patients and resultant harm to those patients, their families and their communities, and to taxpayers and municipal government such as Plaintiffs, including, but not limited to, the following:

a.    Foreseeability of harm to Plaintiffs: Defendants were aware or reasonably should have been aware of the risk of addiction of a large number of patients in places such as Plaintiffs, and need for their care and treatment and in handling other consequences of their addiction and that such costs would be borne by local governments such as Plaintiffs;

b.    Degree of certainty Plaintiffs suffered harm: Plaintiffs have suffered enormous harm and costs in addressing treatment of addicted patients, including but not limited to expenditures for prevention, treatment, emergency response and law enforcement costs and other foreseeable costs related to the need to address the consequences of a large number of residents that become addicted to opioids as a result of Defendants' conduct;

c.    Closeness of connection between Plaintiffs' harm: The explosion of

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

61577634.1

- 122 -

opioid addiction and the presence of opioid addicted patients in Plaintiffs' communities as a result of Defendants' conduct has resulted in expenditures directly for prevention, treatment, emergency response and law enforcement costs and other foreseeable costs related to the need to address the consequences;

d.      Moral blame attached to Defendants' conduct: Defendants' knew or should have known that their wrongful conduct, actions and omissions would result in an explosion of patients who would become addicted to opioids, and that a vast opioid epidemic would result from the prescription of opioids to tens of millions of patients nationwide, including within Plaintiffs' communities, and that the costs would be borne by the state, county and municipal local governments, while Defendants profited tens of billions of dollars collectively from the widespread use of prescription opioid products;

e.      Policy of preventing future harm: As a direct and foreseeable result of Defendants' wrongful conduct, the opioid epidemic and crisis has and continues to occur on a vast scale both nationally and locally in places such as Plaintiffs resulting in tremendous harm and cost to the patients, their families and the communities in dealing with this epidemic and crisis, and there is a need to ensure that the costs of such wrongful conduct is borne by Defendants so that parties contemplating such or similar conduct in the future know they will be held responsible for such harm;

f.      Extent of burden to Defendants: There is no burden to Defendants in that state and other law precludes them from engaging in the conduct alleged herein, and there is no burden from precluding Defendants from profiting from their wrongful conduct and operating within the confines of the law in advertising, marketing, selling and distributing opioid products in a safe manner to minimize the risk of addiction in patients and resultant harm to those patients, their families and their communities, and to taxpayers and municipal government such as Plaintiffs; and

g.      Consequences to the community of imposing a duty to exercise care with resulting liability for breach: Imposing a duty to not engage in Defendants' wrongful conduct of advertising, marketing, selling and distributing opioid products in an unsafe

61577634.1

- 123 -

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

manner would minimize the risk of addiction in patients, and liability for a breach of this duty would benefit communities such as Plaintiffs' in that they would not have to incur the foreseeable costs of the opioid epidemic gripping the country and the nation.

493.    Plaintiffs are not asserting a cause of action under the CSA or other federal controlled substances laws cited above.

494.    As a direct and proximate result of Defendants' negligence, Plaintiffs have suffered and will continue to suffer economic damages including, but not limited to, significant expenses for security services, emergency, health, prosecution, corrections, and rehabilitation services, as well as the cost of opioid addiction treatment paid by Plaintiffs.

495.    As a direct and proximate result of Defendants' negligence, Plaintiffs have suffered and will continue to suffer stigma damage, non-physical property damage, and damage to its proprietary interests.

496.    Defendants' breaches of their duty of care foreseeably and proximately caused damage to Plaintiffs and their residents.

497.    Manufacturer Defendants are guilty of negligence per se in that the Defendants violated applicable California laws, statutes, and regulations, in the manner in which they advertised, marketed, sold and distributed opioid products.

498.    Distributor Defendants are guilty of negligence per se in that the Defendants violated California laws, statutes, and regulations designed to protect Plaintiffs from the harms they have suffered including but not limited to the following:

a.    Defendants falsely advertised opioids in violation of the Sherman Food, Drug, and Cosmetic Laws, California Health & Safety Code § 110390;

b.    Defendants manufactured, sold, delivered, held, or offered for sale opioids that had been falsely advertised in violation of the Sherman Food, Drug, and Cosmetic Laws, California Health & Safety Code § 110395;

c.    Defendants received in commerce opioids that were falsely advertised or delivered or proffered for delivery opioids that were falsely advertised in violation of the Sherman Food, Drug, and Cosmetic Laws, California Health & Safety Code § 110400;

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

61577634.1

- 124 -

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

d.      Defendants failed to report all sales of dangerous drugs subject to abuse in excess of the amounts set by the California State Board of Pharmacy in violation of 16 C.C.R. §1782;

e.      Defendants failed to track and report all purchases that exceeded prior purchases by long-term care facilities or similar customers by a factor of 20 percent in violation of California Business & Professions Code § 4164; and

f.      Defendants failed to report all suspicious orders placed by California pharmacies or wholesalers after January 1, 2018 as required by California Business & Professions Code § 4169.1.

499.    As a direct and proximate consequence of Defendants' negligent acts, omissions, misrepresentations and otherwise culpable acts, there is now a national opioid addiction epidemic, including in Plaintiffs' communities. Plaintiffs, as a further direct and proximate consequence and result thereof, sustained injuries and damages, including, but not limited, to tax dollars spent and costs for treatment of opioid addicted patients, emergency response costs, law and regulatory enforcement costs, and measures for prevention of further opioid abuse and addiction.

500.    As alleged herein, Defendants' negligence was willful, malicious, oppressive, and fraudulent, entitling Plaintiffs to punitive damages.

## FOURTH CAUSE OF ACTION
### (Unjust Enrichment –Against All Defendants)

501.    Plaintiffs reallege and incorporate herein by reference each and every allegation in paragraphs 1 through 500 above as if set forth fully herein.

502.    As an expected and intended result of their conscious wrongdoing as set forth in this Complaint, Defendants have profited and benefited from the increase in the distribution and purchase of opioids within Plaintiffs' communities, including from opioids foreseeably and deliberately diverted within and into Plaintiffs' communities.

503.    Plaintiffs have expended substantial amounts of money in an effort to remedy or

61577634.1

- 125 -

FIRST AMENDED COMPLAINT

1 mitigate the societal harms caused by Defendants' conduct.

2     504.   These expenditures include, but are not limited to, the provision of healthcare

3 services and treatment services to people who use opioids. Plaintiffs have also made payments

4 for opioid addiction treatment.

5     505.   These expenditures have helped sustain Defendants' businesses.

6     506.   Plaintiffs have conferred a benefit upon Defendants by paying for Defendants'

7 externalities: the cost of the harms caused by Defendants' improper distribution practices.

8     507.   Defendants were aware of these obvious benefits, and their retention of the

9 benefit is unjust.

10     508.   Plaintiffs have paid for the cost of Defendants' externalities and Defendants have

11 benefited from those payments because they allowed them to continue providing customers with

12 a high volume of opioid products. Because of their deceptive marketing of prescription opioids,

13 Defendants obtained enrichment they would not otherwise have obtained. Because of their

14 conscious failure to exercise due diligence in preventing diversion, Defendants obtained

15 enrichment they would not otherwise have obtained. The enrichment was without justification

16 and Plaintiffs lack a remedy provided by law.

17     509.   Defendants' misconduct alleged in this case is ongoing and persistent.

18     510.   Defendants have unjustly retained benefits to the detriment of Plaintiffs, and

19 Defendants' retention of such benefits violates the fundamental principles of justice, equity, and

20 good conscience.

21     511.   Plaintiffs are entitled to restitution and disgorgement from Defendants in an

22 amount to be determined at trial.

23                 **FIFTH CAUSE OF ACTION**
             **(Civil Conspiracy –Against All Defendants)**

24

25     512.   Plaintiffs reallege and incorporate herein by reference each and every allegation

26 in paragraphs 1 through 511 above as if set forth fully herein.

27     513.   Defendants engaged in a civil conspiracy in their unlawful marketing of opioids

28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

61577634.1

- 126 -

1   and/or distribution of opioids into California and Plaintiffs' communities.

2       514.    Defendants engaged in a civil conspiracy to commit fraud and misrepresentation

3   in conjunction with their unlawful marketing of opioids and/or distribution of opioids into

4   California and Plaintiffs' communities.

5       515.    Defendants unlawfully failed to act to prevent diversion and failed to monitor for,

6   report, and prevent suspicious orders of opioids.

7       516.    The Manufacturing Defendants further unlawfully coordinated in furtherance of

8   the conspiracy by increasing the volume of opioid sales in the United States through creating a

9   market for non-medical use of opioids of epidemic proportions.

10      517.    Many of the Manufacturing Defendants are members, participants, and/or

11  sponsors of the Healthcare Distribution Alliance ("HDA"), and have been since at least 2006,

12  and utilized the HDA to give further assistance to the conspiracy.

13      518.    The Manufacturing Defendants hid from the general public and suppressed and/or

14  ignored warnings from third parties, whistleblowers, and governmental entities about the reality

15  of the suspicious orders that the Manufacturing Defendants were filling on a daily basis, which

16  lead to the diversion of hundreds of millions of doses of prescription opioids into the illicit

17  market.

18      519.    The Manufacturing Defendants, with knowledge and intent, agreed to the overall

19  objective of their fraudulent scheme and participated in a coordinated, common course of

20  conduct to commit acts of fraud.

21      520.    Indeed, for the Defendants' fraudulent scheme to work, each of the Defendants

22  had to agree to implement similar tactics.

23      521.    By intentionally refusing to report and halt suspicious orders of their prescription

24  opioids, Defendants engaged in a fraudulent scheme.

25      522.    Nevertheless, in order to increase sales of their opioid products in furtherance of

26  the conspiracy, the Defendants engaged in a scheme of deception by refusing to identify or

27  report suspicious orders of prescription opioids that they knew were highly addictive, subject to

28  abuse, and were actually being diverted into the market of non-medical use.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

61577634.1                          - 127 -

523.     Defendants further unlawfully marketed opioids in California and Plaintiffs' communities in furtherance of that conspiracy to increase profits and sales through the knowing and intentional dissemination of false and misleading information about the safety and efficacy of long-term opioid use through, among other things: (a) the use of "Front Groups" that appeared to be independent of the Defendants; (b) the dissemination of publications that supported the Defendants conspiracy; (c) continuing medical education ("CME") programs controlled and/or funded by the Defendants; (d) hiring and deploying so-called "key opinion leaders" or "KOLs" who were paid by the Defendants to promote their message; and (e) the "detailing" activities of the Defendants' sales forces, which directed deceptive marketing materials and pitches directly at physicians and, in particular, at physicians lacking the expertise of pain care specialists.

524.     Each of the Front Groups helped disguise the role of Defendants by purporting to be unbiased, independent patient-advocacy and professional organizations in order to disseminate patient education materials, a body of biased and unsupported scientific "literature," and "treatment guidelines" that promoted the Defendants' false messages.

525.     Each of the KOLs were physicians chosen and paid by each of the Defendants to influence prescribers' habits by promoting the Defendants' false message through, among other things, writing favorable journal articles and delivering supportive CMEs as if they were independent medical professionals, thereby further obscuring the Defendants' role in the conspiracy.

526.     Further, each of the Defendants, KOLs, and Front Groups had systematic links to and personal relationships with each other through (a) joint participation in lobbying groups, (b) trade industry organizations, (c) contractual relationships, and (d) continuing coordination of activities. Specifically, each of the Defendants coordinated their efforts through the same KOLs and Front Groups, based on their agreement and understanding that the Front Groups and KOLs were industry-friendly and would work together with the Defendants to advance the conspiracy.

527.     Defendants' conspiracy and acts in furtherance thereof are alleged in detail in this Complaint, including, without limitation, in Plaintiffs' Counts for violations of California Statutes. Such allegations are specifically incorporated herein.

FIRST AMENDED COMPLAINT

528.    Defendants acted with a common understanding or design to commit unlawful acts, as alleged herein, and acted purposely, without a reasonable or lawful excuse, which directly and proximately caused the injuries alleged herein.

529.    Defendants acted with malice, purposely, intentionally, unlawfully, and without a reasonable or lawful excuse.

530.    Defendants conduct in furtherance of the conspiracy described herein was not mere parallel conduct because each Defendant acted directly against their commercial interests in not reporting the unlawful distribution practices of their competitors to the authorities, which they had a legal duty to do. Each Defendant acted against their commercial interests in this regard due to an actual or tacit agreement between the Defendants that they would not report each other to the authorities so they could all continue engaging in their unlawful conduct.

531.    Defendants' conspiracy, and Defendants' actions and omissions in furtherance thereof, caused the direct and foreseeable losses alleged herein.

532.    Defendants' misconduct alleged in this case is ongoing and persistent.

533.    As a result of Defendants' conspiracy, Plaintiffs are entitled to compensatory damages in an amount to be proved at trial.

534.    As alleged herein, Defendants' conspiracy was willful, malicious, oppressive, and fraudulent, entitling Plaintiffs to punitive damages.

## SIXTH CAUSE OF ACTION
**(False Advertising – Cal. Bus. & Prof. Code § 17500 –Against All Defendants)**

535.    Plaintiffs reallege and incorporate herein by reference each and every allegation in paragraphs 1 through 534 above as if set forth fully herein.

536.    California Business & Professions Code § 17500 makes it unlawful for a business to make, disseminate, or cause to be made or disseminated to the public "any statement, concerning ... real or personal property ... which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

537.    As alleged herein, the Manufacturer Defendants engaged in a systematic

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

61577634.1

- 129 -

campaign designed to disseminate false or misleading statements designed to promote the belief that opioid drugs could safely be used in a non-addictive manner.

538. By way of example, Actavis's predecessor created a patient brochure for Kadian in 2007 that deceptively stated that needing to up one's dose to achieve the same treatment outcome was not a sign of addiction. Purdue sponsored publications that expressed similar sentiments.

539. Actavis's predecessor caused a patient education brochure, Managing Chronic Back Pain, to be distributed beginning in 2003 that admitted that opioid addiction is possible, but falsely claimed that it is "less likely if you have never had an addiction problem."

540. Teva and Purdue sponsored research and publications that falsely and deceptively stated opioids did not have "ceiling dose."

541. Purdue created websites, available to the public that instructed patients to seek new medical providers out if their current provider would not increase their dose.

542. Defendants' false and deceptive advertising practices resulted in increased opioid dosages being prescribed to Plaintiffs' residents, increasing the incidence of opioid addiction and overdose in Plaintiffs' communities.

543. Distributor Defendants also repeatedly omitted material information and/or falsely represented that they were effectively preventing diversion and were monitoring, reporting, and preventing suspicious orders.

544. As alleged above, Defendants' statements about the risks associated with opioid use were not supported by or were contrary to the scientific evidence.

545. As alleged above, each Defendant's conduct, separately and collectively, was likely to deceive California payors who purchased or covered the purchase of opioids.

546. Plaintiffs seek restitution and injunctive relief under California Business & Professions Code § 17535.

547. Plaintiffs also seek an order assessing a civil penalty of two thousand five hundred dollars ($2,500) against Defendants for each violation of California's False Advertising Law pursuant to California Business & Professions Code § 17536.

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

61577634.1                                    - 130 -

## SEVENTH CAUSE OF ACTION

**(Negligent Failure to Warn–Against Manufacturer Defendants)**

548.    Plaintiffs reallege and incorporate herein by reference each and every allegation in paragraphs 1 through 547 above as if set forth fully herein.

549.    At all relevant times, the Manufacturer Defendants had a duty to exercise reasonable and ordinary care and skill, as well as in accordance with applicable standards of conduct in adequately warning the medical profession about the risk of addiction from the use of opioid products, and not to overpromote and over-market opioid products in a manner so as to nullify, cancel out, and render meaningless any written warnings given about the risk of addiction from the use of opioid products.

550.    Defendants breached their duty to exercise reasonable and ordinary care by failing to adequately warn the medical profession about the risk of addiction from the use of opioid products, including by overpromoting and over-marketing opioid products in a manner so as to nullify, cancel out and render meaningless any warnings in the labels about any addiction risk. Defendants' marketing, sales and promotional efforts were designed to stimulate the use of opioid products in situations and for patients who should not have been using those drugs or should have used them only as a last resort before other means were used or other less addictive and dangerous drugs were prescribed.

551.    As a direct and proximate consequence of Defendants' negligent failure to warn, and overpromoting and over-marketing the use of prescription opioid products, there is now a national opioid addiction epidemic, including in Plaintiffs' communities. The People, as a further direct and proximate consequence and result thereof, sustained injuries and damages including but not limited to tax dollars spent and costs for treatment of opioid addicted patients, emergency response costs, law and regulatory enforcement costs, opioid disposal programs, and measures for prevention of further opioid abuse and addiction.

552.    As alleged herein, Defendants' negligence was willful, malicious, oppressive, and fraudulent, entitling Plaintiffs to punitive damages.

FIRST AMENDED COMPLAINT

**Exhibit C**

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request judgment in their favor granting the following relief:

a) Entering Judgment in favor of Plaintiffs in a final order against each of the Defendants;

b) An award of actual and consequential damages in an amount to be determined at trial;

c) An order obligating Defendants to disgorge all revenues and profits derived from their scheme;

d) An order declaring that Defendants have made, disseminated as part of a plan or scheme, or aided and abetted the dissemination of false and misleading statements in violation of the False Advertising Law;

e) Enjoin Defendants from performing or proposing to perform any further false or misleading statements in violation of the False Advertising Law. Any injunctive relief Plaintiffs obtain against Purdue in this action shall not be duplicative of any injunctive terms that remain in place from the Final Judgment;

f) An order requiring Defendants to pay civil penalties for each act of false and misleading advertising, pursuant to California Business & Professions Code §§ 17500 and 17536;

g) An order requiring Defendants to pay restitution pursuant to California Business & Professions Code § 17535;

h) An order requiring Defendants to pay treble the amount of all relief awarded by the Court, pursuant to California Civil Code § 3345;

i) An order declaring that Defendants have created a public nuisance in violation of California Civil Code §§ 3479 and 3480;

j) An order enjoining Defendants from performing any further acts in violation of California Civil Code §§ 3479 and 3480;

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

61577634.1

- 132 -

FIRST AMENDED COMPLAINT

Exhibit C

k)  An order requiring Defendants to abate the public nuisance that they created in violation of California Civil Code §§ 3479 and 3480.

l)  An order requiring that Defendants compensate Plaintiffs for past and future costs to abate the ongoing public nuisance caused by the opioid epidemic;

m)  An order requiring Defendants to fund an "abatement fund" for the purposes of abating the public nuisance;

n)  An order awarding the damages caused by the opioid epidemic, including, *inter alia*, (a) costs for providing medical care, additional therapeutic and prescription drug purchases, and other treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths; (b) costs for providing treatment, counseling, and rehabilitation services; (c) costs for providing treatment of infants born with opioid-related medical conditions; (d) costs for providing care for children whose parents suffer from opioid-related disability or incapacitation; (e) costs associated with public safety and security services relating to the opioid epidemic; (f) costs for cleanup of public areas;

o)  An award of punitive damages;

p)  Injunctive relief prohibiting Defendants from continuing their wrongful conduct;

q)  As award of Plaintiffs' costs, including reasonable attorneys' fees, pursuant to California Code of Civil Procedure § 1021.5;

r)  Pre- and post-judgment interest as allowed by law; and

s)  Any other relief deemed just, proper, and/or equitable.

**PLAINTIFFS DEMAND A JURY TRIAL ON ALL CLAIMS SO TRIABLE.**

Dated: October 4, 2019

**ROBINS KAPLAN LLP**

By:
Roman M. Silberfeld
Bernice Conn
Michael A. Geibelson
Lucas A. Messenger

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

61577634.1

- 133 -

FIRST AMENDED COMPLAINT

**149**

**Exhibit C**

**Office of County Counsel for Alameda County**
Donna Ziegler, Bar No. (142415)
donna.ziegler@acgov.org
1221 Oak Street # 450
Oakland, CA 94612
Telephone:    510 272 6700
Facsimile:    510 272 5020

**Office of the City Attorney for Costa Mesa**
Kimberly Hall Barlow, Bar No. (149902)
kimberly.barlow@costamesaca.gov
3777 North Harbor Blvd.
Fullerton, CA 92835
Telephone:    714 446 1400
Facsimile:    714 446 1448

**Office of the City Attorney for Anaheim**
Robert Fabela (SBN 148098)
RFabela@anaheim.net
200 S. Anaheim Blvd., Suite 356
Anaheim, CA 92805
Telephone:    714 765 5169
Facsimile:    714 765 5123

**Office of the City Attorney for Santa Ana**
Sonia R. Carvalho, Bar No. (162700)
Sonia.Carvalho@bbklaw.com
John Funk, Bar No. (204605)
jfunk@santa-ana.org
18101 Von Karman Ave, Suite 1000
Irvine, CA  92612
Telephone:    949 263 2603
Facsimile:    949 260 0972

**Office of the City Attorney for San Clemente**
Scott C. Smith, Bar No. (120736)
scott.smith@bbklaw.com
18101 Von Karman Ave, Suite 1000
Irvine, CA  92612
Telephone:    949 263 6561
Facsimile:    949 260 0972

**Office of the City Attorney for Encinitas**
Leslie Devaney, Bar No. (154163)
ldevaney@dpmclaw.com
Devaney Pate Morris & Cameron, LLP
402 W Broadway, Ste 1300
San Diego, CA 92101-8508
Phone Number: (619) 354-5030
Fax Number: (619) 354-5035

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

61577634.1

- 134 -

FIRST AMENDED COMPLAINT

Exhibit C

1  **Office of the City Attorney for La Habra**
Richard D. Jones, Bar No. (61649)

2  rdj@jones-mayer.com
3777 North Harbor Blvd.

3  Fullerton, CA 92835
Telephone:    714 446 1400

4  Facsimile:    714 446 1448

5  **Office of the City Attorney for La Mesa**
Glenn Sabine, Bar No. (154163)

6  gsabine@cityoflamesa.us
Sabine and Morrison

7  110 Juniper St
San Diego, CA 92101

8  Phone Number: (619) 234-2864
Fax Number: (619) 656-0633

9  **Office of the City Attorney for Oxnard**

10  Stephen Fischer, Bar No. (174221)
305 W 3rd St., Ste 100E

11  Oxnard, CA 93030
stephen.fischer@oxnard.org

12  Phone Number: (805) 385-7483
Fax Number: (805) 385-7423

13  **Office of the City Attorney for Placentia**

14  Christian Bettenhausen, Bar No. (200961)
clb@jones-mayer.com

15  3777 North Harbor Blvd.
Fullerton, CA 92835

16  Telephone:    714 446 1400
Facsimile:    714 446 1448

17

18

19

20

21

22

23

24

25

26

27

28

ROBINS KAPLAN LLP
ATTORNEYS AT LAW
MINNEAPOLIS

61577634.1

- 135 -

FIRST AMENDED COMPLAINT

**151**

**Exhibit C**